**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benjamin Bernal Cota, | No. CV-16-03356-PHX-DJH |
| Petitioner, | **ORDER** |
| v. | <u>DEATH PENALTY CASE</u> |
| Ryan Thornell, et al.,[1] | |
| Respondents. | |

Petitioner Benjamin Bernal Cota is an Arizona death row inmate seeking habeas relief pursuant to 28 U.S.C. § 2254. Before the Court are his habeas petition and his notice of request for evidentiary development. (Docs. 25, 47.) Respondents filed an answer to the petition and a response in opposition to the request for evidentiary development. (Docs. 35, 56.) The petition and the request for evidentiary development are denied for the reasons set forth below.

## I.    BACKGROUND

In 2009, a jury found Cota guilty of two counts of first-degree murder, two counts of armed robbery, one count of possession of narcotics, and one count of unlawful flight. He was sentenced to death on one of the murder counts and to prison terms for the other counts. The Arizona Supreme Court, in affirming the convictions and sentences, described the facts surrounding the crimes. *State v. Cota*, 272 P.3d 1027, 1032–33 (Ariz. 2012). These

---

[1] Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Ryan Thornell, the Director of the Arizona Department of Corrections, Rehabilitation and Reentry, is substituted for the former Director, David Shinn.

facts are "presumed correct." *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C. § 2254(e)(1)).

Victor Martinez and his wife, Guadalupe Zavala, lived in Peoria. In late 2003, they hired Cota to assist with home repair projects. Martinez and Zavala had jobs outside their home and spoke daily with friends and family. On December 30, 2003, both disappeared.

Martinez was last seen that afternoon. He told his son that he was going to take a nap and then drive Cota home before going to work at 6:00 p.m. Martinez never arrived at work. Zavala worked until 8:00 p.m. that night but was never heard from thereafter. Concerned friends, co-workers, and family members called and went by the couple's home repeatedly in the following days. Cota sometimes answered the telephone and gave inconsistent accounts about the couple's whereabouts. He also began driving the couple's pickup truck and gave their car to his son. He sold the couple's water heater and tried to sell jewelry he claimed the couple had given him.

On January 3, 2004, Cota pawned two of Zavala's bracelets. He withdrew money from the couple's bank accounts on January 5 and 6. He invited friends to stay with him at the victims' home, but told them not to enter the master bedroom or answer the phone. After Cota allowed them to enter the master bedroom, one friend saw a large pile of clothes in the closet.

On January 6, family members went to the home and noticed items missing outside, including the water heater. They called the police and gained entrance into the home. They found the bodies of Martinez and Zavala wrapped in plastic in the master bedroom closet beneath a pile of clothes.

Police found Cota at his mother's home, where the victims' pickup truck was parked. During an ensuing chase, Cota tossed items out of the truck, including drugs and his wallet. Police apprehended him after he crashed the truck and fled on foot. His wallet contained Zavala's date of birth and Social Security number, and pawn tickets dated January 3. Police searched Cota's mother's home and found his shoes. DNA testing of blood on the shoes showed contributions from Cota, Martinez, and Zavala.

A medical examiner and a forensic anthropologist determined that Martinez was bludgeoned to death in his bed. He was struck with a heavy object, at least four and as many as eight or more times, shattering his skull and caving in the side of his head. He had no defensive wounds. Martinez died as a result of blunt force head injuries.

Zavala's arms and legs had been bound, and her mouth, nose, and eyes covered with duct tape. She was struck in the head at least ten times by a heavy object with a blade or sharp object that also caused stab wounds penetrating her lung, diaphragm, and ear. There were defensive wounds on her hands. Zavala died of stab wounds, blunt force injuries, and possible suffocation.

Cota was charged in one indictment with two counts of first-degree murder and two counts of armed robbery, and in a second indictment with possession of narcotics and unlawful flight. The indictments were joined for trial, and a jury found Cota guilty on all counts.

In the aggravation phase of the murder cases, the jury found that Cota had been convicted of a serious offense committed on the same occasion, A.R.S. § 13-751(F)(2), that he committed the crime while on authorized release, § 13-751(F)(7), and that Martinez was over the age of seventy, § 13-751(F)(9).[2]

In the penalty phase, the jury returned a death sentence for the murder of Zavala, but was unable to reach a verdict as to the murder of Martinez. The trial court sentenced Cota to natural life on that count and to prison terms for the non-homicide counts, all but one consecutive to the others.

After the Arizona Supreme Court affirmed the convictions and sentences on direct appeal, Cota unsuccessfully pursued post-conviction relief ("PCR") in state court. He then sought habeas relief in this Court, filing a petition for writ of habeas corpus on September 6, 2017.[3] (Doc. 25.)

---

[2] The subsections of A.R.S. § 13-751 have since been renumbered. The Court refers to the statute in effect at the time of the state court decision.

[3] Cota subsequently filed a Notice of Errata with a corrected table of contents. (Doc. 26.) The Court addresses the claims as they are numbered in that document.

## II.     APPLICABLE LAW

Cota's habeas petition is governed by the terms of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[4] The following legal framework guides the Court's analysis of Cota's claims.

### A.     Exhaustion & Procedural Default

A writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

In Arizona there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings. It provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify the claim's omission from a prior petition. *See* Ariz. R. Crim. P. 32.1(b)–(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at

---

[4] Cota's challenge to the constitutionality of the AEDPA (Doc. 25 at 27–30) is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that the AEDPA violates neither the Suspension Clause nor the separation of powers doctrine).

735 n.1. If no remedies are currently available, the claim is "technically" exhausted but procedurally defaulted. *Id.*; *see also Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

**B.   AEDPA**

Under the AEDPA a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's ruling (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly-established federal law under § 2254(d)(1) if the decision applies a rule that contradicts the governing law set forth in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a Supreme Court decision but reaches a different result. *Williams (Terry) v. Taylor*, 529 U.S. 362, 405–06 (2000); *see, e.g.*, *Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021). The "unreasonable application" prong of § 2254(d)(1) describes a state court ruling that "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407; *see, e.g.*, *Murray (Robert) v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* For a state court's decision to be an unreasonable application of clearly-established federal law, "the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)); *see Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020); *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021). The burden is on the petitioner to show "there was no reasonable basis

for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). He "must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). This standard is meant to be "difficult to meet." *Kayer*, 141 S. Ct. at 523 (quoting *Richter*, 562 U.S. at 102).

Under § 2254(d)(2), habeas relief is available if the state court decision was based on an unreasonable determination of the facts. *See Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340. A "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that § 2254(d)(2) requires federal courts to "accord the state trial court substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1196 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 791 (2022); *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.") (quoting *Brumfield*, 576 U.S. at 314).

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "the record under review is limited to the record in existence at that same time, i.e. the record before the state court"); *see Murray (Robert)*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has

observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7). Therefore:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Gulbrandson.* 738 F.3d at 993–94.

## C.   *Martinez & Ramirez*

For claims not adjudicated on the merits in state court, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

While *Coleman* held that ineffective assistance of counsel in PCR proceedings cannot establish cause for a claim's procedural default, *id.*, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court created a "narrow exception" to that rule. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17.

Accordingly, under *Martinez* an Arizona habeas petitioner may establish cause and prejudice for the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (citing *Martinez*, 566 U.S. at 14); *see Atwood*, 870 F.3d at 1059–60.

To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR counsel was ineffective according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015). *Strickland* requires a demonstration "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citation omitted).

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez* the Supreme Court defined a "substantial" claim as a claim that "has some merit." 566 U.S. at 14. The Court stated that the standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El I*, 537 U.S. at 336).

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez*); *see Davila v. Davis*, 582 U.S. 521, 525 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

Finally, as discussed below, the Supreme Court recently limited the evidence that could be presented to support an argument that PCR counsel performed ineffectively for purposes of cause and prejudice under *Martinez*. In *Shinn v. Ramirez*, 142 S. Ct. 1718, 1733 (2022), the Court held that for claims that were not adjudicated on the merits in state court, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence," unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met.

## III. DISCUSSION

Cota's petition raises 54 claims, some of which were never raised in state court. The Court will first consider these unexhausted claims, and then turn to a merits review of the claims that were adjudicated in state court.

### A. Unexhausted Claims

Cota did not raise Claim 5 or Claims 23–29 in state court.[5] For these claims, Cota argues that the Court's review is *de novo*—that is, without AEDPA deference. (*See, e.g.*, Doc. 25 at 84.) For this proposition Cota cites *Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014). (*Id.*) In *Dickens* the Ninth Circuit held that where a claim of ineffective assistance of trial counsel is excused under *Martinez* by the ineffective assistance of PCR counsel, the underlying claim of trial counsel ineffectiveness is reviewed *de novo*. 740 F.3d at 1321. The claims at issue here do not allege ineffective assistance of trial counsel, so they are not subject to analysis under *Martinez*. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

In his reply brief, Cota also suggests that the ineffective assistance of appellate counsel excuses the default of these claims. (*See, e.g.*, Doc. 41 at 86.) Ineffective assistance of appellate counsel may be used as cause to excuse procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);

---

[5] Cota has withdrawn Claim 25, which, under *Stone v. Powell*, 428 U.S. 465 (1975), was not cognizable on habeas review. (Doc. 41 at 87.)

*Murray v. Carrier*, 477 U.S. 478, 489–90 (1986). Cota did not raise such claims of ineffective assistance of appellate counsel.

Under the Arizona Rules of Criminal Procedure, Cota is precluded from relief on these claims because they could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). Thus, Claims 5 and 23, 24, 26, 27, 28, and 29 are technically exhausted but procedurally defaulted. They are barred from federal review and will be denied.

The claims are also meritless. Claims 5, 24, 26, and 27 allege that Cota's rights were violated by the trial court's erroneous admission of evidence at trial.[6] "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998).The Supreme Court has explained that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). "Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice" has the Court "imposed a constraint tied to the Due Process Clause." *Id.* (internal quotation marks and citations omitted).

The Supreme Court has "'defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Estelle v. McGuire*, 502 U.S. 62, 72–73 (1991) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). A habeas petitioner "bears

---

[6] Claim 5 alleges that police mishandling of the crime scene allowed unreliable physical evidence to be admitted at trial. (Doc. 25 at 84.) Claim 24 alleges that admission of the video of Cota's interrogation resulted in a denial of a fair trial, violated due process, and rendered Cota's death sentence unreliable. (*Id.* at 185.) Claim 26 alleges that the trial court violated Cota's due process rights by admitting irrelevant, prejudicial, and inflammatory testimony about his previous incarceration and prior bad acts. (*Id.* at 189.) Finally, Claim 27 alleges that admission of unduly prejudicial photographs of Cota's swollen and injured hands violated his right to a fair trial and due process and rendered his death sentence unreliable. (*Id.* at 192.)

a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

The Ninth Circuit has explained, "Evidence introduced by the prosecution will often raise more than one inference, some permissible and some not," so, it is up to the jury "to sort them out in the light of the trial court's instructions." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial." *Id.* (internal quotation marks and citation omitted); *see Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) ("A writ of habeas corpus will be granted for an erroneous admission of evidence only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'") (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

Permissible inferences could be drawn from the evidence at issue in these claims, which included autopsy photos, the video of Cota's interrogation, and crime-scene evidence, and the evidence was not so unreliable that its admission violated Cota's due process rights such that he is entitled to habeas relief. *See, e.g.*, *Boyde*, 404 F.3d at 1172–73 (permissible inferences could be drawn from admission of prior robbery); *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001), *overruled on other grounds by* 538 U.S. 202 (2003); *cf. Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."); *see also Kipp v. Davis*, 971 F.3d 939, 952 n.8 (9th Cir. 2020) (same) (citing *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006)).

Claims 5, 24, 26, and 27 are denied as procedurally defaulted, meritless, and barred from federal review.

In Claim 28, Cota alleges that his rights were violated because the jury was not instructed to consider "mercy itself as a mitigating circumstance." (Doc. 25 at 194.) This claim lacks merit.

"The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990). In Cota's case, the trial court instructed the jury that mitigating circumstances "are factors that in fairness or mercy may reduce or extenuate the defendant's moral culpability or blameworthiness and the punishment to be imposed." (RT 8/11/09 at 78.) This, taken in the context of the other instructions offered by the court, satisfied the *Blystone* standard. *See e.g., Bolin v. Chappell*, No. 199CV05279LJOSAB, 2016 WL 3213551, at *161 (E.D. Cal. June 9, 2016), *aff'd sub nom. Bolin v. Davis*, 13 F.4th 797 (9th Cir. 2021); *see also  Barber v. Dunn*, No. 5:16-CV-00473-RDP, 2019 WL 1098486, at *30 (N.D. Ala. Mar. 8, 2019) ("[None of the cases Barber cites . . . hold that a death sentence must be set aside as unconstitutional if the trial judge does not explicitly instruct the sentencing jury that it may consider mercy in determining the appropriate sentence."), *aff'd sub nom. Barber v. Comm'r, Alabama Dep't of Corr.*, 861 F. App'x 328 (11th Cir. 2021).

In Claim 29, Cota alleges that due process requires the Court to reevaluate his death sentence "in light of the significant changes to Cota's person and circumstance in the eight years since he was sentenced"—namely, his demonstration that he does not pose a risk of future danger. (Doc. 25 at 196.) He argues that the claim "was not ripe for review until now." (*Id.*) This claim is meritless.

As Respondents note, habeas relief may be granted only on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The fact that Cota "has proven to be non-violent in prison and has been a model of good behavior" (Doc. 41 at 93) has no bearing on the constitutionality of his death sentence, which was based on the three aggravating factors proved at sentencing, and not on an allegation of future dangerousness. Cota cites no authority for the proposition

1    that a federal habeas court can vacate a death sentence when a state prisoner compiles a

2    relatively clean disciplinary record. Such a proposition would defeat the AEDPA's goal of

3    promoting finality. *See Panetti v. Quarterman*, 551 U.S. 930, 945 (2007). Claim 29 is

4    denied.

5          Finally, Claim 23, alleging that Cota was denied effective assistance of PCR counsel

6    (Doc. 25 at 174), is meritless because there is no constitutional right to the effective

7    assistance of counsel in state post-conviction proceedings. *See Pennsylvania v. Finley*, 481

8    U.S. 551, 555 (1987); *Coleman*, 501 U.S. at 752; *Ramirez*, 142 S. Ct. at 1735 ("[T]here is

9    no constitutional right to counsel in state postconviction proceedings.").

10   **B.    Ineffective Assistance of Trial Counsel Claims**

11         Cota's trial began in April 2009, six years after the murders and his arrest. He was

12   represented by lead counsel John Hamby, who was appointed in early 2006, and second-

13   chair Pam Nicholson. The defense team included a DNA expert, Dr. Norah Rudin.

14         The team also included a mitigation specialist, initially Gilbert Nunez, then Michelle

15   McCloskey. Counsel retained two experts, Dr. Michael Cunningham and Dr. Alan Abrams,

16   to support the principal mitigation themes offered during the penalty phase of trial: Cota's

17   life-long addiction to drugs, his drug use at the time of the offenses and his lack of future

18   dangerousness as an inmate.

19         Cota alleges that counsel performed ineffectively at both the guilt (Claim 9) and

20   penalty (Claim 1) phases of trial. The claims are denied for the reasons that follow.

21         **1.    Clearly-Established Federal Law**

22         Claims of ineffective assistance of counsel are governed by the principles set out in

23   *Strickland*. "The benchmark for judging any claim of ineffectiveness must be whether

24   counsel's conduct so undermined the proper functioning of the adversarial process that the

25   trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To

26   prevail under *Strickland*, a petitioner must show that counsel's representation fell below an

27   objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at

28   687–88. Unless both showings are made, "it cannot be said that a conviction or death

1  sentence resulted from a breakdown in the adversary process that renders the result
2  unreliable." *Id.* at 687.

3      The inquiry under *Strickland* is highly deferential. *Id.* at 689. "A fair assessment of
4  attorney performance requires that every effort be made to eliminate the distorting effects
5  of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to
6  evaluate the conduct from counsel's perspective at the time." *Id.* The "standard is
7  necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o
8  particular set of detailed rules for counsel's conduct can satisfactorily take account of the
9  variety of circumstances faced by defense counsel or the range of legitimate decisions
10 regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

11     Deficient performance is established by "showing that counsel made errors so
12 serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the
13 Sixth Amendment." *Id.* at 687. To make this showing, a petitioner must overcome "the
14 presumption that, under the circumstances, the challenged action might be considered
15 sound trial strategy." *Id.* at 689 (quotation omitted).

16     "The question is whether an attorney's representation amounted to incompetence
17 under 'prevailing professional norms,' not whether it deviated from best practices or most
18 common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The
19 defendant bears the heavy burden of proving that counsel's assistance was neither
20 reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926,
21 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not
22 what defense counsel could have pursued, but rather whether the choices made by defense
23 counsel were reasonable." *Murray (Robert)*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*,
24 151 F.3d 1170, 1173 (9th Cir. 1998)).

25     For *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by
26 "show[ing] that there is a reasonable probability that, but for counsel's unprofessional
27 errors, the result of the proceeding would have been different. A reasonable probability is
28 a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at

694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693); *see Hooper*, 985 F.3d at 628. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 394 (9th Cir. 2000)). The strength of the prosecution's case factors into the determination of prejudice. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Riley v. Payne*, 352 F.3d 1313, 1321 n.8 (9th Cir. 2003) ("[O]ur evaluation of *Strickland* prejudice must be considered in light of the strength of the government's case.")

Under the AEDPA, claims of ineffective assistance of counsel are subject to two layers of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105; *see Burt v. Titlow*, 571 U.S. 12, 15 (2013) (explaining that under the AEDPA, the reviewing court "gives both the state court and the defense attorney the benefit of the doubt"). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. Therefore, the "only question that matters" under § 2254(d) is whether the state court's decision was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 526 (quoting *Richter*, 562 U.S. at 102, 103).

### 2.    Claim 9

Cota alleges that counsel performed ineffectively during the trial's guilt phase. The claim consists of seven subclaims, none of which were presented in state court.[7] (*See* Doc.

---

[7] Cota has withdrawn Claim 9(C), alleging that counsel failed to request an instruction on the lesser-included offense of manslaughter (Doc. 41 at 68) because, in fact, counsel did request the instruction.

25 at 108–23; Doc. 41 at 65.) Cota argues that the claims' default is excused under *Martinez* by the ineffective assistance of PCR counsel. (Doc. 41 at 65–66.)

The Ninth Circuit directs that in assessing PCR counsel's performance under *Martinez*, courts "must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim." *Atwood v. Ryan*, 870 F.3d 1033, 1059 (9th Cir. 2017). As the court in *Atwood* explained:

> If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

*Id.* at 1059–60; *see Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021).

In *Runningeagle v. Ryan*, 825 F.3d 970 (9th Cir. 2016), the court elaborated on the standard for finding PCR counsel's performance prejudicial:

> Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC [ineffective assistance of counsel] claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Id.* at 982; *see Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

a.     Claim 9(A)

Cota alleges that trial counsel failed to take action to prevent the jury from hearing prejudicial testimony about his criminal history and prior bad acts. (Doc. 25 at 111.) The basis of the claim is this exchange that occurred during counsel's cross-examination of Miguel Salazar, a long-time friend of the victim Victor Martinez and an acquaintance of Cota:

> Defense Counsel: And you were aware, weren't you, Mr. Salazar, that Ben Cota had a drug problem?

Witness: I known he was—had been in jail, but I don't know – there's no way I could know he had a drug problem.

Defense Counsel: So you were—as you sit here today, you just don't recollect whether you heard he had a drug problem or not?

Witness: No. Like I say, I knew he had been in jail for using drugs because he told me so, but I didn't know whether he had a problem or not.

(RT 4/20/09 at 128.)[8]  Cota argues that counsel was "careless" in eliciting such testimony and deficient in failing to ask for a curative instruction. (Doc. 25 at 110–11.)

As Respondents note, counsel offered an explanation for his failure to ask for a curative instruction. The next day, Sgt. Robert Pottenger testified about a "probation letter" to Cota he had found when searching the residence of Cota's mother. (RT 4/21/09 at 174–75, 179.) Defense counsel immediately asked to approach the bench and a conference was held outside of the jury's presence. (*Id.*) Counsel moved to preclude any further mention of probation, and the court granted the objection. (*Id.* at 175–76, 179.) The parties also discussed the previous day's testimony from Salazar. Counsel detailed his reasons for not moving to strike either witness' testimony:

I would move to have [Pottenger's testimony regarding probation] stricken in front of the jury, but I'm afraid that's going to call more attention to it, quite frankly.

So tactically all I can do at the moment is object, and then ask the Court to preserve the issue so we can think about what other possible options we might have to address that situation. . . .
. . .

I think at this point I'm worried about asking to strike it just because it calls attention to it. It's in the same vein that Ms. Valenzuela [the prosecutor] was talking about when Mr. Salazar gave me an unexpected answer the other day. She's right. I didn't fuss. I didn't ask to have it stricken or anything. I thought that would call more attention to it. So tactically I moved forward to get a response to my question.

---

[8] "RT" refers to the court reporter's transcripts of Cota's trial.

1    (RT 4/21/09 at 175, 179.)

2        "[C]ounsel's tactical decisions at trial," including decisions regarding cross-

3    examination, "are given great deference and must . . . meet only objectively reasonable

4    standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *see United States v.*

5    *Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions concerning the nature and

6    extent of cross-examination are the type of strategic decisions which, if reasonably made,

7    will not constitute ineffective assistance of counsel."); *People v. Ervin*, 22 Cal. 4th 48, 94,

8    990 P.2d 506 (2000) ("We rarely second-guess counsel's cross-examination tactics, despite

9    the elicitation of seemingly damaging testimony.")  "Cross-examination is always a risky

10   process—even experienced counsel conducting a brilliant cross-examination might

11   inadvertently elicit damaging disclosures, a risk inherent in the tactical decision to conduct

12   cross-examination." *Ervin*, 22 Cal. 4th at 94.

13       Likewise, "[i]n general, the decision not to request a limiting instruction is 'solidly

14   within the acceptable range of strategic tactics employed by trial lawyers in the mitigation

15   of damning evidence.'" *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (quoting

16   *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996)).  Cota relies on *Musladin* for

17   his argument that counsel performed deficiently by failing to request a limiting or curative

18   instruction with respect to Salazar's testimony. (Doc. 41 at 77.) The testimony at issue in

19   *Musladin*, however, bears no relationship to Salazar's testimony that Cota had been in jail

20   on drug charges.

21       In *Musladin* a witness testified that he was told by the Musladin's three-year-old

22   son that Musladin had a gun and was going to shoot the victim. 555 F.3d at 845. Counsel

23   objected to this hearsay evidence but did not ask for a limiting instruction. *Id.* During

24   closing argument, the prosecutor stated that the hearsay testimony of Musladin's child was

25   uncontroverted proof of Musladin's intent to murder the victim. *Id.* The Ninth Circuit

26   rejected the argument that not requesting a limiting instruction was a reasonable strategy

27   because counsel did not want to draw attention to the testimony. *Id.* The court explained:

28

But the reasonable strategic basis for failing to request a limiting instruction vanished when, during closing arguments, the prosecutor pointed to [the child's] statements as uncontroverted evidence of premeditation. The jury's attention was directly drawn to the evidence, so a limiting instruction did not risk highlighting evidence the jury might have forgotten. More significantly, the jury was invited to draw the precise inference—that [the child's] statement was true—that a limiting instruction would have prohibited.

*Id.*

In Cota's case, by contrast, requesting a limiting instruction at the time of Salazar's cross-examination would have further highlighted the testimony that Cota had been in jail. The decision in *Musladin* hinges on the fact that the prosecutor brought the testimony to the jury's attention a second time during closing argument. In addition, a limiting instruction regarding the hearsay testimony in *Musladin* was crucial because it would have prohibited the jury from drawing an inference that the child's testimony was true, thus supporting the element of premeditation.[9] Evidence that Cota had been incarcerated was properly before the jury in the aggravation phase of trial, and therefore Cota's claim of penalty-phase prejudice from Salazar's testimony fails.

Counsel's decision not to seek a limiting instruction was "solidly within the acceptable range of strategic tactics." *Gregory*, 74 F.3d at 823; *see Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984) ("[T]actical decisions by counsel with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel.").

Cota can show neither deficient performance nor prejudice. Claim 9(A) is meritless. Therefore, PCR counsel did not perform deficiently in failing to raise the claim and there was not a reasonable probability that the results of the PCR proceedings would have been different if it had been raised. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d

---

[9] The Ninth Circuit denied Musladin's ineffective assistance claim on the grounds that he failed to show prejudice from counsel's deficient performance. 555 F.3d at 847–48. The court found that the element of premeditation was adequately supported by other evidence. *Id.*

- 19 -

1   at 982. In the absence of cause for the claim's default, it remains barred from federal review

2   and will be denied.

3          b.      Claims 9(B) and (D)

4          As discussed in more detail below, after his arrest Cota was interviewed by Peoria

5   detectives. The interview was recorded. The tape was played for the jurors, who were also

6   provided a transcript of the recording. (Trial Ex. 492.) During the interview Cota, who

7   maintained his innocence throughout, twice made comments potentially implicating his

8   right to remain silent: "I ain't saying nothing more" (*id.*, p. 24) and "I ain't going to say

9   any more" (*id.*, p. 40). The Arizona Supreme Court found that Cota's statements were

10  voluntary; that the so-called "Page 24 statement" did not constitute an unequivocal

11  invocation of Cota's right to remain silent; and that Cota did invoke that right in the "Page

12  40 statement" but that no fundamental error resulted from the admission of the remainder

13  of the interrogation. *Cota*, 272 P.3d at 1035–36.

14         In Claim 9(B), Cota alleges that counsel performed ineffectively by failing to object

15  to the admission of the videotaped interrogation "on the basis that Cota's statements therein

16  were unduly prejudicial" and by failing to request that the trial court view the entire tape.

17  (Doc. 25 at 113.) In Claim 9(D), Cota alleges that trial counsel "neglected to properly move

18  the trial court to suppress Cota's involuntary statements to police officers" and "never

19  unambiguously objected to their admission or argued for the statements' suppression." (*Id.*

20  at 115.) These claims are meritless.

21         First, counsel *did* unambiguously move to suppress Cota's statement on the grounds

22  that it was involuntary, principally based on Cota's state of intoxication at the time of the

23  interrogation. (*See* RT 5/11/09, p.m., at 42–46, 48–51.) Next, Cota was not prejudiced by

24  trial counsel's performance because, as determined by the Arizona Supreme Court after

25  viewing the tape, the statement was voluntary. *See Hebner v. McGrath*, 543 F.3d 1133,

26  1137 (9th Cir. 2008) ("The failure to object to evidence that is admissible under state law

27  cannot be ineffective assistance of counsel.")

28

Cota further asserts that "proper argument" would have convinced the trial court that the Page 24 Statement was an unambiguous invocation of Cota's right to remain silent or, failing that, would have led the Arizona Supreme Court to apply a more favorable standard of review to the claim on appeal. (Doc. 25 at 116.) Again, the rulings of the Arizona Supreme Court foreclose any argument that Cota was prejudiced by this aspect of counsel's performance. The court found both that the Page 24 Statement was not a clear invocation and that any information obtained after the Page 40 Statement was cumulative to the properly-admitted portion of the statement. *Cota*, 272 P.3d at 1035–36.

Finally, the Court agrees with Respondents that it would have been futile to argue that Cota's statement was inadmissible because it was unduly prejudicial. Under Arizona law, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. "[N]ot all harmful evidence is unfairly prejudicial. After all, evidence which is relevant and material will generally be adverse to the opponent." *State v. Schurz*, 859 P.2d 156, 162 (1993). Evidence is unfairly prejudicial if it "has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror." *State v. Mott*, 187 Ariz. 536, 545 (1997). The video was probative because it showed Cota providing his version of events and allowed the jury to assess his credibility. *See e.g., State v. Sotelo*, No. 2 CA-CR 2007-0226, 2008 WL 5104891, at *2 (Ariz. Ct. App. Dec. 5, 2008) (rejecting defendant's argument that video of police interview was "highly prejudicial" because he appeared intoxicated and his "attitude and demeanor . . . and his use of profanity . . . secure[d] a conviction based on emotion, sympathy or horror").

Claims 9(B) and (D) lack merit. PCR counsel did not perform deficiently in failing to raise the claims and there is no reasonable probability that the results of the PCR proceedings would have been different if he had. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982. The claims remain barred from federal review and will be denied.

1          c.      Claim 9(E)

2          Cota alleges that counsel failed to "properly" object to the trial court's consolidation

3   of the murder and the unlawful flight and drug possession cases. (Doc. 25 at 117.) Although

4   he initially argued—successfully—against consolidation of the cases, when the court ruled

5   that evidence of flight would be admissible, counsel decided that "tactically to the defense,

6   there was no benefit to not trying the cases together" and decided not to contest joinder.

7   (RT 4/16/09 at 132; *see* ME 4/25/06; ME 4/16/09 at 3–4.)

8          Cota contends that "acquiescing" to consolidation constituted ineffective assistance

9   because evidence of flight and drug possession "undoubtedly impacted the jury's decision

10  regarding Cota's guilt and sentence." (Doc. 25 at 117.) He also argues that if counsel had

11  objected "unambiguously" to consolidation, the Arizona Supreme Court would have

12  considered the claim on the merits and "likely would have determined that the trial court

13  erroneously consolidated the offenses in violation" of his constitutional rights. (*Id.* at 118.)

14         These arguments are insufficient to meet Cota's burden under either prong of

15  *Strickland*. As discussed below, the Arizona Supreme Court held that evidence of Cota's

16  flight was admissible to show consciousness of guilt. *Cota*, 272 P.3d at 1033. The evidence

17  would have been admissible even if the cases had not been joined, so Cota cannot show

18  prejudice from counsel's decision not to object to consolidation. Moreover, evidence that

19  Cota possessed drugs at the time of his arrest was consistent with the defense theme at both

20  the guilt- and penalty-phases of trial that Cota's culpability was diminished by his longtime

21  addiction and his use of drugs around the time of the murders. Finally, Cota's argument

22  that the Arizona Supreme Court would "likely" have granted relief if counsel had

23  maintained his objection to consolidation is speculative and falls short of affirmatively

24  proving prejudice. *Strickland*, 466 U.S. at 693.

25         Because Claim 9(E) is meritless, PCR counsel was not ineffective in failing to raise

26  it. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982. The claims remain

27  barred from federal review and will be denied.

28

- 22 -

1

        d.      Claim 9(F)

2        Cota alleges that counsel "failed to present a coherent defense." (Doc. 25 at 118.)

3 Counsel did not call any witnesses on Cota's behalf and "relied only on cross-examination

4 of the State's witnesses to advance their theory of the defense. . . ." (*Id.*) According to Cota,

5 counsel's "questions on cross-examination elicited only a few bits and pieces of

6 information that resulted in an incoherent and shallow defense presentation." (*Id.*) Cota

7 also criticizes counsel for failing to "retain or call to testify any relevant experts to support

8 the contentions he feebly presented to the jury." (*Id.*) These arguments are unpersuasive.

9        "A defendant who alleges a failure to investigate on the part of his counsel must

10 allege with specificity what the investigation would have revealed and how it would have

11 altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir.

12 1989); *see Bragg v. Galaza*, 242 F.3d 1082, 1088–89 (9th Cir. 2001) (finding no ineffective

13 assistance based on failure to investigate and question witness where there was no

14 indication of what additional information could have been gained and the prosecution's

15 case against defendant was strong); *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir.

16 1995) ("Absent an account of what beneficial evidence investigation into any of these

17 issues would have turned up, Hendricks cannot meet the prejudice prong of the *Strickland*

18 test.").

19        In the absence of any specific showing as to what an investigation or the input of

20 experts would have produced, Cota's "argument that his counsel could have presented a

21 better defense fails to overcome the strong presumption that counsel's conduct fell within

22 the wide range of reasonable professional assistance." *Mancuso*, 292 F.3d at 954; *see*

23 *Dows*, 211 F.3d at 487 ("Under *Strickland*, counsel's representation must be only

24 objectively reasonable, not flawless or to the highest degree of skill."); *see also Panah v.*

25 *Chappell*, 935 F.3d 657, 669 (9th Cir. 2019) (even if defense counsel was deficient for

26 failing to retain expert to analyze pathology and serology evidence, no prejudice resulted

27 where evidence of guilt was overwhelming and counsel challenged state's expert witnesses

28 on the stand).

1   Because Claim 9(F) is meritless, PCR counsel was not ineffective in failing to raise

2   it. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982. The claim remains

3   barred from federal review and will be denied.

4       e.      Claims 9(G) and (H)

5       Cota alleges that counsel was ineffective for failing to present expert testimony "to

6   explain the unreliability of Cota's interrogated statements," Claim 9(G), and failing to

7   present "expert testimony on physical evidence," Claim 9(H). (Doc. 25 at 119, 121.)

8       Cota argues that an expert could have explained that Cota's statement was

9   "involuntary because of his impaired cognitive state," that his "demeanor in the video was

10  a product of his drug use, and not representative of him as a person," and that his

11  "inconsistent statements were a product of his cognitive state not his mendacity." (*Id.* at

12  119–20.)

13      As Cota acknowledges, during his cross-examination of Det. Laing, defense counsel

14  emphasized Cota's apparent impairment from drug or alcohol use, including the fact that

15  Cota frequently appeared to be sleeping or nodding off. Laing admitted it was possible that

16  "[t]he impact of heroin, among other things, it certainly impairs a person's ability to listen

17  to what's being told to them, process that information in the same way they would when

18  they were sober" and that "an individual under the influence of a narcotic substance such

19  as heroin is certainly more susceptible to confusion." (RT 5/11/09, a.m., at 30, 31.)

20      This testimony, together with the video viewed by the jury, sufficiently

21  demonstrated the effects of Cota's impairment, so not presenting expert testimony on the

22  subject did not constitute deficient performance or result in prejudice. *See Grayson v.

23  Thompson*, 257 F.3d 1194, 1221 (11th Cir. 2001) ("While detailed expert testimony

24  regarding the effects of alcohol on an individual's appreciation of consequences may have

25  been helpful to the jury, the effects of excess alcohol consumption are not necessarily

26  outside the ken of the average juror."); *Gravitt v. Bear*, No. 20-6156, 2021 WL 3440668 at

27  *7 (10th Cir. Aug. 6, 2021) (rejecting claim that expert testimony was necessary because

28  "reasonable counsel could conclude that even laymen would know that heroin, Xanax, and

alcohol are serious intoxicants when taken in combination and in large quantities. Furthermore, the jury was presented with . . . the video of Mr. Gravitt's interview following his arrest, in which he 'has difficulty staying awake, difficulty recalling the details of that night[,] and his speech was noticeably slurred. . . .'") (additional quotes omitted).

Finally, there is no declaration before the Court from any expert establishing that he or she would have been willing to testify on Cota's behalf about the effects of intoxication on Cota during his interrogation. Cota has failed to identify any such expert witness, set forth his or her area of expertise and the substance of his or her testimony, or show that such testimony would have been favorable to the defense case—all of which are required elements to prevail on an ineffective assistance claim. *Alcala*, 334 F.3d at 872–73 & n.3; *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice" under *Strickland*).

Claim 9(H), alleging that counsel performed ineffectively by failing to retain a "police-practices or crime-scene expert to explain to the jury the consequences of police sloppiness and improper evidence collection" (Doc. 25 at 122), fails for the same reasons. Cota argues that although counsel elicited testimony that the officers and technicians who investigated the scene did not consistently wear protective equipment, expert testimony was necessary to support the defense theory that the shortcomings of the investigation rendered the physical evidence unreliable. (*Id.*) Again, however, Cota cannot establish a *Strickland* violation because he offers only speculation about what a crime-scene or police-practices expert would say. *Grisby*, 130 F.3d at 373; *see also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) ("Wildman offered no evidence that an arson expert would have testified on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice.").

Because Claims 9(G) and 9(H) are meritless, PCR counsel did not perform ineffectively by failing to raise them. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982. The claims remain barred from federal review and will be denied.

1          f.      Conclusion

2      Cota cannot establish cause under *Martinez* for the default of these ineffective

3  assistance of trial counsel claims. PCR counsel did not perform deficiently in failing to

4  raise the claims, and if they had been raised there was not a reasonable probability that

5  relief would have been granted during the PCR proceedings. Accordingly, Claim 9 remains

6  defaulted and barred from federal review.

7      **3.      Claim 1**

8      Cota alleges that trial counsel performed ineffectively at the penalty phase of trial.

9  (Doc. 25 at 30.) The claim consists of six subclaims, only one of which, Claim 1(A), was

10 raised in state court. The court will address that claim before turning to the procedurally

11 defaulted claims.

12         a.      Background

13             i.      *Trial proceedings*

14     The penalty phase of Cota's trial occurred over 10 days in July and August 2009.

15 Defense counsel proffered 31 mitigating circumstances, which the court instructed the jury

16 to consider. (ROA 419; RT 7/23/09 at 8–12.)[10]

17     After the jury instructions were read, Martinez's daughter and son offered victim-

18 impact statements. (RT 7/23/98 at 47–71.) Cota's counsel then began their case in

19 mitigation.

20     Counsel called 18 lay witnesses to testify on Cota's behalf, followed by defense

21 experts Drs. Cunningham and Abrams. A number of family members testified on Cota's

22 behalf, including Ralph Cota and Nellie Garcia, Cota's older half-brother and half-sister.

23 Nellie is the product of the incestuous relationship between Bertha, her and Cota's

24 biological mother, and Simon Bernal, Bertha's stepfather, who removed Bertha from her

25 biological family in Mexico when she was a child. Other siblings also testified, including

26 Rick Cota, Inez Cota Villanueva, Manuel Cota Jr., and Henry Cota. Cota's children

27 testified: Jesse Hernandez, Cota's stepson with his wife, Laura DeLeon, and Monica,

28

---

[10] "ROA" refers to the indexed documents from the record on appeal.

Desiree, Adrianna, and Benjamin Jr., Cota's biological children with DeLeon. Also testifying were Graviela Cota, Ralph's wife; Eddie Valenzuela, Inez's husband; Laura DeLeon and her mother, Juanita Suarez; Tony Marin, a family friend; Nora Belinda Orono, the mother of Cota's first two children; and Alan Ellis, a Spanish-speaking social psychologist who investigated Bertha's family in Mexico.

The testimony of Cota's siblings focused on family dysfunction and the severity of Cota's substance abuse difficulties. Cota's father, Manuel, was an alcoholic and womanizer who was absent from the home for long periods of time. When he was home his drinking led to fights with Bertha and caused the marriage to break up. The family moved frequently because Manuel would lose jobs due to his drinking. Bertha was distant and emotionally unavailable; she never told the children she loved them.[11] Nether parent provided any encouragement in academics or attended any of their children's sports events.

Each of Cota's siblings experienced drug addiction. Some had achieved periods of sobriety. They testified that Cota had used drugs throughout his life.

Cota's siblings testified that if Cota were sentenced to life in prison, they would maintain contact with him. They testified that they loved their brother and that his execution would have a negative effect on them.

Cota's children testified that, although they lived apart from him at their grandmother's, he would provide birthday and Christmas gifts and would take them to the carnival or to the park. They testified that Cota encouraged them to stay in school and to avoid drugs. They testified that they loved their father, would maintain contact with him in prison, and would be negatively impacted by his execution.

The mothers of Cota's children described him as a loving father and partner. They testified that he would send drawings from jail that the children would hang on their walls. Both women indicated they would encourage the children to maintain contact with Cota if he were to receive a life sentence.

---

[11] Bertha suffered from dementia and did not testify at Cota's trial. (*See, e.g.*, RT 7/23/09 at 150.)

Ralph Cota, Cota's oldest brother, four years Cota's senior, was born in 1958. He is the biological son of Simon Bernal and Bertha, although for most of his life he believed Simon was his grandfather and Manuel Cota his father. (RT 7/23/09 at 76–77.) Ralph's earliest memories were of living in Eloy, Arizona, but the family moved frequently because Manuel's alcoholism would cause him to lose work. (*Id.* at 75–75.) Manuel worked as a delivery driver and did agricultural jobs. (*Id.* at 77.)

Ralph dropped out of school as a freshman. He testified that when they were old enough, he and his siblings worked in the fields with their father. (RT 7/23/09 at 76–77.) Ralph began using marijuana at 14, encouraged by his father. (*Id.* at 81–82). He began huffing paint at 15, along with Cota, who was about 11, and he taught Cota to smoke marijuana. (*Id.* at 84, 92–93.) Ralph testified that he discovered that his brothers Manuel Jr. and Cota began using heroin when Cota was around 16–17 years old. (*Id.* at 94, 100.) He testified that his father once tried to quit drinking but failed. (*Id.* at 97.)

Ralph moved to Oregon in 1985, in an attempt to escape from the problems caused by his drug use in Arizona, but instead of getting clean, he started using methamphetamine. (*Id.* at 105–06.) He used meth for 10 years but had been clean for a year and a half. (*Id.*) He wanted to quit using marijuana as well. (*Id.* at 106–07.) By the time Cota moved to Oregon in the early 1990s, he was using marijuana, heroin, cocaine, and methamphetamine. (*Id.* at 109–10.) When asked his feelings about Cota, Ralph testified "I love him and—I just love my brother." (*Id.* at 122.) Ralph blamed himself for leaving home at a young age: "If I never left home, things would not be like this—I think my family would have been in better hands if I would have been home." (*Id.* at 123.)

Rick Cota, Cota's younger brother, testified that he started experimenting with marijuana, which was provided by Ralph, at age 11, started using cocaine at 16 or 17, and began using methamphetamine in his late 20s. (*Id.* at 138–40.) He had been sober four or five years. (*Id.* at 141.) He testified that Cota loved his children and tried to be a good father. (*Id.* at 148.) Rick testified that three of his brothers were still struggling with methamphetamine and heroin and that all of his friends and classmates had been drug users.

1    (*Id.*)

2         Jesse Hernandez, Cota's stepson and the biological son of Laura DeLeon, testified

3    that Cota loved all of his children. (RT 7/27/09 at 11.) He would bring gifts and take the

4    children on outings. (*Id.* at 14–15.) Jesse also worked with Cota on electrical jobs. (*Id.*)

5    Jesse was aware Cota was using drugs throughout Jesse's life; he knew his uncles were all

6    using too. (*Id.* at 17.) Jesse testified that he had stayed in contact with Cota, that Cota wrote

7    him lots of letters and encouraged him to be a good example, go to college, "do better

8    things for myself," and "stay away from drugs" (*Id.* at 20, 27–28.) Jesse would continue to

9    visit Cota in prison and keep in touch "[b]ecause I love him." (*Id.* at 22.) Executing Cota

10   would have a big impact on him, his siblings, and his mom. (*Id.*)

11        Monica Cota, Cota's biological daughter, testified that she was aware her parents

12   were using drugs. (*Id.* at 44.) She testified that she and her sisters would have "fun times"

13   when Cota took them to the carnival or out for pizza. He bought Barbies or gave her money

14   as Christmas and birthday gifts. (*Id.* at 46–47.) Monica testified that Cota encouraged her

15   to get an education. (*Id.* at 48.) She continued to have a relationship with him since his

16   arrest. (*Id.* at 48.) He was still a father to her, she still loved him, and she wanted to continue

17   seeing him. (*Id.* at 50, 52–53.)

18        Cota's daughter Desiree testified that Cota gave her relationship advice from jail

19   and told her to stay in school. (*Id.* at 98.) He continued to send birthday and graduation

20   cards. (*Id.* at 101.) Desiree testified that Cota's execution would have a bad impact because

21   he was "always telling me to do the right thing. No one else is going to tell me that. Just

22   my dad." (*Id.* at 104.)

23        Graviela Cota, Ralph's wife, testified that Cota had done a good job of staying clean

24   when he first arrived in Oregon but then but fell in with the wrong people. (*Id.* at 119.) She

25   testified that Cota was a "good dad" who "would go to work, come home and play with

26   [the kids] and feed them and just take care of them and be a good dad to them." (*Id.* at 120.)

27   "He loved them very much" and the kids enjoyed being around him. (*Id.*)

28        Eddie Valenzuela, the husband of Cota's younger sister Inez, testified that Tolleson,

Arizona, where the Cotas grew up, had a reputation as a place with lots of heroin. (*Id.* at 133.) Eddie had been in recovery for 12 years. (*Id.* at 144.) When asked about Cota's potential sentence, Eddie stated, "I'd just ask you guys to have mercy on his soul." (*Id.* at 145.) He continued, "I love him as a brother. I care a lot about every one of them [Cota's family]. . . . [I]t's going to affect my mother-in-law. . ." (*Id.*)

Laura DeLeon, the mother of five of Cota's children, testified that Cota was always a "loving father. He always gave his attention to his kids." (RT 7/28/09 at 29.) Cota encouraged them with school, continued to have contact with them since his arrest, and "helped them a lot." (*Id.* at 30, 40.) He sent them cards and letters which the kids would hang in their rooms (*Id.* at 43.) Laura testified that Cota encouraged her to quit drinking and to be a good parent. (*Id.* at 39.) If he were sentenced to life, Laura would encourage contact between him and the children. (*Id.* at 40.) She testified that it would be hard for her if Cota were executed because they still cared for each other. (*Id.* at 41.) She still wanted Cota in her life, and wished she had married him. (*Id.* at 44)

Juanita Suarez, Laura DeLeon's mother, testified that Cota would bring diapers, formula, clothes, and toys for his children. (*Id.* at 11.) "[H]e always tried" to be a good parent. (*Id.*) She never felt Cota didn't love his kids or wanted to abandon them (*Id.* at 12.) The children looked forward to calls from Cota. (*Id.* at 14.) She testified that Cota "gives them advice—to be good, stay in school and out of trouble." (*Id.* at 14–15.) Juanita would encourage the children to continue visiting Cota. (*Id.* at 16.) His execution would be difficult for them (*Id.* at 17.)

Adrianna Cota, Cota's 15-year-old daughter with Laura, testified that she and her father exchanged letters and talked on the phone about school and sports and how she is doing. (*Id.* at 59–63.) She looked forward to visiting him. (*Id.* at 67.) She and her siblings loved their father and cared what happened to him. (*Id.* at 73–74.) If he received a life sentence she would stay in contract with him, explaining: "as long as he's there, I can always talk to him and see him and stuff." (*Id.* at 73.) "He means the world to me. Without him, I don't know what I would do. I just need him in my life. . . I just wish I could hug

him and just hold him. I love him so much." (*Id.* at 79.)

Benjamin Cota Jr., Laura and Cota's 13-year-old son, testified that Cota taught him to ride a bike (*Id.* at 86.) He and Cota exchanged letters talking about sports and school. Cota advised him to stay out of trouble at school. Benjamín Jr. testified that he loved his father. (*Id.* at 93)

Inez Cota Villanueva, Cota's younger sister, testified that her siblings and peers in Tolleson all had drug problems. (*Id.* at 103.) She testified that Cota loved his kids and tried to be a good father. (*Id.* at 104–06.) Cota's children were still happy to talk with him and get letters. Inez would continue to be in contact with Cota if he received a life sentence. (*Id.* at 114–15.)

Tony Marin, a friend of the family, testified that Cota started using heroin at around 17. (*Id.* at 133.) He described heroin as the most difficult drug to kick. (*Id.*) Marin sold drugs to Cota and his brothers (*Id.* at 137.) Cota's father smoked marijuana with them and once or twice took Marin and Cota to score heroin. (*Id.* at 139.) Marin testified that there is always hope for recovery and if Cota was given a life sentence there was still a chance he could have a good relationship with his kids. (*Id.* at 141–42.) Finally, Marin testified that Cota wasn't in a gang and wasn't a fighter. (*Id.* at 146–47.)

Counsel called Dr. Alan Ellis, a social psychologist and Spanish speaker. (RT 7/29/09 at 4–5.) Dr. Ellis interviewed Cota's mother Bertha and traveled to Mexico to meet with her family, including her sister Marta, brother Javier and half-brother Mario, and her aunt Maria. (*Id.* at 9–10.) Dr. Ellis learned that Bertha had been removed from her family home by the Bernals as a young child and taken to Arizona. Her family didn't learn what happened to her until 1991. (*Id.* at 13–14.) Her first two children, Inez and Ralph, were fathered by her "godfather," Simon Bernal. (*Id.* at 16.) Dr. Ellis also discovered that in Bertha's family there was a history of dementia and alcoholism. (*Id.* at 24.)

Cota's older brother Manuel Jr. testified that he began using marijuana at 14 and heroin at 25. (*Id.* at 27.) Cota started using heroin at around 16–17. (*Id.* at 34.) Manuel Jr. testified that Cota overdosed in the late 90s in the bathroom of their mom's house. (*Id.* at

30–31.) Manuel Jr. was aware of another incident where Cota overdosed at a fast-food restaurant. (*Id.* at 35.) He also testified that their father took them to score heroin a couple times. (*Id.* at 36.)

Cota's younger brother Henry Cota testified that he found Cota lying on the bathroom floor after the heroin overdose. (*Id.* at 43.) He testified that he never saw Cota hit or hurt his children but always showed them love and care. (*Id.* at 46–47.) Cota tried to stop using but never succeeded, despite two stints in rehab. (*Id.* at 47, 55–56.) Henry testified that there were lots of kids with drug problems in their neighborhood. (*Id.* at 47.) Henry smoked marijuana with his father a couple times. (*Id.* at 48–49.) Henry eventually kicked heroin after attending rehab. (*Id.* at 51.)

Nellie Garcia, Cota's oldest sibling, testified that she went to live with her biological father, Simon Bernal, who sexually abused her starting at age five or six or earlier and also sexually abused her older sisters. (*Id.* at 68.) Nellie eventually moved in with Bertha, whom Simon had also sexually abused. (*Id.* at 69.) Nellie learned that Simon was her father and Bertha her mother. (*Id.* at 69–70) When Bertha met Manuel Cota they ran off, taking Ralph but leaving Nellie behind with Simon and his wife. (*Id.* at 72.)

Nellie testified that all of her younger siblings had drug or alcohol problems; some had recovered. (*Id.* at 77.) Nellie described Cota on drugs, hallucinating, thinking people were coming after him, and sleeping by the door. (*Id.* at 79.) Nellie testified that Cota genuinely cared for and loved his children and was a good father but could have been better. (*Id.* at 80.) Nellie took the children to visit Cota in jail, which they enjoyed, and they also exchanged letters. (*Id.* at 81–82.) This would continue if Cota received a life sentence. (*Id.*) Nellie testified that if Cota were sentenced to death it would not be easy for the family but "we are not going to abandon him." (*Id.*) She described Cota's two sides: "one is the monster that everybody has led him to be, or described him to be, and then the other is the brother that I love, that father that his children love, and I'm sure the son that his mother loves. I could never abandon him" (*Id.* at 83.)

1        Cota's final lay mitigation witness was Nora Belinda Orona, the mother of Cota's

2   first two children. She testified that Cota was a "good provider" during their six- or seven-

3   year relationship (RT 8/10/09, a.m., at 5–6). He was going to school to become a

4   journeyman electrician. (*Id.* at 6.) The relationship was happy; he was a "loving father"

5   and a "loving partner." (*Id.* at 7.) Cota was never abusive and never laid a hand on her or

6   the kids. "[H]e was very loving, always worked and wanted the best for us." (*Id.* at 12.) He

7   provided child support sporadically. (*Id.* at 15–16.) Nora couldn't believe that Cota

8   committed the murders because "he was never violent with me, never violent with my

9   children" and was "a very loving person." (*Id.* at 17). If Cota were sentenced to life Nora

10  would "really keep the grandkids and kids to continue to see him" and would write or visit

11  him herself, to show her children that "no matter what somebody is being accused of, you

12  still love them, unconditionally, no matter what." (*Id.* at 18–19.) She continued: "Benny,

13  he's always been a loving person, kind. He was never violent to me or my children. I just—

14  the way I feel about him right now, I still love him. He was my first love. He will always

15  be in my heart. I believe that my children still need to see who their dad is, my grandkids

16  need to know who their grandfather is." (*Id.* at 22.)

17       Counsel next presented the testimony of Dr. Michael Cunningham, a clinical and

18  forensic psychologist who had testified in over 200 cases, including approximately 140

19  capital cases. (RT 8/3/09 at 5, 30; RT 8/4/09 at 73.) Dr. Cunningham interviewed Cota

20  twice for a total of five and a half hours. (RT 8/3/09 at 32.) He also interviewed Cota's

21  father Manuel; Cota's children Monica, Desiree, Adrian, and Benjamin Jr.; and Cota's

22  siblings Manuel Jr., Henry, Ralph, and Nellie; and Tony Marin. (*Id.* at 32–33.) Dr.

23  Cunningham reviewed education records, employment records, criminal records, offense-

24  related records, mental health records, correctional records, and reports prepared by the

25  other experts, including the assessment performed by Dr. James Seward, the State's expert.

26  (*Id.* at 33.) He also reviewed research relating to methamphetamine abuse, specifically as

27  a social and criminal justice issue in Arizona, and data about the rates of violence in the

28  Arizona Department of Corrections ("ADOC") and his own studies and those of other

researchers "that have looked at corollary rates of violence in prison." (*Id.* at 34.)

Counsel then questioned Dr. Cunningham about the concept of "moral culpability" and the "adverse factors" in Cota's background that "might provide some context for the pathway that led to this offense." (*Id.* at 35.) Dr. Cunningham testified that "three broad areas" shape the choices a person makes: "wiring, family, and community." (*Id.* at 43.)

He noted a "genetic predisposition for alcohol and drug dependence" as the first wiring factor in Cota's background. (*Id.* at 45.) Using a PowerPoint presentation, Dr. Cunningham identified numerous relatives of Cota who had experienced drug or alcohol problems. (*Id.* at 46–55.)

The next wiring factor Dr. Cunningham discussed was a "genetic predisposition for psychological and personality disorder." (*Id.* at 55.) He identified in Cota's family system, going back to his paternal grandparents, individuals with behavior problems, psychological disorders, personality disturbances, and a history of juvenile confinement, significant jail time, or prison sentences. (*Id.* at 55–56.)

The next developmental category Dr. Cunningham addressed was the parenting family and "generational family dysfunction." (*Id.* at 91.) Here Dr. Cunningham identified instances across the generations of parental abandonment, children born out of wedlock, and sexual abuse. (*Id.* at 93–94.) Dr. Cunningham explained that various processes are involved in a person's "generational story," including "scripts," or a child's expectations of what his life will be based on what he's seen in his family and community; "modelling" or imitation; and "sequential damage," the passing down from one generation to the next of a damaged person's "emotional limitations and psychological vulnerabilities." (*Id.* at 92, 96–97.)

The next adverse parenting factor Dr. Cunningham addressed was the fact that Cota's mother was a teenager when she began having children, which "stunt[ed] her life in development" and put her "on a pathway to poor marital selections, poverty, abusive relationships, [and] emotional problems herself." (*Id.* at 100.) Dr. Cunningham testified

1    about the developmental damage caused by the sexual abuse Bertha suffered at the hands

2    of her stepfather. (*Id.* at 101–02.)

3          The next factor Dr. Cunningham identified was alcohol and drug abuse by Cota's

4    father. (*Id.* at 102.) He testified that "a parent's alcoholism or drug abuse is a source of

5    psychological injury for a child." (*Id.* at 103.) Alcoholic parents are "more likely to be

6    emotionally detached [s]o the kids are more likely to be emotionally neglected," and in fact

7    Cota's father "was not emotionally engaged with the kids." (*Id.*) The chaos caused by an

8    alcoholic father also impairs the "quality of nurturing" provided by the mother. (*Id.*) The

9    "inconsistency and unpredictability" in such households "robs these kids of the structure

10   that they need to develop in a healthy way psychologically" and puts pressure on them "to

11   grow up faster than they should." (*Id.*) Dr. Cunningham also explained that the alcoholism

12   of parents is a "broad risk factor" which can affect children as adults, causing "problems

13   with self-control" and "contribut[ing] to psychological disorders"; it "can be associated

14   with criminal behavior as well." (*Id.* at 104.)

15         Dr. Cunningham then testified next about the "damaging factor" of "chronic

16   domestic conflict," namely the "chronic arguing and hostility" between Cota's parents

17   arising from Manuel's drinking, womanizing, and frequent absences. (*Id.* at 105.)

18   According to Dr. Cunningham, this type of family conflict correlates with an increased risk

19   of violence committed by boys raised in such environments, including Cota. (*Id.* at 107–

20   08.)

21         The next factor was "emotional neglect." (*Id.* at 109.) Dr. Cunningham noted that

22   Cota's father was often either drinking or absent from the home. (*Id.*) There was "no

23   encouragement or expression of pride in the children." (*Id.*) Neither parent attended any of

24   the children's sports events. (*Id.*) Dr. Cunningham explained that the frequent conflicts

25   between the parents resulted in a lack of "structure and consistency and a sense of safety."

26   (*Id.*) Cota's mother was not affectionate. (*Id.*) She didn't "encourage school performance

27   or attendance and [was] ineffectual in her supervision and discipline of the children." (*Id.*)

28         Dr. Cunningham testified that neglect is more damaging than abuse because "emotional

1  nurturance" from a parent "is the most important thing that goes into the building of a healthy

2  human being." (*Id.* at 111–12.) Childhood neglect "significantly increases the risk of all

3  different kinds of psychological disorders, as well as behavioral problems in childhood and in

4  teen years and as adults." (*Id.* at 115.)

5      The final adverse factors Dr. Cunningham noted were "inadequate supervision and

6  guidance" and the substance abuse of siblings and other family members, which also supported

7  his finding of a genetic predisposition for drug and alcohol dependence. (*Id.* at 116–17.)

8      Having testified about the wiring and family components that shaped Cota's ability

9  to make choices, Dr. Cunningham next testified about community factors. (*Id.* at 117.) He

10  testified about Cota's early exposure to drugs, including that his older brother Ralph

11  introduced him to marijuana when Cota was in elementary school or junior high. (*Id.* at

12  118.) Drugs were also readily available in the community and among Cota's peers. (*Id.*)

13      Dr. Cunningham next testified about the "disturbed trajectory" of Cota's early life,

14  identifying "the childhood onset of poly-drug abuse and dependence" as the first factor that

15  "nudged" Cota off course. (*Id.* at 122.) Dr. Cunningham outlined Cota's early drug use and

16  explained that it prevented Cota from "developing the emotional muscles that you are going

17  to need to deal with in adulthood." (*Id.* at 125–26.)

18      Dr. Cunningham then testified about Cota's drug and alcohol use as an adult, which

19  included regular use of heroin, speedballs (heroin mixed with cocaine), and crack cocaine,

20  along with drinking a six pack daily during the work week and drinking mixed drinks to

21  intoxication on weekends. (*Id.* at 131.)

22      Cota's drug use continued despite his relocation to Oregon and his stints in jail and

23  rehab. (*Id.* at 131–34.) He began stealing to support his habit. (*Id.* at 134.)

24      Dr. Cunningham explained that while a drug addict may have a choice about

25  whether he uses, he does not have a choice about the way the drug makes him feel or affects

26  his body, which are factors determined by genetics. (*Id.* at 137.) He testified that "the effect

27  of addiction is to undermine and distort who you are as a person, distort your judgment,

28  distort your morality, distort your values." (*Id.*)

Dr. Cunningham then outlined the disruptions in Cota's life caused by his addiction and resulting criminal behavior, including his loss of self-esteem, loss of employment, loss of "family role" as husband and father, and his use of heroin and methamphetamine immediately upon his second release from prison. (*Id.* at 138–39.) He then summarized Cota's condition in the lead-up to the murders:

> At that point he is effectively without life structure of family, job, career, house, belongings, car, the things that provide all of us with some sense of structure and stability and predictability, and as you described he has a significant untreated drug problem and has the coping resources of someone that is potentially 12 or 13 years old, back to the point where his alcohol and drug use began.

(*Id.* at 140–41.)

Counsel questioned Dr. Cunningham about methamphetamine abuse and addiction. Dr. Cunningham described the drug as "extraordinarily addictive," so that its continued use is not the product of a "weak will, bad character . . . [or] bad choices." (*Id.* at 143.)

Methamphetamine causes users to become "belligerent and highly aggressive." (*Id.* at 141.) It "unhinges the logical integration of control of thought and emotion," "disturbing the basic structure of how your mind works and your ability to control yourself and the accuracy of your perceptions." (*Id.* at 141–42.) It causes "impulsivity," both "reactive," which can cause the user to "explode . . . in an incredibly violent, potentially homicidal way," and "bad judgment impulsivity," which means that the user is not "thinking through" the consequences of his actions. (*Id.* at 144–45.) Paranoia and mood fluctuations are other effects of methamphetamine use. (*Id.*)

Dr. Cunningham testified about a study showing that the odds of committing homicide are nine times greater for an individual who is using methamphetamine. (*Id.* at 147.) Methamphetamine abuse is also associated with "a marked increase and a likelihood of overkill." (*Id.*)

Counsel then questioned Dr. Cunningham about the "risk assessment" he performed to determine whether Cota would pose a danger while imprisoned. (*Id.* at 161.) Dr. Cunningham opened that "there is a high likelihood that Cota would adjust to a life term

in prison without serious violence." (*Id.* at 162.) This opinion was based on Cota's age, 47, and his "largely nonviolent adjustment" to confinement over a period totaling approximately eight years. (*Id.*) Dr. Cunningham also cited the appraisal of the jail staff, who viewed Cota as a low security risk, taking into account circumstances such as the fact Cota obtained a GED and pursued training in the electrical trades while confined; had a history of employment in the community; maintained contact with his family; and was in marginal health, being overweight and suffering from diabetes. (*Id.* at 164.) Dr. Cunningham also testified that a life sentence is statistically associated with a low likelihood of violence and that the "effectiveness of security and confinement" with ADOC is associated with a reduced risk of violence. (*Id.* at 163–64.) Dr. Cunningham cited studies of inmate populations in support of these factors (RT 8/4/09 at 8–73), including studies showing that "capital offenders are not likely to be violent in prison" (*id.* at 47).

Dr. Cunningham noted that in 64 months in the Maricopa County Jail Cota had been involved in just one incident of violence, where he "punched an inmate in a group disturbance after he had been attacked." (*Id.* at 22.) At an administrative hearing, an allegation of assault was not sustained, and Cota received write-ups for refusing to obey a direct order and conduct that disrupts security. (RT 8/5/09 at 8–9.)

On redirect examination, Dr. Cunningham testified that he had never seen a case where addiction was so prevalent among a sibling group. (8/5/09 at 16.) Nor had he encountered a case "where the mother had two children born by an incestuous relationship who were siblings of the defendant." (*Id.*) He also testified that Cota lacked any of the "protective factors" that could have ameliorated the damage from the risk factors. (*Id.* at 30–33). These absent factors include individual characteristics such as intelligence and resilience, social bonding to positive role models, healthy beliefs and clear standards for behavior, and effective early interventions. (*Id.* at 33.) Cota likewise did not experience any of the developmental assets that have been found to reduce the likelihood of bad outcomes for the child: family support, positive family communication, caring neighborhood, caring school climate, parent involvement in school, family boundaries,

constructive use of time, achievement motivation, positive values, social competencies, and self-esteem. (*Id.* at 33–43.) Dr. Cunningham explained that "people who don't have the assets and have been developmentally injured as well, a significant proportion of them choose badly." (*Id.* at 43.) "Everybody has a choice," he concluded, "but clearly, everybody doesn't get the same choice." (*Id.*)

Counsel then called their second expert witness, Dr. Alan Abrams, a psychiatrist with a specialty in addiction psychiatry. (*Id.* at 76–77.) He reviewed 6000 pages of documents and met with Cota for five and a half hours. (*Id.* at 87.) He also reviewed the psychiatric literature on the relationship between methamphetamine use and violence. (*Id.*)

Dr. Abrams testified that Cota had a severe substance abuse problem since the age of 17 when he started regularly injecting heroin. (*Id.* at 93.) He opined that, given the prevalence of substance abuse and addiction in the family, Cota was "genetically load[ed] for addiction." (*Id.* at 104.) He explained that users of methamphetamine "become irritable and perhaps aggressive"; they experience a hyper-alertness that can become paranoia and even "frank delusion." (*Id.* at 107.) Dr. Abram also cited the study showing that people who had used methamphetamine in the prior month were nine times as likely to have committed a homicide within that month. (*Id.* at 109–10.) He testified that there was no scientific dispute about the link between methamphetamine use and aggression and violence. (*Id.* at 110–11.)

Dr. Abrams testified that he performed a "retrospective diagnosis" of Cota's condition at the time of his arrest. (RT 8/6/09 at 8.) He diagnosed Cota on Axis I with methamphetamine abuse, opioid dependence with physiological dependence, cocaine abuse, and mixed intoxication withdrawal. (*Id.* at 9.) His Axis II diagnosis was dependent personality disorder, with drugs taking the place of a person to be dependent on. (*Id.* at 11.) Cota's Axis IV diagnosis included stressors related to his legal trouble. (*Id.* at 13.) Finally, Dr. Abram assigned Cota an Axis V general assessment score of 55, indicating moderate to severe impairments in functioning. (*Id.* at 14.)

Dr. Abrams then shared his 2008 diagnosis of Cota. He diagnosed Cota on Axis I with a history of methamphetamine and cocaine abuse, opioid dependence in remission in a controlled environment, and adjustment disorder with anxiety and depression. (*Id.* at 15.) The Axis II diagnosis remained the same. (*Id.*) On Axis III, he noted that Cota had now been diagnosed with diabetes and hypertension. (*Id.* at 16.) On Axis V, Dr. Abram assigned a general assessment score of 70, meaning minor impairment reflecting Cota's anxiety and depression. (*Id.*)

Dr. Abrams testified that he had no doubt Cota was using methamphetamine—and escalating his use—at the time of the murders. (*Id.* at 27, 35, 41–42.) Dr. Abram agreed that Cota's methamphetamine use was "a significant factor, if the not primary factor, leading to the murders. . . ." (*Id.* at 42.) He explained that "Cota's thinking was becoming quite distorted, that he was becoming increasingly irritable and aggressive, and that the methamphetamine was the most significant factor that turned Mr. Cota into the violent individual who killed this couple." (*Id.*) He also testified that the murders were characterized by "overkill" of the kind associated with the "extreme emotion" and "irrational rage" experienced by methamphetamine users. (*Id.* at 44.) He concluded, "to a reasonable degree of medical certainty," that "the methamphetamine was causing Mr. Cota to become angry, suspicious, irritable. And as his use increased, I believe it made him become rageful and murderous, and that ended up in the murder of Mr. Martinez and Ms. Zavala." (*Id.* at 45–46.)

The State then called its expert witness, Dr. James Seward, a forensic psychologist and neuropsychologist. (RT 8/10/09, p.m., at 13–17.) He was asked to opine on whether "[Cota] gives any evidence of past or present mental disorder" and to review the reports of the defense experts. (*Id.* at 19.) Dr. Seward also reviewed criminal justice records, substance abuse records, educational records, and occupational records. He also spoke with correctional officers and interviewed Cota. (*Id.* at 19–20.)

Dr. Seward administered the MMPI–II.[12] (*Id.* at 27.) The results were "pretty normal." (*Id.* at 28.) Dr. Seward found no evidence, in his interview with Cota or in his review of the record, that Cota suffered from any mental illness, beyond substance abuse disorder. (*Id.* at 30.) He did not diagnose Cota with antisocial personality disorder. (*Id.* at 34–38.) Dr. Seward did not perform a neuropsychological examination. (*Id.* at 56.)

Dr. Seward testified that from his review of the records Cota did not receive psychiatric treatment while in custody of the Department of Corrections. (*Id.* at 38.) He testified that IQ tests administered by ADOC resulted in scores of 94 and 104, or low average and average. (*Id.*)

Dr. Seward disagreed with Dr. Abram's diagnosis of dependent personality disorder. (*Id.* at 40–41.) He testified that he did not disagree with Drs. Cunningham and Abrams in their assessment of future dangerousness, but noted there are "limitations to these statistical formulae." (*Id.* at 49.) He did agree that the risk of violence for death row inmates or inmates sentence to life is low (*id.* at 50), and he acknowledged that "there's no evidence [Cota's] got any violent behaviors at all in prison" (*id.* at 90).

Following Dr. Seward's testimony, the prosecution presented security footage of the jailhouse melee that Cota was involved in, where he was struck by one inmate and then struck a different inmate. (RT 8/11/09 at 3–4.)

After the evidence was presented, Cota offered a brief allocution. (RT 8/11/09 at 57–58.) The court then provided its final jury instructions and the parties made their closing arguments. (*Id.* at 57–147.) The jury deliberated for one day before reaching a verdict as to one of the counts, finding that Cota should be sentenced to death for the murder of Guadalupe Zavala. (RT 8/13/09.) The Arizona Supreme Court upheld the verdict. *Cota*, 272 P.3d at 1044.

### ii.   PCR proceedings

During the PCR proceedings, Cota raised a claim alleging that trial counsel performed ineffectively by failing to retain mitigation experts "who would have presented

---

[12] Minnesota Multiphasic Personality Inventory.

1    evidence of Cota's cognitive deficiencies and mental illness" and challenged the State's

2    argument that Cota exercised conscious choice in continuing to abuse drugs. (PCR Pet. at

3    2, 20–27.)

4         In support of this claim, Cota offered the opinions of several experts. Dr. Donna

5    Schwartz-Watts, a forensic psychiatrist, diagnosed Cota with dysthymic disorder and

6    cognitive disorder NOS ("not otherwise specified") based on his "reported history of closed

7    head injuries," history of substance abuse, and "clinical findings on his mental status

8    examination." (PCR Pet., Ex. F.) According to Dr. Schwartz-Watts, Cota reported that he

9    had suffered the injuries in two car accidents, hitting his head on the windshield and on the

10   dashboard. (*Id.* at 3.) He did not seek medical treatment for any injuries suffered in the

11   accidents. (*See* Doc. 25 at 46.)

12        Dr. Lesley Hoyt-Croft prepared a lengthy Sociological/Substance Abuse

13   Evaluation. (*Id.*, Ex. E.) She concluded that Cota "is a person who can not (and has not for

14   over 30 year) operate outside the scope of his addiction"; that "everything he has done (and

15   not done)" including the murders, "are all the result of his drug use and drug addiction";

16   that when Cota "'chose' to use drugs at the age of 12 and as a result of genetic and

17   environmental factors became immediately addicted essentially left him without a choice

18   after that time." (*Id.*)

19        Cota also offered a report in which Dr. James Wu, M.D., interpreted Cota's brain

20   scans as abnormal in a "pattern consistent with brain injury, neuropsychiatric illness,

21   substance abuse, and vulnerability to developing stimulant dependence." (*Id.*, Ex. C.)

22        Finally, Dr. Andres Lugo, toxicologist, prepared a Risk Assessment in which he

23   opined that Cota had been exposed to toxic agricultural chemicals while the family was

24   living in a one-room shack without plumbing or electricity in a migrant farm community

25   in Eloy, Arizona. (*Id.*, Ex. D.) According to Dr. Lugo, Cota's exposure began *in utero* and

26   extended for a period of several years in the early 1960s until the family left the camp. (*Id.*

27   at 2.) Dr. Lugo wrote that exposure to such chemicals can cause "cognitive dysfunction

28   and behavioral problems" and leave the brain "highly vulnerable to develop drug

addiction." (*Id.* at 1.) Although Dr. Lugo asserted that he interviewed Cota, Cota's parents, and three of his siblings, he did not provide affidavits or declarations supporting any of the assertions made in his report. In fact, the report lacks quotes from or even statements attributable to anyone with first-hand knowledge of Cota's living situation during his early childhood.

The PCR court found that counsel did not perform ineffectively at sentencing. (PCR Ruling, ME 5/12/15, at 12.)[13] The court first addressed the allegation that trial counsel was ineffective by failing to retain "experts who would have presented evidence of Defendant's cognitive deficiencies and mental illness, attributable to agricultural traumatic toxicity and head injuries." (*Id.* at 6.)

The court contrasted Dr. Schwartz-Watts' diagnosis of cognitive disorder NOS with the opinions of Dr. Abrams and Dr. Seward, "who found no mental disorder." (*Id.* at 7.) The court also noted that the cognitive disorder diagnosis was based in part on Cota's substance abuse history. (*Id.*) The court then addressed Dr. Lugo's toxicology report:

> Defendant's PCR toxicology expert . . . concluded that the defendant was exposed to toxic levels of agricultural chemicals exposure by relying on the defendant's proximity to agricultural fields; Dr. Lugo noted that "most agricultural pesticides used during [his] childhood are currently banned." The "fact" that defendant himself was exposed to toxic chemicals, and that the exposure had an adverse effect on the defendant, is speculative, at best. Dr. Lugo opines that the pesticide exposure makes the defendant's "brain becoming [sic] *highly vulnerable to develop drug addiction*."

(*Id.*) (Emphasis in original.)

The court found that the additional information about exposure to toxins, "if true, might have further substantiated the depth of the defendant's drug addiction" and his inability to benefit from rehabilitation and "could have provided information about a contributing factor, in addition to family history, of the defendant's susceptibility to addiction." (*Id.*) The court found, however, that "expert testimony about the extent of [Cota's] addiction would have been cumulative to the lay testimony actually presented

---

[13] "ME" refers to the trial court's minute entries.

about the defendant's addiction." (*Id.*)

The court next considered Dr. Hoyt-Croft's report, noting that she "confirmed defendant's chronic substance abuse issues, dysfunctional family life and opined that 'psychological, social and environmental factors play a major role in addiction.'" (*Id.*) (citation omitted). The court found that Dr. Hoyt-Croft's "focus on the defendant's denial of responsibility/blaming others would not have been of assistance in persuading the jury that leniency was appropriate." (*Id.*) The court also explained that the report "focuses on rebutting the State's arguments and concedes, 'Every mitigating factor that [the prosecutor] attempts to minimize comes back to the defendant's addiction. . . .'" (*Id.*)

Citing clearly-established federal law, including *Strickland*, 466 U.S. at 691, and *Rompilla v. Beard*, 545 U.S. 374, 383 (2005), the PCR court found that "trial counsel conducted a reasonable investigation." (*Id.* at 9.) The court explained that the "investigation disclosed sufficient mitigation to seek the jury's consideration of thirty mitigating factors, and focused on the defendant's substance abuse and addiction, potential for rehabilitation/positive adjustment to incarceration." (*Id.* at 8.)

The court then noted that trial counsel had retained two experts, Drs. Cunningham and Abrams, "to evaluate adverse factors in the defendant's background or risk assessment for prison." (*Id.*) In his research of Cota's family history, Dr. Abrams reported that Cota worked in the fields at the end of ninth grade when the family moved to Gilroy, California, "living in a camp for migrant workers." (PCR Pet., Ex. B at 7.) Cota also stated that "he and his brothers began working in the fields as soon as they could." (*Id.*) As the PCR court noted, "There were no references to toxin exposure" and "no references to head injuries." (PCR Ruling, ME 5/12/15, at 8.)

The court determined that:

Even had trial counsel overlooked the possibility of toxins or head injury, counsel reasonably relied on his expert to extract relevant background information sufficient to render an opinion or to suggest further investigation. Further, the extent and nature of the fieldwork was within the knowledge of the defendant and his family, whose time in the fields and potential chemical

exposure remains relatively undocumented—other than in general terms—
even now, six years post-trial.

(*Id.*)

The court reiterated that trial counsel presented testimony in support of the
mitigating factors "absence of risk of violence" and "potential for rehabilitation." (*Id.*) The
court found that "[f]ocusing on organicity as a source of the addiction through testimony
similar to that provided by the PCR experts would have diminished trial counsel's ability
to pursue several chosen rehabilitation-related themes in support of leniency." (*Id.*)
According to the court, such a focus "would have required that trial counsel emphasize the
defendant's lack of control over his addiction and susceptibility to relapse due to organic
factors even while claiming that 'potential for rehabilitation' made him a candidate for
leniency." (*Id.*) The court explained:

> For example, Dr. Cunningham testified extensively about the defendant's
> history, family, genetic influences (substance abuse; mental health issues)
> and genealogical factors (incest dysfunctional family abuse and neglect) in
> terms of risk and protective factors that affect child and brain development.
> Trial counsel's chosen strategy enabled him to focus on the role the
> defendant's drug addiction played in his "life trajectory:" his development,
> value system, criminal conduct, instability, and choices. Counsel's use of lay
> witnesses served to humanize the defendant, and permitted counsel to
> address the "hope" for rehabilitation and to avoid providing the jury with
> evidence that brain damage (which his experts did not identify) would thwart
> such efforts.

(*Id.*)

The PCR court found that the omission of evidence of brain trauma and early
exposure to toxic chemicals did not prejudice Cota given the evidence that was presented,
including "the family history of substance abuse" and "defendant's sibling's testimony
about the defendant's particular susceptibility and struggles." (*Id.* at 9.) The court explained
that counsel "presented the genetic, addiction and developmental components to the
defendant's behaviors" and "thoroughly explored the defendant's life trajectory, including
the genetic and familial factors related to addiction." (*Id.*) In light of the evidence that was
presented supporting addiction as a mitigating factor, the court concluded, "the proffered

PCR evidence would have bolstered defendant's tendency toward addiction, but was cumulative to what was presented at trial through defendant's family, friends and the experts, Dr. Abrams and Dr. Cunningham." (*Id.*)

The court likewise rejected the argument that trial counsel "failed to retain experts during the penalty phase who would have challenged the State's assertions that Defendant exercised conscious choice when he failed to complete prescribed rehabilitation programs and/or continued to abuse drugs." (*Id.*)

The court first noted "the thoroughness with which counsel prepared, and presented its themes through the defendant's family, including his siblings who had their own histories of drug abuse [and] through Dr. Cunningham and Dr. Abrams." (*Id.* at 10.) The court observed that the choice of what witnesses to present is a strategic decision. (*Id.*) Trial counsel presented both lay and expert witnesses whose testimony addressed the issue of choice. As the PCR court noted, Drs. Cunningham and Abrams specifically addressed the reasons for Cota's impaired decision-making ability. (*Id.*)

In finding that counsel reasonably decided to offer the testimony of lay witnesses, the court cited the humanizing as well as the explanatory impact of such evidence:

> [S]ince the goal of the sentencing phase is to assist the jury in understanding the defendant as a person, "addiction" evidence specific to the defendant could be introduced—and might have greater impact if presented—through witnesses who had seen the defendant struggle with addiction and who themselves had struggled. Trial counsel chose to explain the nature and impact of addiction through witnesses who had personally experienced it, and who had witnessed the defendant's addiction.
>
> Trial counsel was faced with presenting the defendant as a person who was a candidate for overall rehabilitation and who would follow the rules and not be violent in prison, despite his past failures to make good choices (e.g., not to take advantage of drug rehabilitation treatment options). Trial counsel elicited testimony from a number of witnesses about their own struggles with drugs, their struggles with sobriety, their eventual decision to get "clean," and their ongoing struggles to remain clean. Again, trial counsel sought to confirm that, despite obstacles, the defendant was deserving of leniency rather than death.

(*Id.* at 11.) The court then noted the potential drawbacks of calling an expert to offer

testimony that addiction eliminates a user's ability to make choices:

> Even had a third expert been called to opine that the "defendant had no choice," such testimony would not have eliminated the State's ability to argue that the defendant had made a series of bad choices. Even the defense expert, Dr. Cunningham, who detailed the effect of the defendant's background, acknowledged that the defendant made choices. Another expert testifying that defendant had no choice would have allowed the state to repeating a litany of the bad choices they posited the defendant made. Moreover, suggesting that the defendant had no choice would undercut trial counsel's ability to focus on the likelihood of rehabilitation and success in a prison environment in an attempt to secure leniency rather than death.

(*Id.*)

Finally, the court found that Cota was not prejudiced by trial counsel's performance. (*Id.*) The court "consider[ed] defendant's mitigation had it included toxicity and brain damage, or cognitive deficiency and mental illness, and 'addiction' (versus 'choice') along with the mitigation actually presented—the thirty mitigating factors ('including intoxication at the time of the murders, troubled family history, history of substance abuse, lack of previous violence, and low risk of future violence in prison.')" (*Id.*) (quoting *Cota*, 272 P.3d at 1044). The court continued:

> The jury had already been tasked with considering addiction and the impairment of defendant's choices by his background and experiences. Had the presence of toxins been substantiated, the jury was likely to consider it in connection with the confirmation of defendant's addiction rather than as additional mitigation, and/or to weigh more heavily the demonstrated impact of drug use and abuse on defendant's behavior and actions (in considering leniency) rather than the somewhat more speculative claim of a toxic environment.
>
> Had the defendant presented evidence of mental illness, the evidence would have undercut the trial evidence presented by both sides that he was not suffering from a mental illness. Had the defendant rebutted the claim of "choice" as suggested by PCR counsel, he would have been in the uncomfortable position of asking the jury to consider and reconcile contradictory expert testimony: that he both had a choice and did not have a choice.

(*Id.* at 11–12.)

1    The court concluded that if counsel had presented the additional evidence, the jury

2    would have found the "mitigation insufficient to warrant leniency where the circumstances

3    of the offense included the killing of two people and leaving them wrapped in plastic in a

4    closet. Thus, there was no prejudice." (*Id.* at 12.)

5            b.     Claim 1(A)

6    Cota alleges his trial counsel failed to "investigate, develop, and present readily

7    available and compelling mitigation evidence." (*Id.* at 31–51.) Specifically, he contends

8    that counsel performed ineffectively by failing to present expert testimony detailing Cota's

9    brain damage, cognitive deficiencies, and mental illness and explaining the involuntary

10   nature of his drug addiction. (*Id.*) The PCR court denied the claim on the merits without

11   holding an evidentiary hearing. (PCR Ruling, ME 5/12/15.) Cota argues that the denial of

12   this claim constituted an unreasonable application of *Strickland* and was based on

13   unreasonable factual determinations under § 2254(d)(1) and (2). The Court disagrees.

14           *i.*     *Reasonable application of clearly-established federal law*

15   Cota raises four grounds to support his claim that the PCR court unreasonably

16   applied *Strickland.* In reviewing these challenges, the Court applies the "doubly

17   deferential" standard demanded by *Strickland* and the AEDPA. *See Titlow*, 571 U.S. at 15.

18   Cota first argues that "in rejecting the need for [trial counsel] Hamby to have

19   presented evidence as to Cota's head injuries or toxin exposure, the court incorrectly

20   concluded that counsel 'reasonably relied on his expert to extract relevant background

21   information sufficient to render an opinion or to suggest further investigation.'" (Doc. 25

22   at 35) (quoting PCR Ruling at 8.)

23   Counsel retained two experts. Dr. Cunningham, a clinical and forensic psychologist,

24   was tasked with assessing Cota's "moral culpability": "What is the background of Bennie

25   Cota that would help explain how he got to this tragic offense?" (RT 8/3/09 at 35.) He was

26   also asked to evaluate "what kind of inmate [Cota is] likely to be in prison if sentenced to

27   life." (*Id.*) In addressing these questions Dr. Cunningham reviewed, among other

28   documents, Cota's mental health records and the reports of other experts who had evaluated

him. (*Id.* at 33.) Counsel also retained a psychiatrist, Dr. Abrams, to testify about Cota's long-term addiction and the effects of his drug use, particularly methamphetamine use, at the time of the offenses. (*See* RT 8/5/09, p.m., at 86.) Counsel's decision to use these experts was not deficient.

"The choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). In *Turner* the Ninth Circuit rejected a claim that counsel performed ineffectively by retaining a general psychologist and not an expert on PCP. *Id.* at 876. The court held that the argument that "a more specialized expert would have been more persuasive" failed to support a claim of ineffective assistance of counsel. *Id.*; *see Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Given the obvious role substance abuse played in Cota's life and in the murders, retaining Drs. Cunningham and Abrams as mitigation experts was a reasonable strategic choice.

In *Sanchez v. Davis*, 994 F.3d 1129, 1148 (9th Cir. 2021), the Ninth Circuit held that the state supreme court could reasonably have determined that counsel did not perform deficiently by failing to seek neuropsychological testing to show the petitioner's mental impairment. The court rejected the argument that additional experts should have been retained at sentencing based on "anecdotal" information produced years later during state habeas proceedings suggesting that the petitioner had been exposed to drugs *in utero*, suffered from "inherited deficits," and had experienced head injuries. *Id.* at 1147–48. The court noted that the information was not available to counsel at the time of trial and reiterated that counsel's choice of experts is entitled to deference. *Id.* at 1148. Finally, the court explained that "having consulted two doctors who did not provide support for the conclusion that Sanchez was mentally impaired in a way that could provide a defense, counsel was under no duty to continue to search in an unending quest to find a supportive

1   expert, especially when if that were done, the views of the first experts would still be

2   discoverable and usable by the prosecution to contradict." *Id.*

3       In criticizing the PCR court's ruling, Cota argues, referring to Dr. Cunningham, that

4   it "is impossible to suggest that an expert conducting a risk assessment for prison behavior

5   should also be tasked with investigating and developing all potential mitigating factors,

6   even those entirely unrelated to his or her field of expertise such as a history of exposure

7   to toxic pesticides in utero." (Doc. 25 at 36.) This grossly misrepresents both the role

8   counsel assigned Dr. Cunningham and the content of his testimony, which specifically—

9   and at great length—addressed the genetic and environmental background factors that

10  purportedly reduced Cota's moral culpability for the murders. Both Dr. Cunningham and

11  Dr. Abram interviewed Cota and his family members and reviewed the relevant records.

12  Neither expert put counsel on notice that head trauma or early exposure to toxic chemicals

13  were issues deserving further investigation. It is pure speculation to suggest that either

14  expert, with their extensive experience as defense witnesses in capital cases, would have

15  been incapable of recognizing brain injury or toxic exposure as important mitigating

16  evidence had the record contained such information.

17      As the Ninth Circuit has explained, "When there is no 'objective indication' that a

18  defendant has a mental illness or brain damage, we cannot label counsel 'ineffective for

19  failing to pursue this avenue of mitigation.'" *Earp v. Cullen*, 623 F.3d 1065, 1076 (9th Cir.

20  2010) (quoting *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008)). Moreover,

21  "[a]n expert's failure to diagnose a mental condition does not constitute ineffective

22  assistance of *counsel*, and Earp has no constitutional guarantee of effective assistance of

23  experts." *Id.*; *see Campbell v. Coyle,* 260 F.3d 531, 555 (6th Cir. 2001) (finding counsel

24  reasonably relied on a "trained psychologist" who failed to discover the petitioner's alleged

25  post-traumatic stress disorder).

26      The reasonableness of the PCR court's decision is supported by the speculative

27  nature of the evidence Cota contends should have been presented. Dr. Abrams, a

28  psychiatrist, reviewed more than 6000 pages of records and interviewed Cota and his

family members. (PCR Pet., Ex. B.) The evaluation he prepared in 2009 included sections on Cota's biography and medical history. Dr. Abrams reported that Cota "denied ever having a seizure or loss of consciousness from a head injury." (*Id.* at 11.) He also reported that Cota and his brothers began working in the fields as soon as they were old enough, lived in a camp for migrant workers in California after Cota's ninth-grade year, and worked in the fields in California over summer vacations. (*Id.* at 7.) Cota told Dr. Abrams that his father worked intermittently driving a truck, landscaping, or doing autobody work and his mother did not work when he was young. (*Id.* at 6.) Dr. Cunningham, a forensic psychologist who had testified in more than 150 capital cases was asked to examine adverse developmental factors that might have impaired Cota's development. Like Dr. Abrams he interviewed Cota and his family members and reviewed voluminous records. Dr. Cunningham did not identify head injuries or childhood exposure to toxins as among those adverse factors. In addition, none of the Cota's family members, including his older siblings, testified that his first years were spent in a migrant camp where they were all exposed to pesticides while living in a primitive one-room shack.

Dr. Hoyt-Croft's 2013 report likewise makes no mention of Cota being born and growing up in a migrant camp where he was exposed to pesticides, although she notes, consistent with other reports, that after ninth grade Cota lived in a "camp for migrant workers" in Gilroy, California, and that he and his brothers returned to California to work in the fields during the summers. (PCR Pet., Ex. E.)

Finally, as already noted, Dr. Lugo himself offered no support via affidavit or declaration for his conclusion that Cota and his family lived in an agricultural work camp for the first four to six years of Cota's life and were exposed to dangerous pesticides. (PCR Pet., Ex. F at 3.) Nothing elsewhere in the record supports his findings.

The anecdotal information offered by Cota in the PCR proceedings, which was unknown to trial counsel and not discovered by the defense experts, is not sufficient to establish that counsel's penalty-phase performance was deficient. *See Sanchez*, 994 F.3d at 1148; *Earp*, 623 F.3d at 1076.

Moreover, as the PCR court determined, it was strategically reasonable for trial counsel to argue "absence of risk of violence" and Cota's "potential for rehabilitation" as mitigating factors. (PCR Ruling at 8.) According to the PCR court, arguing that Cota's brain was damaged would have "thwart[ed]" efforts to portray him as capable of rehabilitation and therefore deserving of leniency. (*Id.*) Other courts have acknowledged that evidence of brain damage is a "double-edged sword." *See Evans v. Secretary, Dep't of Corr.*, 703 F.3d 1316, 1328 (11th Cir. 2013) (finding brain damage leading to an impulse disorder could be viewed as evidence that a defendant is beyond rehabilitation); *Leavitt v. Arave*, 646 F.3d 690, 615 (9th Cir. 2011) ("[T]here's no way of knowing which way evidence of a biological mental impairment would have cut; it very well may have counted against Leavitt."); *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998) (counsel exercised reasonable strategic judgment by "steer[ing] away from" evidence of organic brain dysfunction, "calculating that it would not help portray [Petitioner] as normal and capable of rehabilitation"); *Bonin v. Calderon*, 59 F.3d 815, 834–35 (9th Cir. 1995) (counsel's decision not to investigate or present evidence of brain damage at the penalty phase was not ineffective assistance where counsel decided to rely principally on an "institutional adjustment" mitigation theory).

Finally, the cases cited by Cota do not support his arguments. In *Summerlin v. Schriro*, 427 F.3d 623, 642–43 (9th Cir. 2005), the court found ineffective assistance where counsel failed to present available evidence of a key penalty-phase defense, namely the petitioner's psychomotor epilepsy—a condition that could be diagnosed by a psychiatrist or neurologist. The court rejected the State's argument that all of the mitigating evidence was contained in a pretrial report prepared by a psychologist on the question of legal insanity. *Id.* The court explained that "in presenting a penalty phase mitigation defense based on mental health, counsel should not merely rely on competency evaluations conducted at the guilt phase, which are prepared for a different purpose." *Id.* at 642. In Cota's case, by contrast, counsel presented extensive and detailed testimony by experts who had evaluated Cota specifically for mitigation purposes.

In *Lambright v. Schriro*, 490 F.3d 1103, 1118–20 (9th Cir. 2007), the court granted relief on an ineffective assistance claim where counsel failed to obtain any of the petitioner's medical or hospital records, failed to call any witnesses at the mitigation hearing, which occupied less than three transcript pages, and retained no mental health experts, relying instead on a two-page sentencing memorandum, the pre-sentence investigation report, and a damaging report prepared by a court-appointed psychologist. This performance bears no resemblance to that of Cota's counsel at sentencing, who offered mitigating evidence from 20 lay witnesses and two experts over the course of 11 days and several hundred transcript pages.

The PCR court reasonably determined that counsel's reliance on Drs. Cunningham and Abrams did not constitute deficient performance.

Cota next argues that "the PCR court was unreasonable when it repeatedly found that Hamby's decision to focus on a few mitigating factors without being aware of the other compelling and abundant mitigation evidence that existed at the time of trial was not deficient performance." (Doc. 25 at 36) (citing PCR Ruling at 9).

For the reasons just discussed, counsel's decision to focus on Cota's dysfunctional family life, history of addiction, impairment at the time of the murders, and the low risk of violence he posed as an inmate, was a matter of strategy warranting a high level of deference. *See Miles v. Ryan*, 713 F.3d 477, 487 (9th Cir. 2013) ("[Counsel's] decision to rely on Dr. Levy and to focus on other mitigating factors, such as depression, rather than on addiction, was a matter of strategy.") (citing *Pinholster*, 563 U.S. at 190–95, and *Strickland*, 466 U.S. at 691); *Bonin*, 59 F.3d at 834.

Cota next argues that "the PCR court repeatedly sanctioned Hamby's failure to conduct an adequate mitigation investigation" and in doing so "ignored both the prevailing professional norms and the controlling case law." (Doc. 25 at 37) (citing PCR Order at 6–9.) In fact, the court acknowledged that *Strickland* imposes a duty on trial counsel to "conduct a reasonable investigation in order to make an informed decision as to how best to represent his client." (PCR Order at 7) (citing *Strickland*, 466 U.S. at 691). The court

1   also cited clearly-established federal law for the proposition that "[r]easonably diligent

2   counsel may draw a line when they have good reason to think further investigations would

3   be a waste." (*Id.*) (quoting *Rompilla*, 545 U.S. at 383).

4       Cota simply disagrees with the conclusions reached by the PCR court as to the

5   reasonableness of counsel's investigation. His burden under *Strickland* and § 2254(d)

6   requires more, however. The PCR court accurately described the extent of counsel's

7   investigation, the paucity of evidence suggesting that Cota had suffered head injuries or

8   damaging exposure to pesticides, and the potential drawbacks of such evidence given the

9   mitigation case counsel did present. (PCR Ruling at 6–9.) Its application of *Strickland* was

10   not objectively unreasonable.

11       Cota also argues that "the state court's finding that [he] was not prejudiced by trial

12   counsel's failures is objectively unreasonable and unsupported by law." (Doc. 25 at 38.)

13   Cota cites the evidence that was not presented at sentencing, including "evidence regarding

14   Cota's brain damage and exposure to toxins" as well "evidence of Cota's longstanding

15   struggle with depression and cognitive disorder, his brain dysfunction and limitations, or

16   the reasons why his drug addiction was not within his control." (*Id.*)

17       To demonstrate prejudice, a petitioner "must show that there is a reasonable

18   probability that, but for counsel's unprofessional errors, the result of the proceeding would

19   have been different." *Strickland*, 466 U.S. at 694. When challenging a death sentence, "the

20   question is whether there is a reasonable probability that, absent the errors, the sentencer .

21   . . would have concluded that the balance of aggravating and mitigating circumstances did

22   not warrant death." *Id.* at 695. In determining whether there is a reasonable probability of

23   a different result, a reviewing court "reweigh[s] the evidence in aggravation against the

24   totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The

25   totality of the evidence includes both that produced at trial and the evidence produced

26   during the habeas proceedings. *Id.* at 536 (citing *Williams (Terry)*, 529 U.S. at 397–98;

27   *see Schurz v. Ryan*, 730 F.3d 812, 816 (9th Cir. 2013).

28

1    The PCR court found that there was not a reasonable probability of a different
2    outcome if the new evidence had been presented: "Had trial counsel presented the
3    additional proposed alleged mitigating factors, the jury would not have found the
4    mitigation insufficient [sic] to warrant leniency where the circumstances of the offense
5    included the killing of two people and leaving them wrapped in plastic in a closet." (PCR
6    Ruling at 10.) This was an objectively reasonable determination.

7    As the PCR court found, much of the new information was cumulative. Dr. Hoyt-
8    Croft's report duplicates the penalty-phase testimony of Drs. Cunningham and Abrams on
9    Cota's substance abuse history, the nature of addiction, and the effects of heroin and
10   methamphetamine. Dr. Schwartz-Watts's diagnosis of cognitive disorder NOS depends
11   largely on information that was before the jury at sentencing, including Cota's "family
12   history" and "substance abuse history." (PCR Pet., Ex. F at 5.) The diagnosis of dysthymia,
13   or chronic depression, relies on the "suicide note" and Cota's "low self-esteem and self-
14   criticism." (*Id.*) This information was presented at sentencing, as was the fact that Cota had
15   been prescribed anti-depressants in jail. The results of the brain scans interpreted by Dr.
16   Wu were consistent with substance abuse and a vulnerability to dependence. (*Id.*, Ex. C.)
17   There was extensive penalty-phase testimony from the defense experts documenting the
18   genetic component of addiction. There was also testimony that Cota's IQ was in the low-
19   average or average range, so counsel cannot be faulted for failing to further pursue his
20   cognitive limitations. Finally, as noted above, it is not clear whether the jury would have
21   viewed evidence of brain damage as mitigating or as evidence that Cota was incapable of
22   nonviolence and rehabilitation. *See Levitt*, 646 F.3d at 615.

23   Because Cota has not met "the highly demanding and heavy burden [of] establishing
24   actual prejudice," *Allen*, 395 F.3d at 1000, he has not shown that the PCR court's ruling
25   was objectively unreasonable.

26                    *ii.    Reasonable factual determinations*

27   Cota argues that the PCR court's decision resulted from several unreasonable factual
28   determinations. The court's first error, according to Cota, was "discount[ing the] evidence

regarding the toxic chemicals he was exposed to during his time as a migrant worker." (Doc. 25 at 39) (citing PCR Order at 7.) This argument is unpersuasive. First, the toxicologist's report states that Cota was exposed to damaging pesticides in Eloy from the time of his conception till the family moved when he was four to six years old. (PCR Pet., Ex. D at 2.) Cota surely was not a "migrant worker" at that point. He began to work in the fields in California during the summers after ninth grade, but there is no allegation that he was exposed to toxins then, and the gravamen of Dr. Lugo's risk assessment is that Cota's brain *in utero* and as a small child was especially vulnerable to toxins.

Cota next complains that the PCR court, by using the phrase "if true" in its assessment of Dr. Lugo's findings, was making the unreasonable assumption that the evidence was not true. (Doc. 25 at 39.) Cota also argues that "nothing in the court's order or the toxicologist's report clarifies why the court did not find the evidence credible." (*Id.* at 40.) Finally, Cota faults the court for finding "the extent and nature of the fieldwork was within the knowledge of the defendant and his family, whose time in the fields and potential chemical exposure remains relatively undocumented." (*Id.*) (quoting PCR Ruling at 8.)

These arguments don't withstand scrutiny. First, by using "if true" to describe the evidence, the court was clearly proceeding on the assumption that the evidence was true for the purposes of its analysis. (*See* PCR Ruling at 7) ("The additional toxin information, if true, might have further substantiated the depth of the defendant's drug addiction. . . . "). For the reasons discussed above, the PCR court's description of the assertions in Dr. Lugo's assessment as "speculative" and "relatively undocumented—other than in general terms" (PCR Ruling at 7, 8), is accurate. Neither Cota nor his relatives provided the defense team any information about exposure to toxins despite extensive investigations into the Cota family's background. Dr. Lugo's report itself, prepared several years after the trial, fails to offer any evidence linking Cota with exposure to a specific harmful pesticide. According to the state court the deference to which it is entitled, its findings concerning Cota's alleged exposure to toxins is not objectively unreasonable. *See Brumfield*, 576 U.S. at 314; 28 U.S.C. § 2254(d)(2).

Finally, Cota contends that the PCR court "unreasonably determined that the entirety of Cota's proffered mitigation at the PCR stage, involving his traumatic head injuries, abnormal brain scans, rampant exposure to toxic pesticides . . . , his diagnosed cognitive and dysthymic disorders, and the expanded information regarding addiction . . . was cumulative to what was presented at trial." (Doc. 25 at 41) (citing PCR Order at 9.)

In denying Cota's claim that counsel failed to retain appropriate experts, the PCR court concluded:

> The defendant claims that early exposure to toxic chemicals and brain trauma affected him negatively, and faults trial counsel for failing to discover the exposure and trauma and its impact. Given the evidence deduced at the original sentencing, which identified no mental illness; the family history of substance abuse; defendant's sibling's testimony about the defendant's particular susceptibility and struggles; trial counsel presented the genetic, addiction and developmental components to the defendant's behaviors. Trial counsel thoroughly explored the defendant's life trajectory, including the genetic and familial factors related to addiction.
>
> Trial counsel presented addiction as mitigation. Thus, the proffered PCR evidence would have bolstered defendant's tendency toward addiction, but was *cumulative* to what was presented at trial through defendant's family, friends and the experts, Dr. Abrams and Dr. Cunningham.

(*Id.*) (Emphasis added.)

This was not an objectively unreasonable finding. Trial counsel presented a thorough case, through both lay and expert witnesses, explaining the causes and effects of Cota's substance abuse. Assuming the new evidence provides additional, credible explanations for Cota's "tendency toward addiction" (*id.*), it "barely . . . alter[s] the sentencing profile presented" to the jury. *Strickland*, 466 U.S. at 700; *see Babbitt*, 151 F.3d at 1175 (finding no prejudice where counsel failed to present cumulative mitigating evidence); *Bobby*, 558 U.S. at 12 (finding no prejudice where new evidence added "nothing of value").

To the extent the new evidence is not cumulative, it has the "double-edged" quality the PCR court recognized, and would have been inconsistent with the themes of lack of

1   future dangerousness and potential to be rehabilitated.

2          *iii*      *Conclusion*

3         Ultimately, as the United States Supreme Court has explained, "it is difficult to

4   establish ineffective assistance when counsel's overall performance indicates active and

5   capable advocacy." *Richter*, 562 U.S. at 111. Cota's counsel provided "active and capable

6   advocacy" throughout his trial, including at the penalty phase. *See Babbitt*, 151 F.3d at

7   1176 ("[C]ounsel did far more than a cursory investigation.").

8         The PCR court's denial of this claim was not "so obviously wrong as to be 'beyond

9   any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 526 (quoting *Richter*,

10   562 U.S. at 102, 103). Claim 1(A) fails to satisfy the "doubly deferential" standard

11   demanded by *Strickland* and the AEDPA. *See Titlow*, 571 U.S. at 15. Therefore, Claim

12   1(A) is denied.

13         c.     Claims 1(B) to 1(F)

14         Cota did not raise these claims in state court. He asserts, with respect to each of

15   these claims, that "[b]ecause this claim has not been adjudicated by the Arizona state

16   courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and

17   the Court may consider the claim de novo." (Doc. 25 at 51) (citing *Dickens*, 740 F.3d at

18   1320). This is misleading. In *Dickens* the Ninth Circuit remanded to the district court a

19   "fundamentally altered," and therefore "new," claim of ineffective assistance of trial

20   counsel to determine under *Martinez* whether cause and prejudice existed to excuse the

21   claim's default. 740 F.3d at 1320. The court then explained that "*if Dickens can show cause*

22   *and prejudice to excuse a procedural default, AEDPA no longer applies and a federal court*

23   *may hear this new claim de novo.*" *Id.* at 1321 (emphasis added). Accordingly, Claims 1(B)

24   to 1(F) must satisfy *Martinez* before the Court considers their merits. They do not.

25         As stated above, to establish "cause" under *Martinez*, a petitioner must demonstrate

26   that PCR counsel was ineffective under *Strickland. See Clabourne*, 745 F.3d at 377. That

27   means Cota must demonstrate that PCR counsel's performance with respect to these claims

28   was both deficient and prejudicial. *Id.* To satisfy the prejudice prong, Cota must

demonstrate there was a reasonable probability that, absent the deficient performance, the result of the PCR proceedings would have been different. *Id.* (citation omitted).

In Claim 1(B) Cota alleges that counsel was ineffective for failing to "object to the State's improper and prejudicial statements during its penalty-phase closing argument." (Doc. 25 at 51.) As objectionable comments Cota cites the prosecutor's statements on his silence and remorselessness; on unproven or uncharged aggravators, namely pecuniary gain; and on a causal nexus test for mitigating evidence. (*Id.* at 51–55.)

As discussed below in the Court's analysis of Claim 3, the Arizona Supreme Court rejected Cota's claims that the prosecutor impermissibly commented on his silence, improperly characterized the murders based on speculation, and improperly suggested Cota committed the murders for pecuniary gain. *Cota*, 272 P.3d at 1042–43. The court also found that "[a] defendant may claim remorse"—as Cota did in his allocution—"but if he does the State may rebut that statement." *Id.* at 1043. Because there was no reversible misconduct on the part of the prosecutor, it was not deficient for defense counsel to fail to object. *Strickland* does not require trial counsel to make futile objections, so the decisions of Cota's counsel were reasonable under these circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (challenge to a futile objection fails both prongs of *Strickland*).

Moreover, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993). Under *Necoechea*, trial counsel's decision not to object to the prosecutor's comments, possibly to avoid highlighting them, was a reasonable strategic decision. *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013).

Finally, as described below, the prosecutor did not misstate the law regarding causal nexus, so counsel did not perform ineffectively by failing to object.

Cota can show neither deficient performance nor prejudice. Claim 1(B) is meritless. Therefore, PCR counsel did not perform deficiently by failing to raise the claim and there is not a reasonable probability that the results of the PCR proceedings would have been different if it had been. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982. In the absence of cause for the claim's default, it remains barred from federal review and will be denied.

In Claim 1(C) Cota alleges that counsel was ineffective by failing to request that the "jury be instructed to consider mercy itself as a mitigating factor." (Doc. 25 at 55.) As described above (Claim 28), this is a meritless argument and such a request by counsel would have been futile. Because the underlying ineffective assistance claim is meritless, PCR counsel's failure to raise the claim was neither deficient nor prejudicial, and cause for the claim's default is absent.

In Claim 1(D) Cota alleges that trial counsel was ineffective for failing "to properly request that Cota's jury be instructed that he was parole ineligible" and "incorrectly [telling] the trial court that it could sentence Cota to a life sentence that included the possibility of parole." (Doc. 25 at 56.) This claim is meritless so PCR counsel did not perform ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

First, counsel did request a parole-ineligibility instruction (ROA 456), citing *Simmons*, and "objected . . . to any statement to the jury about the possibility of release after 25 years." (RT 7/17/09.) Even if counsel had failed to request such an instruction, that failure would not be ineffective assistance because, under then-current Arizona law and its incorrect interpretation of *Simmons*, Cota was theoretically entitled to some form of release. *See Cota*, 272 P.3d at 1042. Finally, as discussed below, because the prosecution did not argue that Cota presented a future danger, *Simmons* was not triggered and Cota was not entitled to a parole ineligibility instruction.

The default of Claim 1(D) is not excused. The claim is denied as barred from federal review.

1   In Claim 1(E), Cota alleges that counsel was ineffective for failing "to request that

2   the jury be instructed that the cumulative effect of mitigation was a separate, independent

3   mitigating factor itself." (Doc. 25 at 59.) Because the Arizona Supreme Court rejected an

4   identical claim in *State v. Chappell*, 236 P.3d 1176, 1188 (Ariz. 2010), it would have been

5   futile for counsel to request such an instruction. Because the underlying ineffective

6   assistance claim is meritless, PCR counsel's failure to raise the claim was neither deficient

7   nor prejudicial, and cause for the default does not exist. *See Atwood*, 870 F.3d at 1059–60;

8   *Runningeagle*, 825 F.3d at 982.

9   In Claim 1(F), Cota alleges that trial counsel performed ineffectively by failing "to

10   adequately advise Cota of the consequences of allocution"—namely, the risk that by

11   expressing remorse he would open the door to damaging rebuttal from the prosecution

12   (Doc. 25 at 60.) As Respondents note (Doc. 35 at 76), this allegation is wholly conclusory,

13   lacking any factual support or citation to record. "Conclusory allegations which are not

14   supported by a statement of specific facts do not warrant habeas relief." *Jones v. Gomez*,

15   66 F.3d 199, 205 (9th Cir. 1995).

16   This meritless claim remains procedurally defaulted and barred from federal review.

17   *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

18   **C.   Prosecutorial Misconduct and *Brady* Claims**

19   **1.   Claim 3**

20   Cota alleges that the prosecutors engaged in misconduct in violation of his rights

21   under the Fifth, Sixth, and Fourteenth Amendments. (Doc. 25 at 69.) He alleges that the

22   prosecutor (A) improperly commented on Cota's silence; (B) "implored the jury to

23   sentence Cota to death based upon speculation and uncharged or unproven aggravating

24   circumstances"; (C) improperly argued that Cota's mitigation evidence should be given

25   limited or no weight without proof of a causal nexus to the crime; and (D) improperly

26   commented on Cota's lack of remorse. Cota presented Claims 3(A) and (B) to the Arizona

27   Supreme Court on direct appeal. (Opening Brief, Doc. 35-1, Ex. A at 93–96.)

28

1          a.      Claim 3(A)

2          Cota proposed remorse as a nonstatutory mitigating circumstance, and the court so

3   instructed the jury. (*See* RT 8/11/09 at 65.) At the close of the penalty-phase, Cota gave an

4   allocution in which he apologized to the victims' families, to his parents and siblings, and

5   to his children. (RT 8/11/09 at 55–56.) He stated that he "wasn't strong enough to beat the

6   drugs" and that his "addiction caused him to sin against man and God." (*Id.*) He asked his

7   children to forgive him. (*Id.* at 55.) He then "begg[ed]" the jury, if it "could find any mercy

8   or forgiveness in [its] heart, to please sentence [him] to life in prison." (*Id.* at 56.) He did

9   not admit responsibility for the murders.

10         During her penalty-phase closing argument, the prosecutor challenged the

11  expressions of remorse Cota offered in his allocution and commented on his refusal to take

12  responsibility for the murders, including during his interview with the detectives. (RT

13  8/12/09, a.m., at 21–22, 24–25; RT 8/12/09, p.m., at 25–28.) She asked whether Cota ever

14  told the jury or the victims "that he murdered Lupe and Victor? No, he didn't. . . . [D]id he

15  admit to killing them? No." (*Id.* at 21.) She repeated that "Cota never admitted to killing

16  them. . . . Because he still is going to maintain to his family and to everybody else that he

17  talks to that he is innocent." (*Id.*) She also argued that if Cota were "truly sorry and

18  remorseful, wouldn't he have told the police how sorry he was?" (*Id.* at 22.)

19         The Arizona Supreme Court denied Cota's argument that the prosecutor

20  impermissibly commented on his right to remain silent, finding that her statements "were

21  fair rebuttal to Cota's allocution":

22              Most of the statements at issue simply noted that Cota never expressed
              remorse for committing the crime during the allocution. A defendant may
23              claim remorse in allocution, but if he does so the State may rebut that
              statement.
24

25              The prosecutor also said that if Cota "were truly sorry and remorseful,
              wouldn't he have told the police how sorry he was? On that 107 minutes of
26              video, what do you see? Angry, combative man. He is not admitting." This
              argument can fairly be read, however, as contrasting Cota's denials of
27

28

- 62 -

responsibility in the interrogation with his subsequent claim of remorse. Such comments are permissible.

*Cota*, 272 P.3d at 1042–43 (citations omitted). This decision was neither contrary to nor an unreasonable application of clearly-established federal law.

The Fifth Amendment prohibits a prosecutor from commenting to the jury about a defendant's failure to testify at trial. *Griffin v. California*, 380 U.S. 609, 615 (1965); *see United States v. Robinson*, 485 U.S. 25, 32 (1988) ("*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt.") (quotation omitted). "While a direct comment about the defendant's failure to testify always violates *Griffin*, a prosecutor's indirect comment violates *Griffin* only 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir.1987)). However, while it is impermissible under *Griffin* to call attention to or comment on a defendant's failure to testify, "[i]t is proper for the prosecutor to address the defense's arguments." *Rhoades v. Henry*, 598 F.3d 495, 510 (9th Cir. 2010). Finally, "prosecutorial comments on failure to testify only require reversal 'where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal.'" *Beardslee v. Woodford*, 358 F.3d 560, 587 (9th Cir.), *supplemented sub nom. Beardslee v. Brown*, 393 F.3d 1032 (9th Cir. 2004) (quoting *Lincoln*, 807 F.2d at 809).

Taking these principles into account, the Court finds that the prosecutor's comments about Cota's lack of remorse did not violate *Griffin*. First, the comments were not extensive, occupying approximately 10 transcript pages of a closing argument that stretched to 100 pages. *Beardslee*, 358 F.3d at 587. Next, because Cota explicitly advanced remorse as a mitigating circumstance and allocated in support, it was "proper for the prosecutor to address the defense's arguments." *Rhoades*, 598 F.3d at 510.

Finally, the comments about Cota's lack of remorse were not "manifestly intended to call attention to the defendant's failure to testify, or [] of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Hovey*, 458 F.3d at 912. They referred instead to Cota's allocution and his interview with the police. The prosecutor's arguments about Cota's lack of remorse were "tethered to evidence that was part of the record in the penalty phase" and "rested entirely upon statements [the defendant] himself had made." *Sims v. Brown*, 425 F.3d 560, 588–89 (9th Cir. 2005) (finding prosecutor's statements regarding petitioner's lack of remorse did not constitute impermissible comments about petitioner's exercise of his right not to testify).

Applying AEDPA deference to the state court's decision, Cota is not entitled to relief. *See Demirdjian v. Gipson*, 832 F.3d 1060, 1069–70 (9th Cir. 2016) (finding a reasonable argument could be made that prosecutor's statements were not comments on defendant's silence but on defense's failure to offer exculpatory evidence). Claim 3(A) is denied.

b.      Claim 3(B)

Cota alleges that the prosecutor improperly characterized the murders based on speculation and improperly suggested Cota committed the murders for pecuniary gain. With respect to the former allegation, the Arizona Supreme Court found no reversible error, noting that "[t]he prosecutor may argue the facts and reasonable inferences from the evidence at the penalty phase." *Cota*, 272 P.3d at 1042. The court explained:

> The evidence supported her statements that Cota "laid in wait" and "viciously" killed Zavala because after killing Martinez, Cota apparently waited for Zavala to return from work. Substantial evidence also supported the characterization of Zavala's murder as vicious and the prosecutor's statement that Cota intended to "get rid" of her. None of these statements encouraged the jury to consider unproven aggravators.

*Id.*

The court found "[s]lightly more troubling" the prosecutor's "statement that Cota committed the murders for money, because the aggravation phase jury was unable to reach a verdict on the F(5) aggravator." *Cota*, 272 P.3d at 1042. The court noted, however, that:

the prosecutor did not argue in the penalty phase that the jury should consider pecuniary gain as an aggravator. The statement was in fair rebuttal of Cota's argument that the murders may have been committed in a methamphetamine-induced rage. Moreover, the judge instructed the jury that closing arguments were not evidence and explained the different functions of the aggravation and penalty phases.

*Id.* (citation omitted).

Cota argues that this decision was contrary to or involved an unreasonable application of clearly established federal law and constituted an unreasonable determination of the facts in light of the evidence presented. (Doc. 25 at 69.)

"Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir. 1996) (internal quotation marks omitted); *United States v. Tucker*, 641 F.3d 1110, 1120–21 (9th Cir. 2011). A petitioner is entitled to habeas relief on a claim of prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

During her penalty phase closing argument, the prosecutor offered this description of the circumstances surrounding the murders:

He chose to kill Victor, and he chose to kill Lupe, and he chose the manner with which to end their lives. He intentionally murdered Victor asleep in his bed. And then he laid in wait for Lupe to come home from work, and then he viciously murdered her, too. He alone decided their fate, and he alone gave them no chances.

(RT 8/12/09, a.m., at 18–19.)

Another thing to consider is, after he chose to kill Victor, as he's thinking, making his decision, planning what he is going to do next, if he goes back to Mom's house at that point, he knows Lupe is going to come home and she's going to know I was the one that was here when she left for work. She is going to know that I am the one who did this, so I got to get rid of Lupe too, or else he needed more information from Lupe.

1  (RT 8/12/09, p.m., at 18.)

2      The Arizona Supreme Court's denial of Cota's prosecutorial misconduct claim was

3  a reasonable application of clearly-established federal law and based on a reasonable

4  interpretation of the facts, namely the timeline of the murders.

5      Victor visited his son Julian on the afternoon of December 30. He told Julian that

6  he planned to go home, nap, take Cota home, and start work at 6:00 p.m. (RT 4/16/09 at

7  99.) Victor did not show up for work that night. (RT 4/20/09 at 97.) A medical examiner

8  and a forensic anthropologist testified that Victor was bludgeoned to death while he lay in

9  bed. (RT 5/5/09 at 41, 49, 52, 55; RT 5/13/09 at 44, 47.)

10     On December 30, Lupe worked from 11:00 a.m. to 8:00 p.m. (RT 4/20/09 at 90.)

11  She was scheduled to work the next day but never showed up. (*Id*. at 90, 168.) Evidence

12  showed that her arms and legs were bound; her mouth, nose, and eyes were covered with

13  duct tape; and she was hit in the head at least ten times with a heavy object with a blade or

14  sharp implement. (RT 5/5/09 at 65, 72, 73, 77–78, 92; R.T. 5/13/09 at 47, 50.) She had

15  defensive wounds on her hands. (RT 5/5/09 at 68–69.) She died of stab wounds, blunt force

16  injuries, and possible suffocation. (*Id.* at 78–79.)

17     The prosecutor's comments about the timing of the murders—that Victor was

18  murdered first, in bed, and Cota waited in the house until Lupe arrived home from work—

19  and the viciousness of Lupe's murder are reasonable inferences from this evidence. *See,*

20  *e.g.*, *Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002) (prosecutor's comments

21  during closing argument regarding the manner of victim's death were reasonable inferences

22  from the evidence); *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000) (prosecutor's

23  "speculation regarding the clothing that Petitioner was wearing on the night of the murder,

24  the possible disposal of evidence that the State never obtained, and the possibility that

25  Petitioner recognized [the victim] because Petitioner had been in the store prior to the night

26  of the murder . . . constitute[d] arguably reasonable inferences from the evidence presented

27  at trial.").

28

Later in her closing argument, the prosecutor described Cota as having "several hours to think about what to do with Lupe. And then he tied her up. Not in a meth-induced rage or irritability out of control. He calmly tied her up after he got control of her. . . ." (RT 8/12/09, p.m., at 40.) The prosecutor continued:

> Then he decided to cut those bindings so he could take the bracelets. Cleaning up so well even the cops didn't focus on this murder until the 6th of January. Others didn't see the murders that were in that house. If this plan was so disorganized and so bad, why did it take a week for anybody to figure out what happened, even though there was—there was at least—you heard at least a minimum of six other people, besides the defendant, in that house, prior to the victims ever going through. . . . It was a murder for money. It was a plan that he made.

(*Id.* at 41.)

The Arizona Supreme Court reasonably found that these comments were "fair rebuttal" to Cota's mitigation argument that he was under the influence of drugs and alcohol and significantly impaired at the time of the crimes. The court also reasonably found that the jury was properly instructed that "the attorneys' statements, remarks, and arguments are not evidence" and "what the lawyers say in their closing arguments is not evidence." (RT 8/11/09 at 60–61.) A jury is "presumed to follow" a judge's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir. 2004) ("[W]e note that the jury was instructed that argument of counsel is not evidence. That instruction tends to draw the sting from improper arguments."); *see also Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010) (explaining that arguments of counsel carry less weight with juries than instructions from the court) (citing *Boyde v. California*, 494 U.S. 370, 384 (1990)).

Finally, for the reasons just discussed, the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" as required to obtain habeas relief. *Darden*, 477 U.S. at 181; *see Byrd*, 209 F.3d at 536 (finding that "even if the statements in question are considered impermissible comments on facts not in evidence, we conclude that they do not meet the stringent standard for

1    obtaining habeas relief" and "the comments were not so egregious so as to render the entire

2    trial fundamentally unfair") (quotation omitted).

3          Claim 3(B) is denied.

4          c.      Claims 3(C) and 3(D)

5          Claim 3(C) alleges that the prosecutor committed misconduct by arguing that Cota's

6    mitigation evidence should be subjected to an impermissible causal nexus test. (Doc. 25 at

7    75.) Claim 3(D) alleges that the prosecutor improperly commented on Cota's lack of

8    remorse. (*Id.* at 76.) Respondents argue that Cota did not raise these claims in state court.

9    (Doc. 35 at 103–04, 106.)

10         Cota contends that he "fairly presented" Claim 3(C) on direct appeal by alleging

11   that his Eighth and Fourteenth Amendment rights were violated when the trial court

12   allowed "the State to argue that [Cota's] mitigation evidence should be given limited or no

13   weight absent proof of a causal nexus to the murder(s)." (Opening Br., Doc. 35-1, Ex. A at

14   105.) He raised the claim as one in a series of "constitutional challenges to the death

15   sentence raised and preserved for future federal review." (*Id.* at 108.) The Arizona Supreme

16   Court summarily denied the claim. *Cota*, 272 P.3d at 1045.

17         Cota did not fairly present this prosecutorial misconduct claim, alleging violations

18   of the Fifth, Sixth, and Fourteenth Amendments, to the Arizona Supreme Court. "It is not

19   enough that all the facts necessary to support the federal claim were before the state courts,

20   . . . or that a somewhat similar state-law claim was made." *Harless*, 459 U.S. at 5 (citation

21   omitted). A petitioner will not exhaust a federal claim if the claim he presents to the state

22   court rests on a different constitutional theory for relief, even if the claim as presented to

23   the state court arises from the same facts as the claim presented to the federal court. *See*

24   *Murray (Roger)*, 882 F.3d at 807 (fair presentation requires petitioner "to present the state

25   courts with the *same* claim he urges upon the federal courts") (quoting *Picard v. Connor*,

26   404 U.S. 270, 276 (1971)).

27         Claim 3(C) is therefore defaulted. Cota argues that the default is excused by the

28   ineffective assistance of appellate counsel. (Doc. 41 at 54.) Cota did not exhaust a claim

that appellate counsel was ineffective by failing to raise this claim of prosecutorial misconduct. Therefore, ineffective assistance of appellate counsel cannot serve as cause for the underlying claim's default. *Carpenter*, 529 U.S. at 453; *Murray*, 477 U.S. at 489–90.

The claim is also meritless because neither the trial court nor the prosecutor misstated the law regarding a causal nexus requirement for consideration of mitigating evidence.[14] The prosecutor correctly explained that the jury need not find a causal nexus in order to consider mitigating evidence but it is entitled to take into account the absence of a connection to the crime in determining the "weight" of a mitigating circumstance. "Once the jury has heard all the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight." *McKinney v. Ryan*, 813 F.3d 798, 817 (9th Cir. 2015). Accordingly, "the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *Id.* at 818.

Claim 3(C) is denied.

Cota acknowledges that he did not raise Claim 3(D) in state court. (Doc. 25 at 69–70.) He offers no excuse for the claim's default. (*Id.* at 70, 76–78.) Claim 3(D) is therefore barred from federal review.

---

[14] The trial court instructed the jury: "You must consider and give effect to all mitigating circumstances that were raised by any aspect of the evidence. You are not required to find that there is a connection between the mitigating circumstance and the crime committed in order to consider that mitigating evidence." (RT 8/11/09 at 61.)

During her closing argument, the prosecutor stated, referring to the court's instruction:

That's called a nexus. What does this evidence have to do with the crime? You are not required to find that to be able to consider that mitigating. But what you are allowed to do is to determine, you know, if it has absolutely zero nexus am I as a juror going to give that mitigating factor much weight? You know? That's your personal decision. Do you think it's worth a lot if it has absolutely nothing to do with what happened on December 30th, 2003?

(RT 8/12/09, a.m., at 15.)

d.      Conclusion

The Arizona Supreme Court's denial of Claims 3(A) and (B) was not an error lying "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Claims 3(C) and (D) are procedurally defaulted and barred from federal review. Claim 3(C) is also meritless.

**2.      Claim 4**

Cota alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), and his due process rights by withholding evidence about DNA testing. (Doc. 25 at 78.) The Arizona Supreme Court denied the claim on direct review. *Cota*, 272 P.3d at 1039–40.

a.      Background

Shannin Guy of the Department of Public Safety ("DPS") crime lab performed DNA testing. Her report and notes were disclosed before trial and included the hand-written acronym "EDNA" (extraneous DNA) in three locations. *Id.* at 1039. Guy left DPS and the State could not initially locate her, so it notified Cota on March 12, 2009, that it would call another DPS analyst, Scott Milne, who would conduct new testing. *Id.*

Jury selection began on April 2. Milne's report was completed on April 3 and a copy provided to defense counsel the next day. Milne was unable to retest some items consumed by Guy's testing. *Id.*

However, using a relatively new method, he tested items on which previous tests were inconclusive, including Cota's tennis shoe. *Id.* The State made additional disclosure concerning Milne's report on April 24. His notes included one reference to "EDNA." *Id.*

The State located Guy on the eve of trial and notified Cota that it intended to call Guy  and Milne. *Id.* Cota interviewed both witnesses on April 30. *Id.*

On May 11, Cota claimed that the State did not provide him with all of Milne's electronic data. The court found no bad faith, but ordered the State to disclose the data. (RT 5/11/09 at 4.) The State provided Cota with electronic data that afternoon. *Cota*, 272 P.3d at 1039.

Guy testified on May 14 and May 18. She opined that the sample from Cota's shoe contained DNA from Cota and other "unknown" contributors. (RT 5/14/09 at 94.) Milne later testified that the sample contained DNA from both victims. (RT 6/22/09 at 24–82.)

On May 19, Cota filed a motion asking the State to produce Guy's electronic data and "the laboratory's corrective actions log and extraneous DNA log." (ROA 398.) The trial court granted the motion. (ROA 399.) On June 1, Cota still had not received Guy's electronic data. The court ordered that it be turned over for use in cross-examining Milne. (RT 6/1/09 at 72, 77; ME 6/1/09.) The court also ordered Milne to provide additional data.

The EDNA log was disclosed on May 21, and contained a list of all contaminated samples. *See Cota*, 272 P.3d at 1039. DPS procedure was not to disclose the EDNA log unless it was specifically requested. *Id.* On June 8, Cota filed a motion to dismiss for *Brady* violations. (ROA 412.)

The trial court found that DPS improperly withheld the EDNA log and certain electronic data and that the defense was prejudiced. (ME 6/9/09.) It determined, however, that the prejudice could be cured without a mistrial or preclusion of all DNA evidence. (*Id.* 2–3.) Neither Guy nor Milne had testified about any sample in the EDNA log. (*Id.* at 3.) The court allowed Cota to re-call Guy for additional cross-examination, re-interview Milne before his testimony, interview another person at the lab, and tour the lab. (*Id.* at 3–4.) The court also granted a continuance until June 22 to allow Cota's experts to review the materials. (*Id.* at 4.)

On June 22, Cota filed another motion to dismiss, alleging that some of Guy's electronic data was still missing. (ROA 420.) The trial court held an evidentiary hearing at which Guy and Milne testified. Following the hearing, the court found that the electronic data was missing because it had been improperly backed up and that some of Guy's files were either destroyed or not retrievable. (ME 6/22/09 at 2.) The court denied Cota's request for a mistrial. (*Id.* at 3.) The court ordered Guy's testimony stricken but denied Cota's request to preclude Milne's testimony as well. (*Id.*) After Cota argued that striking Guy's

1    testimony would deprive him of the opportunity to demonstrate deficiencies in the DPS

2    lab, the court allowed Cota to re-call her. (RT 6/22/09 at 91.)

3          Cota did not re-call Guy but cross-examined Milne at length. (RT 6/23/09 at 27–

4    204.) At Cota's request, the court instructed the jury that DPS had a duty to disclose all

5    relevant information to the defense and ordered the State not to argue that the EDNA log

6    need not have been disclosed. (RT 7/7/09 at 18.)

7          b.    Analysis

8          In denying Cota's *Brady* claim, the Arizona Supreme Court found that the trial

9    court's sanctions were sufficient to cure the violation. *Cota*, 272 P.3d at 1040. The court

10   explained:

11         Cota argues that a mistrial should have been granted or, at the least, Milne's
     testimony precluded. But preclusion is required only when no less stringent

12         sanction will suffice. We apply a four factor test to determine whether
     preclusion is appropriate: (1) "how vital the precluded witness is to the

13         proponent's case," (2) "whether the opposing party will be surprised and
     prejudiced by the witness' testimony," (3) "whether the discovery violation

14         was motivated by bad faith or willfulness," and (4) "any other relevant

15         circumstances."

16
           The trial court appropriately considered these factors. It found Milne's
17         testimony "extremely relevant and important to the State's case" and that
     there was no bad faith. It also found that any prejudice to Cota could be cured
18         by additional disclosure, interviews, and continuances. Cota had access to all
     relevant information before cross-examining Milne and identifies no area in
19         which the cross-examination would have materially differed had he been
20         granted more time.

21
           Cota argues that a new trial is "ordinarily" the remedy for a *Brady* violation.
22         But many *Brady* violations are discovered after trial, when no other remedy
     could suffice. Here, the trial court had other options and did not abuse its
23         discretion by using them. The sanctions imposed sufficiently protected
24         Cota's due process rights.

25   *Id.* (citations omitted). This decision was neither contrary to nor an unreasonable

26   application of clearly established federal law.

27         *Brady* holds that "the suppression by the prosecution of evidence favorable to an

28   accused upon request violates due process where the evidence is material either to guilt or

punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The government violates its obligation under *Brady* where (1) the evidence in question was favorable to the accused, (2) the government willfully or inadvertently suppressed the evidence, and (3) the evidence is material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

"*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial. To escape the *Brady* sanction, disclosure 'must be made at a time when disclosure would be of value to the accused.'" *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)) "As long as ultimate disclosure is made before it is too late for the defendant[] to make use of any benefits of the evidence, Due Process is satisfied." *Dotson v. Scribner*, 619 F. Supp. 2d 866, 874 (C.D. Cal. 2008) (quoting *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997) (additional quotation omitted)).

In Cota's case,  the trial court's actions, including striking Guy's testimony, allowing the defense to recall her, and granting a continuance to allow the defense to review the DNA materials, satisfied due process. In *United States v. Anderson*, 391 F.3d 970, 975 (9th Cir. 2004), for example, the court found that no *Brady* violation resulted from the government's delay in identifying two witnesses. The defense secured the appearance of those witnesses and had the opportunity to recall another witness whose testimony could have been impeached. *Id.* In *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992), the government provided the defense with the grand jury testimony of an FBI agent only after the agent had been cross-examined. The Ninth Circuit held that any *Brady* violation did not require reversal because the defendant was given the opportunity to recall the agent for additional cross-examination. There was no prejudice because the evidence was provided "at a time when disclosure would be of value to the accused." *Id.* (quoting *Gordon*, 844 F.2d at 1403); *see also United States v. Gamez-Orduno*, 235 F.3d 453, 461–62 (9th Cir.

1   2000) (finding that delayed disclosure of material evidence was cured by granting the

2   defense a two-month continuance to prepare for hearing); *United States v. Alvarez*, 86 F.3d

3   901, 905 (9th Cir. 1996) (no prejudice to defendant from government's untimely

4   production of officer's rough notes showing discrepancies with his testimony, where

5   defense eventually received the notes and was able to fully cross-examine the officer).

6   Even assuming a *Brady* violation did occur here, it did not prejudice Cota because

7   Guy's testimony was stricken and Cota received disclosure of the DNA information in time

8   to be of value in cross-examining Milne. *See Gordon*, 844 F.2d 1397, 1403. Cota argues

9   that the State's delayed disclosures impeded the preparation of his defense, but

10  "[m]ateriality focuses not on trial preparation, but instead on whether earlier disclosure

11  would have created a reasonable doubt of guilt." *United States v. Fallon*, 348 F.3d 248,

12  252 (7th Cir. 2003) (citing *United States v. Agurs*, 427 U.S. 97, 112, n.20 (1976)). Here,

13  the Arizona Supreme Court reasonably concluded that Cota was not prejudiced under

14  *Brady* and its progeny. Accordingly, Claim 4 is denied.

15  **D.    Trial Error Claims**

16  **1.    Claim 2**

17  Cota alleges that his due process rights were violated because the jury was

18  incorrectly instructed that he could be eligible for parole and the trial court refused to

19  permit Cota to present evidence of his ineligibility for future release. (Doc. 25 at 63.) The

20  Arizona Supreme Court denied this claim on direct review:

21      Cota argues that the trial court erred by instructing the jury that a life sentence
        might allow for release after twenty-five years, because he is not eligible for
22      parole under A.R.S. § 41–1604.09(I). This argument, however, conflates
        parole and release. Cota would have been eligible for other forms of release,
23      such as executive clemency, if sentenced to life with the possibility of
24      release.

25      The instruction given accurately stated the law. *State v. Hargrave,* 225 Ariz.
        1, 15 ¶ 53, 234 P.3d 569, 583 (2010). Cota's "argument that he is not likely
26      to actually be released does not render the instruction legally incorrect." *Id.*

27  *Cota*, 272 P.3d at 1042.

28  Although this was a correct statement of Arizona law at the time, it was an incorrect

- 74 -

statement of clearly-established federal law, namely *Simmons v. South Carolina*, 512 U.S. 154 (1994). *See Cruz v. Arizona*, 143 S. Ct. 650, 654–55, 598 U.S. ---, No. 21-846 (Feb. 22, 2023).

*Simmons* held that when a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death is life imprisonment without the possibility of parole, due process entitles him to inform the jury of his parole ineligibility. 512 U.S. at 169. The Court explained that "if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without the possibility of parole will necessarily undercut the State's argument regarding the threat the defendant poses to society." *Id.* at 168–69.

In 1994, Arizona abolished parole for all felonies committed after 1993. A.R.S § 41–1604.09(I)(1). Therefore, "the only 'release' available to capital defendants convicted after 1993 was, and remains, executive clemency." *Cruz*, 143 S. Ct. at 655. In *Lynch v. Arizona*, 578 U.S. 613 (2016), the Supreme Court held that *Simmons* applies in Arizona, noting that "*Simmons* expressly rejected the argument that the possibility of clemency diminishes a capital defendant's right to inform a jury of his parole ineligibility." *Id.* at 615. Accordingly, if the prosecution made Cota's future dangerousness an issue, he was entitled to inform the jury, through instruction or argument, that if it did not sentence him to death, he would serve a life sentence without the possibility of release. *Simmons*, 512 U.S. at 177–78. A defendant's future dangerousness is at issue if it is "a logical inference from the evidence, or was injected into the case through the State's closing argument." *Kelly v. South Carolina*, 534 U.S. 246, 248 (2002) (quotation omitted).

Cota argues that his "future dangerousness was at issue throughout his trial" and that "the State put [his] future dangerousness at issue by portraying him as someone capable of great violence because he only cared about satisfying his addiction." (Doc. 25 at 65.) Cota states that the prosecutor, during his guilt-phase rebuttal closing argument, "reminded the jury that Cota fled from police." *Id.* Cota quotes the prosecutor as saying:

"The guy escaped. How comfortable are you with that scenario?" (RT 7/9/09, p.m., at 52.)
This is a misrepresentation of the trial transcript and the content of the prosecutor's
argument. In fact, the prosecutor was responding to Cota's closing argument by drawing a
distinction between the reliability of eyewitness testimony, which Cota had criticized the
State's case for lacking, and circumstantial evidence, by quoting the testimony of Sgt. Luis
Aponte. Sgt. Aponte testified that he surveilled Cota's mother's house when he saw a
person fitting Cota's description get into the S-10 pickup, (RT 4/22/60), and witnessed the
beginning of the car chase, (*Id.* at 62). Accurately represented, the passage runs as follows:

> Then the chase begins. Seven miles later that S-10 crashes, but the man
> driving that S-10 escapes. Escapes. Aponte takes that stand and says: "I think
> it was the defendant." Eyewitness testimony: "I saw that guy I thought was
> the defendant get into that truck. The guy escaped." How comfortable are
> you with that scenario? That is eyewitness testimony.
>
> How comfortable are you with that? One man saying, "I sort of believe it was
> the defendant," instead of the circumstantial evidence that you have in this
> case. . . ."

(*Id.*)

Far from emphasizing Cota's dangerousness, the prosecutor was asking the jury
how comfortable it was with that kind of eyewitness testimony in contrast to the
circumstantial evidence the State presented. He was not asking if the jurors were
comfortable knowing that Cota had escaped

Cota cites additional passages from the prosecutor's guilt-phase rebuttal closing
argument, including his use of the word "savagely" to describe the beating that killed
Victor Martinez. (*Id.* at 65.) The prosecutor's statement—"Victor was savagely beaten.
There's just no other way to say it"—was made in support of the State's theory that Cota,
acting with premeditation, killed Victor while he was napping in his bed, a theory
supported by the blood spatter evidence but challenged by the defense. (RT 7/9/09, p.m.,
at 68.)

Cota also argues that the prosecutor depicted him as killing the victims so that he
could "'driv[e] their cars and steal[] their stuff.'" (Doc. 25 at 65.) (citing RT 7/09/09, p.m.,

at 34). Yet, these comments were made by *Cota's counsel*—not the prosecutor. Not only does Cota misrepresent the source of the comments—he again blatantly misrepresents their import. Cota's counsel was attacking the thoroughness of the police investigation, arguing that police did not complete their investigation because "There's no need to. We have a heroin addict; he was there. He was driving their car. We think he's stealing their stuff. Why go through all this stuff? Just nail him." (RT 7/9/09, p.m., at 34.) Nothing contained in the prosecution's guilt-phase closing argument put Cota's future dangerousness at issue.

Cota contends that during the mitigation stage of trial, the prosecution made his future dangerousness an issue during the testimony of defense expert Dr. Cunningham. (Doc. 25 at 66.) As discussed above, based on his assessment of Cota, Dr. Cunningham opined that if Cota were to receive a life sentence, there was little risk that he would engage in future violence because of factors such as his age, prison disciplinary history, and the security measures implemented at ADOC. (RT 8/4/09 at 65–70.) On cross-examination, the prosecutor questioned Dr. Cunningham about instances of escape from prison, which Cunningham described as "highly infrequent[]," and the potentially "very tragic and serious results" of such escapes. (RT 8/4/09 at 83–84.)

Cota also relies on several comments made during the prosecutor's penalty-stage closing argument. (Doc. 25 at 65–66.) He cites the prosecutor's comment that Cota "has the ability to conform his requirements to the law, and he chose not to do it," and that "[h]e knew exactly what he was doing. And he did it anyway." (RT 8/12/09, a.m., at 56.) Cota cites the prosecutor's argument that there was no potential for Cota to be rehabilitated from his addictions, as evidenced by his continued use of alcohol and drugs in jail. (*Id.*, p.m., at 32.) Cota further cites "one of the State's rhetorical questions to the jury," where the prosecutor asked, in reference to Cota's continued use of narcotics while in jail, "What other laws is he not going to be willing to follow?" (*Id.*, a.m., at 40.) Finally, Cota cites the prosecutor's description of Cota's involvement in a jailhouse altercation, which, the prosecutor asserted, showed that Cota was not "some old, decrepit man" but someone "capable of committing getting in there and rumbling. (*Id.*, p.m., at 31.) This comment

addressed Cota's proposed mitigating circumstance that he did not have a history of violence. (*Id.* at 30–31.) With respect to the proposed mitigator that Cota did not pose a risk of violence in prison, the prosecutor simply responded that "it's not mitigating. You are supposed to be good in prison." (*Id.* at 33.)

As already noted, *Simmons* is implicated only where the prosecution offers some evidence or argument that a defendant poses a future danger. *See Lynch*, 578 U.S. at 615 ("During the penalty phase, the State argued that the jurors should consider the defendant's future dangerousness when determining the proper punishment."); *Robinson v. Beard*, 762 F.3d 316, 327 (3d Cir. 2014) ("Unlike the prosecutor in *Kelly,* who presented evidence that the defendant had engaged in violent behavior even while incarcerated, the prosecutor at Robinson's trial did not suggest to the jury that Robinson posed 'a risk of violent behavior, whether locked up or free.'" (citing *Kelly*, 534 U.S. at 253–54). That did not happen here.

Unlike the prosecutor in *Simmons*, the State in Cota's case did not explicitly argue that the jury should impose a death sentence in order to protect society. *See Simmons*, 512 U.S. at 157. In *Simmons*, the prosecutor argued to the jury that its role was "to decide what to do with [the defendant] now that he is in our midst" and that its "verdict should be a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Id.* at 176 (O'Connor, J., concurring) (internal quotation marks omitted). These arguments "strongly implied that [the defendant] *would* be let out eventually if the jury did not recommend a death sentence." *Id.* at 178.

Nor did the prosecutor in Cota's case "accentuate[ ] the clear implication of future dangerousness raised by the evidence." *Kelly*, 534 U.S. at 255. In *Kelly*, the prosecutor emphasized the defendant's future dangerousness by telling jurors he hoped they would "never in [their] lives again have to experience . . . [b]eing some 30 feet away from such a person." *Id.* Referring to the defendant as "the Butcher of Batesburg," "Bloody Billy," and "Billy the Kid," the prosecutor also presented evidence that while in prison, Kelly made a shank, attempted to escape, and planned to hold a female guard as a hostage, as well as

evidence of "Kelly's sadism at an early age . . . and his inclination to kill anyone who rubbed him the wrong way." *Id.*

In *Richmond v. Polk*, 375 F.3d 309, 332 (4th Cir. 2004), the state supreme court held that the trial court did not err by failing to provide a parole-ineligibility instruction because the prosecution limited its argument to the defendant's future dangerousness in prison. The Fourth Circuit found this to be an unreasonable application of *Simmons*. *Id.* at 334. The court rejected the conclusion that the prosecutor's comments about Richmond's conduct in prison did not constitute an argument that Richmond would be a danger if released. *Id.* at 332–33. The prosecutor in *Richmond* argued, for example, that "there is only one way you can ensure that this defendant does not kill again, and that is to impose the penalty that he has earned and worked for and deserves." *Id.* at 332. The Fourth Circuit likened this statement to the argument in *Simmons* that imposing a death sentence would be "'an act of self defense.'" *Id.* at 332 n.11 (quoting *Simmons*, 512 U.S. at 176). The court concluded that the jury would have interpreted the prosecution's comments as an argument that Richmond posed a danger to society outside of prison.[15] *Id.* at 333.

By contrast, the prosecutors in Cota's case simply rebutted his mitigating evidence by recounting his crimes and his failure to take advantage of opportunities for drug treatment. *See Garcia v. Shinn*, No. CV-15-00025-PHX-DGC, 2022 WL 1166408, at *30–31 (D. Ariz. Apr. 20, 2022). The prosecutor's arguments were "essentially backward-looking" and focused on Cota's past offenses, which "does not by itself trigger *Simmons*." *Warren v. Thomas*, 894 F.3d 609, 615 (4th Cir. 2015). The prosecutor's comments, including her reference to the prison brawl, constituted "a few words and phrases in an extensive closing argument." *Id.* Taken in context, the argument "may sensibly be read as

---

[15] Despite finding a *Simmons* violation, the Fourth Circuit determined that Richmond was not entitled to habeas relied because the error was harmless. *Richmond*, 375 F.3d at 334–35. The court noted a circuit split on the question of whether *Simmons* error is subject to harmless error review. *Id.* at 334. The United States Supreme Court has not applied the harmless error standard to *Simmons* error. The parties here engage the issue (Docs. 35 at 92–93, 41 at 47), but the Court declines to do so, having determined there was no error.

a comment on [the defendant's] past crimes and character rather than any prospect of his release." *Id.* The prosecutor herself, referencing Dr. Cunningham's actuarial estimates of violence by inmate population groups, emphasized that the State had "never alleged future dangerousness as an aggravating factor, nor tried to prove that to you. Nor are we seeking a punishment from you for what he may do in the future. What we're here to talk about is the crime that he already committed, the crime that he already committed and the punishment that fits him and fits the crimes." (RT 8/12/09, a.m., at 39.)

In *Warren*, the prosecutor argued that the defendant had a "habit of killing women, doing it over and over again," that he had been given a second chance and "chose not to use it," and asked "How many more chances do we have to give him?" *Id.* The Fourth Circuit found no *Simmons* violation, explaining:

> In support of the death penalty . . . , the prosecutor relied not on the risk that Warren might in the *future* be released from prison and endanger the community, but rather on what Warren already had done in the *past*— namely, his actions and state of mind in committing the three murders of which he was convicted. . . . That those murder convictions reveal Warren to be a person fairly described as "dangerous" does not by itself trigger *Simmons*, or virtually all capital proceedings would be governed by that decision.

*Id.* (emphases in original); *see Robinson*, 762 F.3d 327–28 ("The prosecutor's statements characterizing Robinson as a 'dangerous big city hoodlum,' as well as the evidence regarding Robinson's ownership of guns and his criminal past, conveyed Robinson's specific intent to kill. . . . None of the prosecutor's statements implied that the jury should elect to sentence Robinson to death as an act of self-protection.").

The State did not rest its case for the death penalty on the premise that Cota would be dangerous in the future. *See Simmons*, 512 U.S. at 168–69; Richmond, 375 F.3d at 335 ("[T]he State clearly brought Richmond's future threat outside of the prison context and sought to make the jurors feel as if they could be Richmond's next victim.") The prosecutors focused on Cota's past actions and did not clearly or strongly imply that he would pose a danger to society if released. Therefore, they did not make Cota's future

1  dangerousness an issue at sentencing as required for a parole ineligibility instruction under

2  *Simmons*.

3       Claim 2 is denied.

4      **2.**    **Claim 6**

5       Cota alleges that his rights under "the Constitution's voluntariness principles" and

6  *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated when the trial court allowed the

7  State to play a video of his police interrogation. (Doc. 25 at 90.) The Arizona Supreme

8  Court denied the claim on direct appeal. *Cota*, 272 P.3d at 1035–37. Cota argues that the

9  court's decision was contrary to or involved an unreasonable application of clearly-

10  established federal law and was based on an unreasonable determination of the facts. (Doc.

11  25 at 90.) The claim is meritless.

12       a.    Voluntariness/intoxication

13       Cota was arrested on January 6, 2004, at about 5:30 p.m. Detectives William Laing

14  and Dave Hickman of the Peoria Police Department began interviewing him at around 9:20

15  p.m. (Trial Ex. 492 at 1.)[16]

16       On May 11, 2009, during the trial, the court held a voluntariness hearing at which

17  Det. Laing testified and portions of the tape were played. At the outset of the interview,

18  Det. Laing read Cota the *Miranda* advisory and Cota indicated that he understood his

19  rights. (*Id.* at 1.) During the interview, Cota appeared to nod off on several occasions. (RT

20  5/11/09, p.m., at 10–11; Trial Ex. 492 at 11, 14, 40.) He told the detectives that he had used

21  heroin half an hour to an hour before he was arrested, or four and a half to five hours before

22  the interview began. (Trial Ex. 492 at 32.)

23       At the voluntariness hearing, Det. Laing testified that no threats or promises were

24  made to Cota, nor had he been subjected to any physical abuse. (RT 5/11/09, p.m., at 11–

25  12.) He testified that Cota appeared to understand his questions and made no "illogical

26

27

28      [16] The interrogation transcript is included among the exhibits to Respondents' PCR response brief. (*See* Doc. 35-2, Ex. E, App'x 6.)

responses." (*Id.* at 14, 35–36.) After approximately two hours, the detectives ended the interrogation when Cota requested an attorney. (*Id.* at 12.)

At the conclusion of the voluntariness hearing, the trial judge made a number of findings. He found that during the interrogation, Cota was "tired and likely suffering effects or residual effects of some drug" but was "oriented as to time and place," to "the chronology of that date's events," and to "the proceeding [sic] week's events," and was able to "consistently" answer questions about those events. (*Id.* at 53.) He found that Cota "appear[ed] to [answer] all questions" and "to give coherent, logical, appropriate answers." (*Id.* at 54.) The judge then noted that Cota did not confess to the murders, and eventually invoked his right to counsel. (*Id.*) He concluded that "under the totality of the circumstances," "the statements were voluntarily made" and could be introduced at trial.[17] (*Id.*)

On direct appeal, the Arizona Supreme Court, noting that its "review of the videotape of the interrogation confirms that Cota fully comprehended the questions posed and gave appropriate answers," held that the "record supports the trial court's finding that his statements were voluntary." *Cota*, 272 P.3d at 1035. This decision satisfies neither § 2254(d)(1) or (2).

"An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)). The question is whether, under the totality of the circumstances, the defendant's will was overborne when he confessed. *Id.* at 1031. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167. To determine whether a confession was voluntary, courts consider the length, location, and continuity of the interrogation; the suspect's maturity, education, and physical and

---

[17] Cota criticizes the trial court for failing to watch the entire video-tape of the interrogation, and that counsel performed ineffectively in not pressing the court to do so. (Doc. 25 at 91.) The records shows, however, *see Cota*, 272 P.2d at 103–36, that the Arizona Supreme Court viewed the tape, and it is that court's decision which is under review.

1    mental condition; and whether the suspect was advised of his *Miranda* rights. *Withrow v.*
2    *Williams*, 507 U.S. 680, 693–94 (1993).

3         Viewed in the totality of the circumstances, Cota's statement was not involuntary.
4    First, he does not allege coercive activity on the part of the detectives who interrogated
5    him. While not fatal, *see United States v. Preston*, 751 F.3d 1008, 1019 (9th Cir. 2014),
6    under *Connelly* this severely undermines Cota's voluntariness claim; with no coercive
7    conduct to be susceptible to, his state of intoxication is not relevant to the voluntariness
8    inquiry. *See, e.g.*, *Andersen v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990)
9    ("[Petitioner's] intoxication by itself could not support a finding of involuntariness and is
10   relevant only to the extent it made him more susceptible to mentally coercive police
11   tactics.") (citing *Connelly*, 479 U.S. at 163–67). Even assuming there had been coercive
12   conduct, other factors demonstrate that the statement was voluntary. Cota was 40 years old
13   and had extensive experience with the criminal justice system. He did not confess to the
14   killings, and ended the interrogation by asking for an attorney. He had been advised of his
15   *Miranda* rights. His answers to the detectives' questions were appropriate and logical,
16   albeit evasive and sometimes inconsistent.

17        The Arizona Supreme Court reasonably determined that Cota was not incapacitated,
18   his will was not overborne, and his statement was voluntary.

19        b.    *Miranda*

20        In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that prior
21   to custodial interrogation a suspect must be informed of his right to remain silent and his
22   right to have an attorney present. If the suspect invokes either of these rights, the
23   interrogation must cease. *Id.* at 444–45.  Both the right to remain silent and the right to
24   counsel must be invoked unambiguously. *See Berghuis v. Thompkins*, 560 U.S. 370, 381–
25   82 (2010). If a suspect makes a statement concerning his right to silence "'that is ambiguous
26   or equivocal' or makes no statement, the police are not required to end the interrogation,
27   or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."
28   *Id.* (quoting *Davis v. United States*, 512 U.S. 452, 461–62 (1994)). "An unequivocal and

1    unambiguous invocation of the right to remain silent is one articulated 'sufficiently clearly

2    that a reasonable police officer in the circumstances would understand the statement *to be*

3    a request' to exercise his right to remain silent and terminate the interrogation, not that it

4    *might be* a request to remain silent." *Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1194

5    (11th Cir. 2012) (quoting *Davis*, 512 U.S. at 459).

6    　　　Violations of *Miranda* are subject to harmless error analysis. *Arizona v. Fulminante*,

7    499 U.S. 279, 310 (1991); *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding

8    that reversal is required if a constitutional error "had substantial and injurious effect or

9    influence in determining the jury's verdict"). Where the state court has found harmless

10   error, that determination is subject to the review prescribed by the AEDPA. *Brown v.*

11   *Davenport*, 142 S. Ct. 1510, 1517 (2022).

12   　　　As noted earlier, Cota cites two alleged invocations of his right to remain silent, the

13   "Page 24 Statement" and the "Page 40 Statement." The Arizona Supreme Court held that

14   Cota unambiguously invoked his right to remain silent in the latter instance but not the

15   former. *Cota*, 272 P.3d at 1036. Because the detectives did not terminate the interview after

16   the Page 40 Statement, the court held that Cota's *Miranda* rights were violated. *Id.* The

17   court determined, however, that there was no fundamental error requiring reversal because

18   "the continued questioning did not prejudice Cota at any phase of the trial." *Id.* at 1037. As

19   the court explained:

20   　　　　Cota did not admit to the murders, either before or after page 40. Rather, he

21   　　　continued to maintain his innocence even after invoking his right to remain
     　　　silent. Thus, the only prejudice Cota could have suffered from admission of

22   　　　statements after page 40 was from a lack of credibility in his protestations of

23   　　　innocence. However, virtually all of Cota's statements after page 40 mirrored
     　　　others made earlier in the interrogation.

24

25   　　　　The one significant exception is Cota's claim after page 40 that Martinez
     　　　came back to the house at some point, stating that Zavala was "dead in his

26   　　　heart." But other evidence on this point was properly admitted at trial. Cota's

27   　　　drug dealer testified that Cota had told her that the couple had gone on
     　　　vacation to Mexico, but that Martinez had returned and said Zavala was

28   　　　"dead in his heart."

- 84 -

*Id.*

Cota argues that the court unreasonably determined that the Page 24 statement was not an unambiguous invocation of the right to remain silent. (Doc. 25 at 95.) He also contends that the court's conclusion that he was not prejudiced by introduction of the statement was an "unreasonable application of *Miranda* and its progeny as well as an unreasonable determination of the facts in light of the evidence." (*Id.* at 96.) He argues that he was prejudiced because "the videotaped interrogation was central to the State's theory that Cota was manipulative and calculating" and because the prosecution characterized the statement as a confession. (*Id.* at 94.)

The following exchange took place on page 24 of the interrogation transcript, after the detectives had repeatedly told Cota—"apparently inaccurately," *Cota*, 272 P.3d at 1036—that blood had been found on his clothes:

> Laing: That's why we are asking you. The blood's on your clothing. I don't see any big injuries on you to get that kind of blood.
>
> Cota: There ain't no blood on my shirt.
>
> Laing: Yes there is.
>
> Cota: I'm not saying nothing no more you guys are fucking with me.

(Trial Ex. 492 at 24.)

In finding the statement ambiguous, the Arizona Supreme Court concluded that a "reasonable officer could have construed Cota's comments as meaning that he knew the officers were lying about blood on his shirt and that he no longer wished to talk about this subject." *Cota*, 272 P.3d at 1036 ("Cota was responding . . . to a specific question about blood on his clothes"). This ruling did not involve "an error well understood and comprehended in existing law." *Smith v. Boughton*, 43 F.4th 702, 710 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 778 (2023) (quoting *Richter*, 562 U.S. at 103).

In *Smith*, a detective began his interrogation by questioning the defendant about a stolen van. *Id.* at 704. He then changed the topic, describing an armed robbery. At that

point the defendant stated: "I don't want to talk about, I don't want to talk about this. I don't know nothing about this. . . . I'm talking about this, uh, van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this." *Id.* at 705. The questioning continued and the defendant ultimately confessed to the robbery. *Id.* at 705–06. The state supreme court "determined that it was 'not clear' whether Smith's statements were 'intended to cut off questioning about the robberies, cut off questioning about the minivan, or cut off questioning entirely.'" *Id.* (quoting *State v. Cummings*, 850 N.W.2d 915, 927 (2014)).

"The [state] court also observed that Smith intermixed his possible invocations with exculpatory statements . . . that it believed were 'incompatible with a desire to cut off questioning.'" *Id.* (quoting *Cummings*, 850 N.W.2d at 928). Finally, the state court explained that the defendant's willingness to talk about the van "even if he was 'unwilling, or perhaps unable, to answer questions about the robberies,'" suggested that his "statements could be construed as 'selective refusals to answer specific questions' rather than assertions of 'an overall right to remain silent.'" *Id.* (quoting *Cummings*, 850 N.W.2d at 928).

The Seventh Circuit held that the state court did not unreasonably apply *Miranda*. *Id.* at 710–11. The court explained that a "reasonable interpretation of Smith's statement that he did not want to talk 'about this' is that *this* referred only to the robbery . . . and that Smith was willing to continue talking about the van. That possibility alone means it was not unreasonable for the Wisconsin Supreme Court to conclude that Smith's statement fell short of satisfying *Thompkins*'s unambiguous-invocation test." *Id.* at 710. The court concluded that the defendant's "statement was not a clear and unequivocal invocation of the right to remain silent about any and all topics." *Id.*

Likewise, Cota's Page 24 statement could be interpreted as ambiguous rather than a clear invocation of his right to remain silent on all topics. *See Owen*, 686 F.3d at 1192–93  (holding that defendant's statements—"I'd rather not talk about it" and "I don't want to talk about it"—were made in response to questions about specific, discrete details of the crime, not general questions about the crime itself, and thus his invocations were

ambiguous); *cf. Wesson v. Shoop*, 17 F.4th 700, 706 (6th Cir. 2021) ("I ain't got nothin' to say to y'all" was not an unambiguous revocation of *Miranda* waiver but, when seen in context, "an expression of frustration at his plight" when confronted with the evidence against him).

Finally, Cota's Page 24 statement is similar to the statements in *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006), where the defendant told a police officer that he's "not going to talk about nothin' . . . I ain't going to talk about shit." The Seventh Circuit found this statement "as much a taunt—even a provocation—as it is an invocation of the right to remain silent." *Id.*; *see Wesson*, 17 F.4th at 706. The court also noted that when the defendant "wanted to end the interview, he knew how to do it unambiguously. He didn't do so before he uttered his statements." *Id.* Like the defendant in *Sherrod*, Cota knew how to end his interrogation by unambiguously requesting a lawyer.

### c.    Harmless error

The Arizona Supreme Court's ruling that Cota was not prejudiced by admission of the interrogation does not satisfy the AEDPA. First, as the court noted, *Cota*, 272 P.3d at 1037, at no point in the interrogation did Cota admit to any involvement in the murders. *See Firmingham v. Yukins*, 27 Fed.Appx. 530, 536 (6th Cir. 2001) (finding erroneous admission of statement was harmless error where petitioner "never admitted to participating in the planning or execution of the murder" and where other witnesses provided "detailed evidence" of her involvement); *Her v. Jacquez*, No. 2:09-CV-612-JAM-TJB, 2011 WL 1466868, at *45 (E.D. Cal. Apr. 18, 2011) (any *Miranda* error was harmless where "Petitioner never made any confession in his interview" with detective but "steadfastly denied anything to do with the shooting" and "strong evidence," including DNA, linked him to the crime).

In addition, any improperly admitted portions of the interrogation contained statements that were cumulative to statements made prior to the Page 40 statement. *Id.*; *see Brecht*, 507 U.S. at 639 (improper references to post-*Miranda* silence were cumulative in light of "the State's extensive and permissible references to petitioner's pre-*Miranda*

1   silence"); *Michaels v. Davis*, 51 F.4th 904, 946–47 (9th Cir. 2022) (erroneous admission

2   of confession was harmless as cumulative to properly admitted aggravating evidence);

3   *Davis v. Grandlienard*, 828 F.3d 658, 666–67 (8th Cir. 2016) (finding improperly admitted

4   portions of defendant's statement were cumulative to properly admitted portions).

5      The evidence of Cota's guilt was overwhelming. *Brecht*, 507 U.S. at 639 ("[T]he

6   State's evidence of guilt was, if not overwhelming, certainly weighty"). He was living in

7   the victims' house after they had disappeared; when visitors stayed at the house, Cota told

8   them not to enter the master bedroom where the bodies were hidden. *Cota*, 272 P.3d at

9   1033. Cota gave away, sold, or pawned items belonging to the victims. *Id.* His wallet

10  contained Zavala's identification information. *Id.* Finally, DNA from both victims was

11  found on his shoes. *Id.*

12     Given this evidence, and the other factors just discussed, the Arizona Supreme Court

13  reasonably found, under § 2254(d)(1) and (2), that Cota was not prejudiced by the

14  admission of his interrogation.

15         d.    Conclusion

16     The Arizona Supreme Court's denial of Claim 6 was neither contrary to nor an

17  unreasonable application of clearly established federal law, nor was it based on an

18  unreasonable determination of the facts. Claim 6 is denied.

19         **3.    Claim 7**

20     Cota alleges that the trial court violated his Fifth, Eighth, and Fourteenth

21  Amendment rights by requiring that he undergo psychological testing by the State's

22  retained expert or forego the presentation of all his mental health expert testimony. (Doc.

23  25 at 97.) The Arizona Supreme Court denied the claim on direct appeal. *Cota*, 272 P.3d

24  at 1037.

25  After Cota gave notice of his intent to present mental health experts in the penalty phase

26  of his trial, the State moved for an examination by its expert, which was to include the

27  MMPI–II personality inventory, or, alternatively, to preclude Cota's experts from

28  testifying. Cota objected because his experts had done no psychological testing. The trial

1    court overruled the objection.

2        In denying the claim on appeal, the Arizona Supreme Court explained:

> A defendant offering expert mental health testimony must either submit to a state examination or forego introducing his evidence. *State v. Schackart*, 175 Ariz. 494, 500–01, 858 P.2d 639, 645–46 (1993); *Phillips v. Araneta*, 208 Ariz. 280, 283 ¶ 9, 93 P.3d 480, 483 (2004) (applying *Schackart* to the penalty phase of a capital trial). The State's examination need not mirror that of the defense. Rather, the State is entitled to "a meaningful opportunity to rebut the defendant's expert testimony." *Phillips*, 208 Ariz. at 283 ¶ 9, 93 P.3d at 483. Here, the State's expert testified that mental health experts commonly use the MMPI, which contains a validity scale potentially helpful in evaluating the diagnoses made by Cota's experts. The judge did not abuse his discretion by ordering Cota to submit to the MMPI.

*Cota*, 272 P.3d at 1037 (additional citations omitted). This decision was neither contrary to nor an unreasonable application of clearly established federal law.

The Fifth Amendment privilege against self-incrimination applies at the penalty phase of trial. *Estelle v. Smith*, 451 U.S. 454, 465 (1981). However, a defendant may not assert his Fifth Amendment privilege to preclude the prosecution from using material from a defendant's mental health evaluation to rebut psychiatric evidence introduced by the defendant himself. *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987). Accordingly, "[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). As the Ninth Circuit has explained, "a defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue." *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) (citing *Buchanan*, 483 U.S. at 422–23); *see also White v. Mitchell*, 431 F.3d 517, 536–37 (6th Cir. 2005) (holding that a capital defendant's rights were not violated when the prosecution used a pretrial competency report to rebut mitigating evidence offered by defendant's expert); *United States v. Taylor*, 320 F.Supp.2d 790, 793 (N.D. Ind. 2004) (finding that defendant's Fifth and Sixth Amendment rights "are not infringed by this

1    Court's Order directing him to submit to a mental health exam conducted by the
2    Government's mental health expert since he has indicated that he intends to introduce
3    mental health evidence during the penalty phase"). Cota's right against self-incrimination
4    was therefore not violated by the trial court's ruling.

5           Claim 7 is denied.

6    **4.      Claim 15**

7           Cota alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated
8    when the trial court erroneously consolidated his drug and flight charges with the first-
9    degree murder and robbery case, admitted evidence of Cota's flight, and instructed the jury
10   that flight could be considered evidence of guilt.[18] (Doc. 25 at 143.) The Arizona Supreme
11   Court denied this claim on direct appeal. *Cota*, 272 F.3d at 1033–34.

12          As the court noted, Cota "twice consented to the joinder. He first did so months
13   before trial and again early in the trial when the judge entered a formal consolidation
14   order." *Id.* at 1033. Because Cota consented to joinder, the court specifically addressed
15   only the admissibility of the flight evidence. *Id.* The court's rejection of Cota's challenges
16   to joinder and the admission of the flight evidence was neither contrary to nor an
17   unreasonable application of clearly-established federal law.

18          On habeas review, propriety of a joinder of counts "rests within the sound discretion
19   of the state trial judge." *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002). "The
20   simultaneous trial of more than one offense must actually render petitioner's state trial
21   fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C.
22   § 2254 would be appropriate." *Id.* To establish the requisite level of prejudice, a petitioner
23   must show that the impermissible joinder "had a substantial and injurious effect or
24   influence in determining the jury's verdict." *Davis v. Woodford*, 384 F.3d 628, 638 (9th
25   Cir. 2004). Cota cannot make that showing because the flight evidence was admissible in

26   _____

27   [18] At the conclusion of the guilt phase of Cota's trial, the court instructed the jury: "In
     determining whether the State has proved the defendant guilty beyond a reasonable doubt,
28   you may consider defendant's running away, hiding, or concealing evidence, together with
     all the other evidence in the case." (RT 7/7/09, a.m., at 15.)

1    his murder trial. Therefore, he was not prejudiced by joinder. *See Fields*, 309 F.3d at 1110

2    (explaining that cross-admissibility of evidence is critical in determining whether joinder

3    is permissible).

4         The Arizona Supreme Court determined that the flight evidence was admissible,

5    noting that such evidence "is admissible to show consciousness of guilt when the defendant

6    flees in a manner which obviously invites suspicion or announces guilt." *Cota*, 272 F.3d at

7    1033 (internal quotation omitted). The court then rejected Cota's argument that the eight

8    days that passed between the murders and his flight rendered the evidence inadmissible,

9    explaining that "[r]emoteness of flight in relation to the commission of the crime . . . goes

10   to the weight of the evidence, not its admissibility." *Id.* (additional citations omitted).

11   Finally, the court rejected Cota's argument that "the flight evidence was inadmissible

12   because he may have been fleeing because he had violated parole and had drugs in the car."

13   *Id.* The court explained that evidence of flight is not "per se inadmissible" simply because

14   a defendant is wanted on other charges. *Id.* at 1034 (citation omitted). The court concluded

15   that "the circumstances here justify an inference that Defendant was fleeing from some

16   other, more serious crime." *Id.* (quotation omitted). This decision does not entitle Cota to

17   habeas relief.

18        As previously noted, state law rulings, including a trial court's evidentiary rulings,

19   are generally not proper grounds for habeas corpus relief. *Estelle v. McGuire*, 502 U.S. at

20   67–68. When a petitioner asserts a due process violation based on admission of evidence,

21   a federal habeas court is limited to determining whether the challenged evidence "rendered

22   the trial so fundamentally unfair as to violate due process." *Windham*, 163 F.3d 1092, 1103

23   (9th Cir. 1998); *see Boyde*, 404 F.3d at 1172 (describing a petitioner's "heavy burden in

24   showing a due process violation based on an evidentiary decision.").

25   Under the AEDPA, "even clearly erroneous admissions of evidence that render a trial

26   fundamentally unfair may not permit the grant of federal habeas corpus relief if not

27   forbidden by 'clearly established Federal law,' as laid out by the Supreme

28   Court." *Holley*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see Dowling*, 493 U.S. at

352 (the Supreme Court has "very narrowly" defined the category of infractions that violate due process.) For example, the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith." *Garceau*, 275 F.3d at 774; *cf. Bugh*, 329 F.3d at 512–13 (admission of evidence of petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly-established federal law because there was no such precedent holding that state violated due process by permitting propensity evidence). The Supreme Court has likewise never held that the admission of flight evidence violates due process.

Even if federal habeas relief were available on this type of claim, evidence of Cota's flight resulted in no such violation because the Ninth Circuit has held that the admission of evidence does not rise to the level of a constitutional violation so long as a permissible inference can be drawn from the evidence. *Jammal*, 926 F.2d at 920; *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003); *see also Boyde*, 404 F.3d at 1172–73 (finding admission of evidence did not violate due process when jury could draw from the evidence a permissible inference that petitioner committed the crime). There was a permissible inference to be drawn from evidence of Cota's flight from the police. "Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself." *United States v. Harris*, 792 F.2d 866, 869 (9th Cir. 1986); *see Allen v. Chandler*, 555 F.3d 596, 599 (7th Cir. 2009) ("It is well established that evidence of flight is admissible as a circumstance tending to show a consciousness of guilt."; *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989) (holding that evidence of flight from law enforcement is admissible to prove guilt).

Finally, given the strength of the evidence against him, Cota has not shown that admission of the flight evidence had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 623.

Claim 15 is denied.

### 5. Claim 16

Cota alleges that the admission of "excessively gruesome" photographs during the

guilt and sentencing phases of his trial resulted in the denial of a fair trial, violated due process, and rendered his death sentence unreliable. (Doc. 25 at 151.) This claim is meritless.

Over defense counsel's objection, the trial court admitted photographs "depict[ing] both victims in the condition the medical examiner received them and during the autopsies." *Cota*, 272 P.3d at 147. The trial court found that the prejudicial nature of the photographs was outweighed by their "strong, probative value because all of them are intended to be used by the medical examiner during his testimony." (RT 5/5/09 at 11.) Three of the photographs were admitted only in black and white to minimize any "gruesome effect." *Id.*

On direct appeal, the Arizona Supreme Court held that the trial court did not abuse its discretion by admitting the photos. *Cota*, 272 P.3d at 148. The court explained that under Arizona law, "the fact and cause of death are always relevant in a murder prosecution." *Id.* (quotation omitted). The court found that the "photographs here also helped to corroborate the State's theory on the timing of the two deaths." *Id.* This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

In *Walden v. Shinn*, the Ninth Circuit rejected a gruesome-photos claim as "foreclosed by *Holley v. Yarborough*, in which we held that there was  . . . no clearly established federal law providing that the 'admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.'" 990 F.3d 1183, 1204–05 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 791 (2022) (quoting *Holley*, 568 F.3d at 1101).

Cota argues that the prejudicial effect of the photographs outweighed their probative value because the cause of death was not disputed. (Doc. 25 at 154.) This argument is unpersuasive. "The State 'cannot be compelled to try its case in a sterile setting.'" *State v. Bocharski*, 22 P.3d 43, 49 (Ariz. 2001); *see Boggs v. Shinn*, No. CV-14-02165-PHX-GMS, 2020 WL 1494491, at *34 (D. Ariz. Mar. 27, 2020). Likewise, an "assertion that the photos

1    were probative only of matters not in dispute does not render them irrelevant as the state

2    must carry its burden of proof on uncontested issues as well as contested ones." *State v.*

3    *Canez*, 42 P.3d 564, 585 (Ariz. 2002), *abrogated on other grounds by* Ariz. R. Crim. P.

4    16.2(b); *see Walden*, 990 F.3d at 1205 ("[N]othing in the Due Process Clause of the

5    Fourteenth Amendment requires the State to refrain from introducing relevant evidence

6    simply because the defense chooses not to contest the point.") (quoting *McGuire*, 502 U.S.

7    at 70).

8            Finally, Cota has not shown that admission of the photographs had a substantial and

9    injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at

10   623; *Plascencia v. Alameida*, 467 F.3d 1190, 1203 (9th Cir. 2006).

11           Claim 16 is denied.

12       **6.      Claim 17**

13           Cota alleges that "the trial court erred in refusing to declare a mistrial after the

14   victims' family member made unduly prejudicial inflammatory and irrelevant statements

15   to the jury." (Doc. 25 at 15.) He also contends that "to the extent they authorized such

16   statements," A.R.S. §§ 13-752(R) and 13-4426(A) are unconstitutional. (*Id.*)  The Arizona

17   Supreme Court rejected these arguments on direct appeal. The court first noted that it had

18   previously upheld the constitutionality of § 13-752(R), which authorizes victim impact

19   statements in capital cases. *Cota*, 272 P.3d at 1041.  The court then found that the trial

20   judge did not abuse his discretion in refusing to declare a mistrial after Victor Martinez's

21   daughter, "Noni," made a victim impact statement. The Arizona Supreme Court decision

22   was neither contrary to nor an unreasonable application of clearly-established federal law.

23   *Id.*

24           The presentation of victim impact evidence in a capital sentencing is not per se

25   unconstitutional. In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held

26   that the introduction of a victim-impact statement to a capital sentencing jury violated the

27   Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), however, the Court

28   overruled *Booth* in relevant part.

The *Payne* Court explained that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family." 501 U.S. at 825 (citation and internal quotation marks omitted). "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827. Therefore, the Court concluded, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. The Court left intact *Booth*'s prohibition on the admission of characterizations and opinions about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

In arguing that *Booth* and *Payne* were violated, Cota cites the following passages of Noni Martinez's statement to the jury:

> We think about how they were murdered. It plays in my mind every night when we go to bed. It's almost a slow motion, a camera.

> My brother and I discovered the bodies. It was one of the hardest things to see your loved ones mutilated, tortured in that manner.

(RT 7/23/09 at 48.)

She continued, stating that her children loved her father and that she would not be able to share their "achievements in life with him":

> I'm so proud of them. But I don't have a parent to share it with. I share it with Esther and my brother.

> But the defendant will have—will be able to share pictures and visitation from his family. Just isn't fair that we can't share it with mine.
> . . .

> I had the privilege of taking Lupe and the honor of taking Lupe back home to Mexico for burial. I will tell you that was the hardest thing. That was the hardest part of this journey, taking her and turning her body over to her father

and her siblings. I warned them they could not and should not open the casket because it wasn't their Lupe. But being a parent myself, I would want to see my child. I don't care what condition.

She didn't look like herself. She was mutilated, unrecognizable.

(*Id.* at 50–51.)

As the Arizona Supreme Court noted, during Noni's statement "at least four members of the jury cried." *Cota*, 272 P.3d at 1041. Defense counsel moved for a mistrial. (*See* RT 7/23/09 at 52–63.) The trial court denied the motion but offered to provide a curative instruction, which Cota declined. (*Id.* at 62–63.)

The Arizona Supreme Court found that Noni Martinez's testimony did not meet the standard required for a mistrial; it was not so "unduly prejudicial that it render[ed] the trial fundamentally unfair." *Cota*, 272 P.3d at 1041 (citation omitted). The court explained that a "trial is not unfair simply because jurors were emotional during the statement." *Id.* The court continued:

> The judge correctly noted that the use of the word "mutilated" was supported by the evidence. While finding "tortured" more problematic, the court noted that Ms. Martinez used the word as a lay person and that her use of the word was not "out of line" given her observation of the two bodies. Finally, the judge noted that Ms. Martinez's comparison of her situation to Cota's was accurate and the jurors already had that obvious information before the statement. The judge properly rejected the argument that the statement was an implicit sentencing recommendation.

*Id.*

The court further noted, *id.*, that the jury had been properly instructed that it could consider victim impact evidence only "to the extent that it rebuts mitigation" and not "as a new aggravating circumstance." (RT 7/23/09 at 13.) The trial court also instructed the jury that it "must not be influenced at any point in these proceedings by conjecture, passion, prejudice, public opinion or public feeling." (*Id.* at 5.)

Cota is not entitled to relief under *Booth* and *Payne*. Noni's statements were not qualitatively different from the evidence found permissible in *Payne*, where, for example, the victim's mother testified about how the murder of her daughter and granddaughter

affected the daughter's three-year-old son.[19] 501 U.S. at 814–15; *see, e.g.*, *Simmons v. Bowersox*, 235 F.3d 1124, 1134 n.4 (8th Cir. 2001) (recounting testimony of victim's husband, daughter, and sister).

The statements did not offer characterizations of the defendant or the appropriate sentence. *Payne*, 501 U.S. at 830 n.2. To the extent any of the statements referred to the crime, their admission did not have a "substantial and injurious effect or influence in determining" Cota's sentence. *Brecht*, 507 U.S. at 637; *see Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020) (applying harmless error standard to admission of mother's victim-impact statement); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless error standard to admission of improper victim-impact statement).

Given the trial court's instructions, which jurors are presumed to follow, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987), even if the victim-impact evidence had been erroneously admitted, the error was harmless. *See Lockett v. Trammell*, 711 F.3d 1218, 1239–40 (10th Cir. 2013) (finding error harmless where jury was correctly instructed that its sentencing decision was "limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence"); *Welch v. Workman*, 630 F.3d 980, 997, 999 (10th Cir. 2011) (admission of unconstitutional victim-impact statements "vividly and emotionally" describing the crimes was harmless error where jury was properly instructed); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) ("[A]ny prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy.").

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of *Booth* and *Payne*. Claim 17 is denied.

### 7.    Claim 18

Cota alleges the state court violated his rights under the Double Jeopardy Clause by

---

[19] She testified that her grandson "cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie." *Payne*, 501 U.S. at 814–15.

convicting him of two counts of murder and considering the same conduct in sentencing him to death under the (F)(2) aggravating factor. (Doc. 25 at 163.) The Arizona Supreme Court rejected this claim. *Cota*, 272 P.3d at 1046.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Supreme Court has explained that the clause consists of several protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *United States v. DiFrancesco*, 449 U.S. 117, 129 (1980) (quotation omitted). None of these protections are implicated by the application of the (F)(2) aggravating factor to each of Cota's murder convictions.

Cota was not being punished twice for the same crime. His sentences were based on the murders of two different victims; there were two convictions and two sentences. Aggravating circumstances, such as that set forth in (F)(2), only determine whether the crime of murder will carry the death penalty. As the Supreme Court has explained, "[a]ggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between alternative verdicts of death and life imprisonment." *Poland v. Arizona*, 476 U.S. 147, 156 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)); *see Lowenfield v. Phelps*, 484 U.S. 231, 244–46 (1988); *Green v. Zant*, 738 F.2d 1529, 1541 (11th Cir. 1984) (statutory aggravating circumstances are not offenses for double-jeopardy purposes, but rather are procedural standards designed to control a jury's discretion in capital cases in order to ensure against capricious and arbitrary enforcement of the death penalty). There is no Supreme Court precedent rejecting the use of multiple homicides as an aggravating factor, on double-jeopardy or any other grounds.

The Arizona Supreme Court's denial of Cota's challenge to the (F)(2) aggravating factor was neither contrary to nor an unreasonable application of clearly established federal law. Cota is not entitled to relief on Claim 18.

1

### 8.   Claim 19

Cota alleges that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he committed armed robbery and felony murder. (Doc. 25 at 165.) On direct appeal the Arizona Supreme Court denied Cota's claim that the trial court erred in denying his motion for judgment of acquittal on the armed robbery and felony murder charges. *Cota*, 272 P.3d at 1040.

The court rejected Cota's argument "that the State presented no evidence to establish the necessary concurrence of intent to take the victims' property and use of force against the victims."[20] *Id.* The court explained that, "Use of force may precede the taking of property, but the State must prove the coexistence of the intent and the use of force in order to establish armed robbery." *Id.* The court then noted:

> This is not, however, a case in which the evidence could only be reasonably interpreted as showing that the intent to steal was formed after the murders. Instead, . . . substantial evidence was introduced that "[a]ppellant's financial condition provided the motive for [the] killing."

*Id.* (citations omitted).[21]

In reviewing a claim of insufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining the sufficiency of the evidence, this Court may not substitute its assessment of guilt for that of the factfinder and may not weigh the credibility of witnesses. *Herrera v. Collins*, 506

---

[20] Armed robbery requires a showing "that defendant (1) while armed with a deadly weapon, (2) took property from another person against that person's will, and (3) in the course of taking the property, defendant threatened or used force against that person with the intent to deprive them of their property." A.R.S. §.§ 13-1902, -1904. The Arizona Supreme Court clarified that "there must be evidence establishing that defendant's intent to commit robbery was coexistent with the use of force." *State v. Wallace (Wallace I)*, 728 P.2d 232, 235 (1986).

[21] The court further noted that because Cota was also convicted of premeditated murder, "the murder convictions would stand even if the felony murder verdict were improper." *Cota*, 272 P.3d at 1040 n.8.

U.S. 390, 401–02 (1993); *Jackson*, 443 U.S. at 319 n.13. Moreover, a state court's construction of its own statute is binding on this court. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law"). Finally, under the AEDPA, courts "apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of *Jackson*. The evidence at trial showed that Cota killed Martinez and Zuvela with a blunt object and that immediately after the murders he began living in the victims' house, driving one of their vehicles and giving another to his son, and selling their property. A rational juror could infer from this evidence that Cota, who prior to the murders had no transportation, was sleeping on the floor of his mother's house, and was trying to support a drug habit, intended to steal from the victims.

Claim 19 is denied.

### 9.    Claim 20

Cota alleges that the trial court's refusal to instruct the jury on the lesser-included offense of manslaughter violated his rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 25 at 167.) The Arizona Supreme Court denied the claim on direct appeal, noting:

> the jury was instructed on second degree murder, which it rejected. By rejecting that lesser-included offense, it "necessarily rejected all other lesser-included offenses." Moreover, Cota was convicted of both premeditated and felony murder, and manslaughter is not a lesser-included offense of felony murder.

*Cota*, 272 P.3d at 1041 (citations omitted).

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that failing to instruct a capital jury on a lesser-included charge supported by the evidence violates the Constitution. *Id.* at 637. The Court explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to

give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.*

Cota's jury was instructed on a third option—second-degree murder—so *Beck* was satisfied. In Arizona manslaughter is defined as "[c]ommitting second degree murder . . . upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim." A.R.S. § 13–1103(A)(2). As the Arizona Supreme Court noted, by finding that Cota did not commit second-degree murder the jury necessarily rejected a manslaughter charge. *Cota*, 272 P.3d at 1041. In addition, because Cota was also convicted of felony murder, *id.*, there was no prejudice from the absence of such an instruction.

Claim 20 is denied.

**10.    Claim 21**

Cota alleges that the trial court deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments when it refused to instruct the jury that Arizona law presumptively requires that sentences for separate crimes run consecutively. (Doc. 25 at 169.)

Defense counsel asked the court to instruct the jury that if it sentenced Cota to life on both counts of murder, the sentences would run consecutively unless the judge expressly directed otherwise. Cota raised the claim on direct review. The Arizona Supreme Court denied the claim because "Cota's proposed instruction was not an accurate statement of the law." *Cota*, 272 P.3d at 1042. The court explained that: "Sentences 'run consecutively unless the court expressly directs otherwise.' A.R.S. § 13-711(A). But this statute creates no presumption in favor of consecutive sentences." *Id.* (citation omitted).

Cota alleges that this decision was contrary to and an unreasonable application of clearly-established federal law. (Doc. 25 at 169.) The claim is meritless.

Again, federal habeas corpus relief is unavailable for errors of state law. *McGuire*, 502 U.S. at 67–68. "The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *see*

*Beaty v. Stewart*, 303 F.3d 975, 986 (9th Cir. 2002) (petitioner's claim "that the trial court improperly imposed consecutive sentences in violation of Arizona law" was "not cognizable in federal habeas proceedings").

The Court is also bound by the Arizona Supreme Court's interpretation of its own sentencing laws. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (*per curiam* ) (holding that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). In finding there was no statutory presumption requiring consecutive sentences, the court in *Cota* cited *State v. Garza*, 962 P.2d 898, 901–02 (1998). *Cota*, 272 P.3d at 1043. In *Garza* the Arizona Supreme Court explained that the "statute . . . does not use the word 'presumption' and creates no such presumption." 962 P.2d at 901.

The Arizona Supreme Court's interpretation of the statute is binding on this Court. For that reason, and because an error in the state court's application of state law is not cognizable on federal habeas review, Cota is not entitled to relief. Claim 21 is denied.

## F.    Juror Claims

### 1.    Claim 8

This claim consists of three subclaims challenging the prosecutor's use of peremptory strikes against prospective female jurors, religious jurors, and jurors familiar with mental health issues. (Doc. 25 at 100.)

Cota contends that he raised these claims during the PCR proceedings. (*Id.*) He did not. He raised a claim alleging that appellate counsel performed ineffectively by failing to raise a claim challenging the prosecutor's use of peremptory strikes based on the mental health experiences of three female prospective jurors.[22] (PCR Pet. at 16–20; *see* Petition

---

[22] The potential jurors, Jurors 8, 69, and 97, had relatives who suffered from conditions such as alcoholism, bipolar disorder, Asperger's syndrome, and schizophrenia, or were themselves being treated for bipolar disorder or depression. (*See* RT 4/6/09 at 54, 63–64; RT 4/7/09 at 87–88; RT 4/8/09 at 135, 154–55; RT 4/14/09 at 21–22, 26–29.) As the prosecution noted to the trial court in justifying the strikes, Cota's mental health and drug use were issues in the trial.

1    for Review, Doc. 35-1, at 16–20.) He did not argue that appellate counsel was ineffective
2    for failing to challenge the striking of jurors on the basis of gender or on religious grounds.
3    (*Id.*) Those subclaims are procedurally defaulted and barred from federal review.

4         Respondents assert that the subclaim about potential jurors who had familiarity with
5    mental health issues is also unexhausted and procedurally defaulted. (Doc. 35 at 127–28.)
6    Cota replies that he presented the "substance" of the claim and that any default is excused
7    by the ineffective assistance of PCR counsel. (Doc. 41 at 62–63.) The latter argument fails
8    because *Martinez* apples only to defaulted claims of ineffective assistance of trial counsel.
9    *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

10        However, while the PCR claim was titled "ineffective assistance of appellate
11   counsel," Cota's analysis focused exclusively on the elements of a claim alleging the
12   discriminatory use of peremptory strikes, with Cota citing *Batson v. Kentucky*, 476 U.S. 79
13   (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). (PCR Pet. at 16–20;
14   *see* PR at 16–20.) The PCR court, following the same analytical framework, found that
15   "appellate counsel's performance was not deficient, as [Cota] has not shown that an
16   identified group was improperly excluded from his jury." (ME 5/12/15 at 6.)

17        Rather than further addressing the procedural status of this claim, the Court will
18   consider its merits. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on
19   the merits); *see also Lambrix v. Singletary*, 520 U.S. 518, 524–25 (1997) (explaining that
20   the court may bypass the procedural default issue in the interest of judicial economy when
21   the merits are clear but the procedural default issues are not).

22        In *Batson* the Supreme Court held that "[p]urposeful racial discrimination in
23   selection of the venire violates a defendant's right to equal protection because it denies him
24   the protection that a trial by jury is intended to secure." 476 U.S. at 86. Subsequently, in
25   *J.E.B.*, the Court explained that "gender, like race, is an unconstitutional proxy for juror
26   competence and impartiality." 511 U.S. at 129.

27        To determine when the use of peremptory strikes amounts to unconstitutional
28   discrimination, the Supreme Court established a three-part, burden-shifting test. First, the

defendant must make a prima facie showing that the totality of the circumstances gives rise to an inference of discrimination. *Johnson v. California*, 545 U.S. 162, 168 (2005) (citing *Batson*, 476 U.S. at 93–94). The burden then shifts to the State to offer nondiscriminatory justifications for the strikes. *Id.* (citing *Batson*, 476 U.S. at 94). Finally, the trial court evaluates the prosecution's explanation and determines if the defendant established purposeful discrimination. *Id.* "If the defendant fails to establish a prima facie case, the burden does not shift to the prosecution, and the prosecutor is not required to offer an explanation for the challenge." *Tolbert v. Gomez*, 190 F.3d 985, 988 (9th Cir. 1999).

The Ninth Circuit uses a three-part test to carry out the first step of the *Batson* inquiry. *Nguyen v. Frauenheim*, 45 F.4th 1094, 1099 (9th Cir. 2022). "Under that test, to show a prima facie case: (1) the prospective juror must be a member of a cognizable group, (2) the prosecutor must use a peremptory strike to remove that juror, and (3) the totality of the circumstances must raise an inference that race or gender motivated the prosecutor to strike." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006).

Cota's claim fails the test's first prong because the protections of *Batson* have not been extended beyond the categories of race and gender. For example, the Supreme Court has not extended *Batson* to a juror's religious affiliation. *See Cash v. Barnes*, 532 F. App'x 768, 769 (9th Cir. 2013) (citing *Davis v. Minnesota*, 511 U.S. 1115 (1994)); *Whitehead v. Ryan*, No. CV-14-2481-TUC-LCK, 2018 WL 5905915, at *16 (D. Ariz. Nov. 9, 2018). Courts have likewise concluded that the exclusion of prospective jurors based on age does not violate equal protection. *See Weber v. Strippit, Inc.*, 186 F.3d 907, 911 (8th Cir. 1999).

Cota cites no authority holding that the protections of *Batson* apply to jurors who are familiar with mental health issues, nor does he suggest that experience with mental illness is a race- or gender-specific phenomenon. In fact, courts have held that familiarity with mental health issues is a race-neutral grounds for striking a prospective juror. *See, e.g.*, *Whatley v. Dunn*, No. 1:19-CV-938-TFM-N, 2022 WL 3999822, at *14 (S.D. Ala. Aug. 31, 2022) (proffered reasons for striking potential jurors, including "having friends or family members with drug and alcohol problems" and "experiences with mental illness

and mental health treatment," were "facially race-neutral,"); *Counter v. McCann*, 484 F.3d 459, 469 (7th Cir. 2003) (striking of African-American woman was non-discriminatory where she was a nurse who might have knowledge of mental illness, which was an issue at trial).

No *Batson* violation resulted from the prosecution's use of peremptory challenges to strike jurors familiar with mental health issues. Claim 8 is denied.

### 2.      Claim 10

Cota alleges that his right to a jury drawn from a representative cross-section of the community under the Sixth and Fourteenth Amendments was violated when the court refused to provide an interpreter for and released from service jurors who spoke only Spanish. (Doc. 25 at 123.) He further alleges that A.R.S. § 21–202(B)(3), which requires dismissal of prospective jurors "not currently capable of understanding the English language," is unconstitutional. (*Id.*)

Prior to jury selection, Cota moved to preclude the jury commissioner from excluding non-English speakers from the master jury list. The trial court denied the motion, relying on *State v. Cordova*, 511 P.2d 621 (Ariz. 1973).

On direct appeal, the Arizona Supreme Court upheld the constitutionality of A.R.S. § 21–202(B)(3). *Cota*, 272 P.3d at 1034. The court noted that the fair cross-section requirement is violated when the group alleged to be excluded is a "distinctive" group in the community; representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and the underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Id.* (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). The court continued: "The Constitution is not violated . . .  if 'a significant state interest' is 'manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group.'" *Id.* (quoting *Duren*, 439 at 367–68).

The court then rejected Cota's argument that "non-English speaking Hispanic citizens" are a "distinctive group," explaining that the statute "excuses all prospective

jurors 'not currently capable of understanding the English language,' not just Hispanics." *Id.* (quoting § 21-202(B)(3)). The court concluded that non-English speakers "are not a 'distinctive group' for Sixth Amendment purposes." *Id.* The court also held that § 21-202(B)(3) "serves a significant state interest" because having to translate for non-English-speaking or -reading jurors "would be an undue burden upon the State court system.'" *Id.* (quoting *Cordova*, 511 P.2d at 623).

The Arizona Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law. "[T]he Supreme Court has recognized that there is room in every jury selection system for reasonable qualifications and exemptions." *United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996) (citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). "The requirement that jurors speak English is unquestionably reasonable. . . ." *Id.* (citing 28 U.S.C. § 1865(b)(3))[23]; *see United States v. Fernandez-Hernandez*, 652 F.3d 56, 67–68 (1st Cir. 2011) (finding requirement that jurors in the District of Puerto Rico be proficient in English did not violate defendant's right to a jury made up of fair cross section of community and was "justified by the overwhelming national interest served by the use of English in a United States court") (additional quote omitted); *cf. Ayala v. Davis*, 576 U.S. 257, 278 (2015) (holding that English-language proficiency is a valid race-neutral reason for exercising a peremptory strike). "A defendant's constitutional rights to be tried by a jury reflecting a cross-section of the community and by a jury from which persons have not been excluded by reason of race do not override the interest in restricting jury service to persons who are competent to serve." *United States v. Iverson*, 897 F.3d 450, 465 (2d Cir. 2018).

Finally, Cota "has not referred to, and the Court is not aware of, any cases of the United States Supreme Court holding that a state defendant has a constitutional right in a criminal case to have the state court provide interpreters for prospective jurors with

---

[23] The federal Jury Selection and Service Act provides that a person is qualified to serve on a jury "unless," he or she "is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form" or "unable to speak the English language." 28 U.S.C. § 1865(b)(2) and (3).

difficulty understanding the English language." *Lopez v. Sec'y, Dep't of Corr.*, No. 8:12-CV-44-T-27TBM, 2015 WL 477188, at \*5 (M.D. Fla. Feb. 5, 2015). In the absence of clearly-established federal law governing the issue, this aspect of the claim fails under § 2254(d)(1). Claim 10 is denied.

### 3.      Claim 11

Cota alleges that the trial court's refusal to investigate whether a juror was asleep during Cota's mitigation presentation deprived him of his rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 25 at 126.) The Arizona Supreme Court denied the claim on direct appeal. *Cota*, 272 P.3d at 1041–42.

During the penalty phase of Cota's trial, defense counsel asked to voir dire Juror 12 because "several people" said that his eyes were closed during testimony. *Id.* at 1041. The trial judge noted that he had watched Juror 12 closely after the allegations were brought to his attention. *Id.*

Although he had seen Juror 12's eyes closed on occasion, he could tell the juror was not asleep because he was tapping his foot and moving his wrist. *Id.* The judge denied the request for voir dire and Cota's subsequent motion for a new trial. *Id.*

The Arizona Supreme Court found that the trial court did not abuse its discretion. *Id. at* 1042. Specifically, the court determined that the trial judge permissibly relied on his personal observations of the juror's conduct in open court. *Id.* at 1041–42. This decision was neither contrary to nor an unreasonable determination of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Under the Sixth Amendment, a criminal defendant is guaranteed the right to be tried by a fair and impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). An impartial jury means jurors "capable and willing to decide a case solely on the evidence before it." *United States v. Olano*, 507 U.S. 725, 738 (1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). The presence of a sleeping juror during trial does not *per se* deprive a defendant of the right to due process, a fair trial, or an impartial jury. *See Tanner v. United States*, 483 U.S. 107, 126–27 (1987); *United States v. Springfield*, 829 F.2d 860, 864 (9th

Cir. 1987) (finding no violation of due process of the right to a fair trial and impartial jury when juror napped through part of testimony).

A state court's determination that a juror was not sleeping is entitled to a presumption of correctness. *See Anderson v. Terhune*, 409 F. App'x. 175, 179 (9th Cir. 2011) (explaining that trial court's observations of an allegedly sleeping juror entitled to presumption of correctness absent evidence of "significant" problem). In *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1283 (11th Cir. 2014), a case factually indistinguishable from Cota's, defense counsel moved for a mistrial after notifying the trial judge that a juror was sleeping during trial. The trial judge found that the juror was "'nodding,' but was still awake," and denied the motion. *Id.* The Eleventh Circuit held that "[w]hile Insignares maintains the juror was sleeping, he has not provided clear and convincing evidence rebutting the trial judge's contrary factual finding. Therefore, we adopt the trial judge's finding that the juror was awake." *Id.*

Cota cites *United State v. Barrett*, 703 F.2d 1076, 1084 (9th Cir. 1983), which found that the trial court abused its discretion in failing to hold an investigative hearing on the "sleeping-juror" issue. *Barrett* is distinguishable, however, because there the juror himself informed the court that he had been sleeping during the trial and asked to be removed from the panel as a result. *Id.* The trial court therefore could not "properly take judicial notice of the fact that 'there was no juror asleep during this trial' without making further inquiry into the matter." *Id.*

In Cota's case, "the allegation of a sleeping juror was raised by the defendant" and the trial judge was "allowed . . . to take judicial notice of the fact that the juror had not been sleeping without requiring the judge to make any inquiry into the allegation." *Id.*

Claim 11 is denied.

### 4. Claim 12

Cota alleges that his rights to a fair trial and an impartial jury were violated when the court struck a prospective juror, Juror 46, who "indicated that she was generally opposed to the death penalty but could follow the law and impose it in the right case."

(Doc. 25 at 129.) The Arizona Supreme Court denied this claim on direct appeal, finding that cause existed for the juror's dismissal and that Cota had a fair opportunity to rehabilitate her. *Cota*, 272 P.3d at 1034–35. Cota argues that this decision was contrary to and an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 25 at 129.)

      a.    Additional background

Because Cota's drug addiction and drug use among his friends and family would be issues at trial, the juror questionnaire included questions about addiction. *Cota*, 272 P.3d at 1035. Juror 46 disclosed that two of her brothers had died of heroin overdoses. *Id.*

During voir dire, the prosecutor questioned Juror 46 about her ability to set aside her personal experience and consider the evidence impartially:

> Ms. Valenzuela: Having to deal with drugs or drug usage and your role that you had to play in that situation. If you have to hear evidence about someone using drugs or the effects of drugs on someone—you know, I know your brothers actually died. So, I mean, are you going to be able to set that aside, you know, and it's part of your life experiences, are you going to be able to set that aside and listen to what you hear . . . maybe from witnesses, maybe from psychologists . . . but are you able to set your personal experiences aside and listen to that? Can you tell me what you feel about that?
>
> Juror 46: Honestly, no. It's upsetting me right now thinking about it.
>
> Ms. Valenzuela: And I can see that. And I apologize for doing that. We just have to ask. Because like I said, there's no right or wrong answers. We just need to know if this is the right case for you. And if it's not, it's not. So would you feel better to not have to sit on this type of case with that information?
>
> Juror 46: If it's got substance abuse, I would rather not. Just we were really not told that.
>
> Ms. Valenzuela: Would you be able, in your personal opinion as you sit there right now, to be fair and impartial to both sides if you have to hear about those issues?
>
> Juror 46: It's hard to say.
>
> Ms. Valenzuela: Because of your personal experience?

1

2      Juror 46: Right.

3    (RT 4/7/09, a.m., at 83–85.)

4          During a bench conference after that exchange, the prosecutor asked defense

5    counsel if he would stipulate to releasing the juror. (*Id.* at 85.) Defense counsel declined,

6    asking for an opportunity to rehabilitate the juror. (*Id.*) The court agreed. (*Id.*)

7          Voir dire continued with the prosecutor asking Juror 46 how she would respond to

8    hearing evidence about heroin use, given that heroin had killed her brothers:

9          Ms. Valenzuela: If you were to hear evidence about the same specific drugs
          that your brothers had an issue with, would that also be difficult for you?
10

11        Juror 46: Yes, it would.

12        Ms. Valenzuela: Would it make you even more unfair or unbiased [sic]?

13        Juror 46: Probably.

14   (*Id.* at 87.)

15        The prosecutor then asked Juror 46 if she would be able to sit through the mitigation

16   stage of trial "fairly and impartially," assuming Cota had been found guilty and at least one

17   aggravator had been proven:

18        Juror 46: Again, I think that not knowing the case, if the drug issue is a big
          issue, I think that would be difficult for me. If it's not a big issue, then —
19

20        Ms .Valenzuela: That would make it difficult for you to be fair and impartial?

21        Prospective Juror: Uh-huh. I think too many emotions.
22

23        Ms .Valenzuela: With all of that taken into account, and you would be hearing
          that sort of information, do you think that you're the sort of juror that should sit on
24        this case?

25        Juror 46: Probably not.

26   (*Id.* at 88.)

27        Defense counsel then questioned the juror. When pressed on whether her personal

28   experiences would impair her ability to serve fairly, Juror 46 replied: "I think I would like

- 110 -

to talk more in private, if you want more information." (*Id.* at 96.) The court then interjected and the following colloquy took place:

> The Court: Ma'am, I can tell from the tone of your voice that it's very difficult for you to answer these questions. Can you tell you [sic] us just generally, without invading your privacy, because of your family experiences with heroin addiction, with a drug addiction, do you think that that's going to affect your abilities to be fair to the defense or the prosecution or to both of them?
>
> Juror 46: I don't know if I would be as fair to the prosecution. Because living through that, I would understand what would drive somebody to do things that they would not normally do under normal circumstances.
>
> The Court: And do you think that that would affect your abilities to be fair in this case?
>
> Juror 46: I don't know, to be honest with you.
>
> The Court: Okay.
>
> Juror 46: I don't know. I know it's very emotional for me.
>
> The Court: Sure. Sure. Sometimes we encourage our jurors to ask if it's possible for you to draw a line between your own personal experiences or your family experiences and the evidence that you hear in this case. Is that something that you would be able to do?
>
> Juror 46: I want to be honest here. It would just depend, I think. Again, knowing what destroyed my family.
>
> The Court: Okay. The last question that I have is whether that emotion that is associated with this type of evidence that may be presented in this case, is that something that is going to prevent you from hearing and seeing the evidence that's presented in court?
>
> Juror 46: Probably so, because I'm having trouble right now and we're really not talking about it.

(*Id.* at 96–98.)

After hearing arguments from counsel, including the defense's argument that further questioning might elicit a response from Juror 46 indicating that it was not impossible for

her to serve as a juror, the court overruled defense counsel's objections and excused Juror 46 for cause. (*Id.* at 99–100.)

b. Analysis

A prospective juror in a capital case may be excluded for anti-death-penalty views if she indicates she is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968). However, the exclusion of jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violates the Constitution. *Id.*

In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court held that a prospective juror's views on the death penalty could not be challenged for cause unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Id.* at 45. In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court reaffirmed the *Adams* standard, holding that dismissal for cause is appropriate if the prospective juror's views "prevent or substantially impair" her ability to follow the law. *Id.* at 424.

On federal habeas review a state court's determination that a juror's views would substantially impair the discharge of her duties is a factual finding entitled to a presumption of correctness. *Witt*, 469 U.S. at 426 ("[D]eference must be paid to the trial judge who sees and hears the juror."); *see Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."); *see Morgan v. Illinois*, 504 U.S. 719, 730 (1992) ("The adequacy of voir dire is not easily the subject of appellate review. . . ."). The AEDPA requires an additional, "independent, high standard" of deference. *Uttecht*, 551 U.S. at 10;

*see White v. Wheeler*, 577 U.S. 73, 78 (2015); *Ochoa v. Davis*, 50 F.4th 865, 878 (9th Cir. 2022).

Cota argues that because "Juror 46 never emphatically stated that she could not be fair and impartial" but "simply and candidly told the court that her background and experience with drug addiction would impact her emotionally," striking her without follow-up by counsel or the court violated his Sixth, Eighth, and Fourteenth Amendment rights. (Doc. 25 at 133.) This argument is unpersuasive.

A trial court's "finding may be upheld even in the absence of clear statements from the juror that he or she is impaired[.]" *Uttecht*, 551 U.S. at 7. "A juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment." *United States v. Fell*, 531 F.3d 197, 215 (2d Cir. 2008) ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case. . . .") (quoting *Uttrecht*, 551 U.S. at 18). "Because appellate judges are absent from voir dire, when a prospective juror fails to express herself 'carefully or even consistently . . . it is [the trial] judge who is best situated to determine competency to serve impartially.'" *United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010) (quoting *Patton v. Yount*, 467 U.S. 1025, 1039 (1984)); *Ochoa*, 50 F.4th at 886.

Here, the trial judge was in the best position to determine the juror's competency to serve based on her demeanor and her equivocal responses when repeatedly asked whether she could be fair to both sides and evaluate the evidence impartially given her personal experience with the damage caused by drug abuse. *See Uttecht*, 551 U.S. at 9; *Ochoa*, 50 F.4th at 877–78; *Allen*, 605 F.3d at 466. Juror 46 consistently replied that emotions and background would make it difficult to serve as an unbiased juror. (*See* RT 4/7/09, a.m., at 83, 87–88, 98.)

While Cota criticizes the extent of the voir dire, the Supreme Court has not held that voir dire must be lengthy or focused on the ultimate question. Less direct inquires can be sufficient when examined in totality of the questioning. *See Darden*, 477 U.S. at 175–77

(looking to entirety of voir dire to determine if juror's performance would have been substantially impaired). The Court recognized that there is no formula applicable to voir dire because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.'" *Witt*, 469 U.S. at 424–25. In any event, the voir dire of Juror 46 occurred over 15 transcript pages and produced responses indicating that her views "would prevent or substantially impair the performance of [her] duties as a juror." *Adams*, 448 U.S. at 45.

Applying the additional level of deference AEDPA requires, the Arizona Supreme Court's decision to affirm the trial court's excusal of Juror 46 for cause was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see Wheeler*, 577 U.S. at 78–79. Nor was the decision based on an unreasonable determination of the facts. *Witt*, 469 U.S. at 429; *see Gentry v. Sinclair*, 705 F.3d 884, 911 (9th Cir. 2013). Claim 12 is denied.

**5.     Claim 13**

Claim 13 consists for several subclaims. Cota alleges that his Sixth, Eighth, and Fourteenth Amendment rights were violated when the trial court improperly excused Juror 2 during the guilt phase of trial; designated Jurors 5, 9, and 13 as alternates; and allowed Jurors 9 and 10 to deliberate in the penalty phase of trial despite not having deliberated in the guilt and aggravation phases. (Doc. 25 at 134.)

a.     Juror 2

Early in the trial, a witness testified that he had known Victor Martinez for 50 years. (RT 4/20/09 at 66.) The prosecutor mistakenly called this period "half a decade." (*Id.* at 36.) In response to a question from Juror 2, the prosecutor indicated that he misspoke: "I guess a decade is 10 years." (*Id.* at 68.) Later that day, the prosecutor stressed the term "half a century," resulting in laughter from some in the courtroom. (*Id.* at 132; *see* RT 4/21/09 at 4, 18–27.)

As discussed the next day between the court and the parties, Juror 2 had reported to the bailiff that she felt "humiliated" by the prosecutor's conduct and as a result had missed several minutes of testimony. (RT 4/21/09 at 4–5.) She had also expressed concern whether she would be able to side with the State after the way the prosecutor had responded. (*Id.)*

The court and counsel agreed to bring Juror 2 in for private questioning. During her discussion with the judge, she confirmed that she was upset by the prosecutor's comments. (*Id.* at 10.) The court and counsel reassured her that the prosecutor's comment was a self-deprecating admission of his own mistake and that any laughter was not at the juror's expense but instead was a way "to relieve stress." (*Id.* at 8–10, 21.) Juror 2 appeared to accept this explanation, stating "I'm not offended anymore. Now I have forgiven." (*Id.* at 17.) She further indicated, when questioned by counsel, that she could "go on from this point," evaluate the evidence fairly, and apply the proper burden of proof. (*Id.* at 26–30.)

After Juror 2 was excused, the prosecutor stated that "from the State's perspective, she's assured us that she can be fair and impartial." (*Id.* at 30.) The judge, although expressing concern about the juror's willingness to answer his questions directly, agreed that Juror 2 had provided assurances of her impartiality. (*Id.* at 33.)

Later that day, however, the prosecutor initiated another discussion with the court indicating that both the State and defense counsel still had concerns about Juror 2's statements to the bailiff. (*Id.* at 69–70.) Defense counsel stated that he wanted additional time to consider the issue, but was concerned that if Juror 2 was excused only two alternate jurors would remain. (*Id.* at 70.)

The next day, the State formally asked the court to excuse Juror 2 based on concerns regarding her "emotional reactions to things" which had caused her to miss several minutes of testimony. (RT 4/22/09 at 5, 7.) Although not dismissing the prosecutor's concerns about Juror 2's propensity to be offended, defense counsel objected, reiterating his concern that dismissing her would reduce the number of alternates to two. (*Id.* at 5–6.) He also argued that Juror 2 was conscientious and taking her role as a juror seriously. (*Id.* at 6.) The court, after laying out half a dozen grounds supporting his decision, including the fact that he did

not accept the juror's reassurance that she could be fair, granted the State's motion to excuse Juror 2, concluding that he did "not believe that she can continue as a fair and impartial juror in this case." (*Id.* at 12.)

The Arizona Supreme Court held that the trial court's decision to excuse the juror was supported by a "reasonable ground" under Rule18.4(b) of the Arizona Rules of Criminal Procedure. *Cota*, 272 P.3d at 1038.

Cota argues that the trial court improperly dismissed Juror 2 because during her colloquy with the court, she indicated that she could be fair and impartial. He alleges that the Arizona Supreme Court's ruling affirming the trial court's decision to dismiss the juror was an unreasonable application of clearly established federal law and "constitute[d] an unreasonable application of the facts in light of the evidence." (Doc. 25 at 138.) These arguments fail.

As just discussed, "[r]eviewing courts owe deference to a trial court's ruling on whether to strike a particular juror. . . ." *Wheeler*, 577 U.S. at 77. This is true "even in the absence of clear statements from the juror that he or she is impaired." *Id.* at 78; *see Uttecht*, 551 U.S. at 9 (explaining that deference to the trial court is necessary "because it is in a position to assess the demeanor of the venire, and of the individuals who compose it"). Under the AEDPA, this Court accords an additional, independent layer of deference to the trial court's ruling. *Id.* (citing *Uttecht*, 551 U.S. at 10) (noting "doubly deferential" standard of review applicable to such claims). Finally, a state court's determination of juror partiality is entitled to a presumption of correctness on federal habeas review. *See Witt*, 469 U.S. at 426–28 (1985); *see also Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (explaining that trial court's determination of the existence of good cause to dismiss and juror fitness are factual findings "entitled to special deference" on habeas review).

Cota's allegations do not survive these standards of review. The record supports the trial judge's skepticism about Juror 2's ability to be fair and impartial as well as his, and counsel's, other concerns about the juror's temperament. (*See* RT 4/22/09 at 9–12.)

The judge was "in a superior position to observe" Juror 2's "physical appearance and demeanor." *Perez*, 119 F.3d at 1427; *see Yount*, 467 U.S. at 1039 (explaining that the trial court is "best situated to determine competency to serve impartially.") The judge observed Juror 2's "affect and body language" and concluded she was still upset about what she took to be the lack of professionalism surrounding the "half century" incident. (RT 5/22/09 at 11.) The judge also explained that he remained "very troubled" by the juror's "adamant refusal" to answer his question as to whether she believed she could be a fair and impartial juror. (*Id.* at 11–12.)

Cota had not shown that the rulings of the trial court or the Arizona Supreme with respect to Juror 2's dismissal were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*White*, 577 U.S. at 77 (quoting *Richter*, 562 U.S. at 103) (additional quotation marks omitted).

b.      Jurors 5, 9, 10, and 13

Cota alleges, with respect to these jurors, that "the trial court disregarded the Arizona Rules of Criminal Procedure in its selection of alternates to accommodate jurors' vacations." (Doc. 25 at 137.) The Arizona Supreme Court rejected this claim on direct appeal. *Cota*, 272 P.3d at 1038. The court noted that Juror 9 had made vacation plans for the week when guilt-phase deliberations were to begin and Jurors 5 and 13 had paid for out-of-town tickets when the penalty phase began. *Id.* "On each occasion, the trial judge designated the jurors as alternates instead of releasing them or continuing the trial." *Id.* The court then explained:

> Alternates are supposed to be selected by lot by the clerk. Ariz. R. Crim. P. 18.5(h). However, designation of alternates by the trial judge does not require reversal in the absence of resulting prejudice. Cota has not shown that he was deprived of a fair and impartial jury at any stage of the trial, and therefore cannot demonstrate prejudice.

*Id.* (citations omitted)

Again, federal habeas court is limited to deciding whether a conviction violated the United States Constitution; relief does not lie for violations of state law. *McGuire*, 502 U.S. at 67–68. Cota does not assert that a defendant in state court has a federal constitutional right to alternate jurors chosen by lot. Any violation of Rule 18.5(h) is at most an error of state law, and not cognizable on federal habeas review.

Cota next argues that his rights were violated when Jurors 9 and 10, who served as alternates during the guilt and aggravation phases of the trial, were allowed to deliberate in the penalty phase. (Doc. 25 at 137–38.) The Arizona Supreme Court rejected this claim:

> Cota argues that the trial court erred by allowing Juror 10 to deliberate in the penalty phase after serving as an alternate in the previous two phases. But we have repeatedly rejected the argument that the same jurors must serve in all phases of a capital trial
>
> Cota argues that these cases are distinguishable because the trial court here did not voir dire Juror 10 to see if she accepted the previous verdicts. But this is not required; the juror must simply be aware of her role in the penalty phase. Although it may be advisable for the trial court to discuss this role with the juror individually, such discussion is not necessary where the entire jury is instructed properly, as it was here.

*Cota*, 272 P.3d at 1038 (citations omitted).

Citing *Ring v. Arizona*, 536 U.S. 684 (2002), Cota asserts that "his constitutional rights to a unanimous jury verdict were violated by substituting new jurors into the penalty deliberation who had not participated in the guilt and aggravation eligibility deliberations." (Doc. 25 at 138.) This argument fails.

First, *Ring* was satisfied when the jury unanimously found that the aggravating factors had been proved and therefore Cota was eligible for a death sentence. *Ring* holds only that a jury in a capital case must unanimously determine the existence of aggravating factors that render a defendant eligible for the death penalty. 536 U.S. at 602.

Next, there was no violation because Jurors 9 and 10 were substituted before penalty-phase deliberations began. The penalty phase is a distinct stage of trial, and the Arizona Supreme Court has held that the use of different juries in the aggravation and

penalty phases does not violate a defendant's rights. *State v. Prince*, 250 P.3d 1145, 1156 (Ariz. 2011) (citing *State v. Moore*, 213 P.3d 150, 166 (Ariz. 2009)); *see Garcia*, 2022 WL 1166408, at *29.

Finally, Cota's argument is unsupported by clearly-established federal law. *See Goff v. Bagley*, 601 F.3d 445, 468 (6th Cir. 2010) ("Goff has cited no caselaw to support his argument that the substitution of an alternate juror—who was present for both the guilt-phase and penalty-phase hearings but did not participate in the guilt-phase deliberation—for a sitting juror before the commencement of penalty-phase deliberations is a constitutional violation, nor could we find any."); *cf. Battle v. United States*, 419 F.3d 1292, 1302 (11th Cir. 2005) (rejecting argument that defendant was prejudiced by seating alternate juror during penalty phase); *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000) ("[T]he issues of guilt and of punishment are sufficiently distinct that the alternate didn't have to hear the deliberations on the former issue in order to be able to participate meaningfully in the deliberations on the latter issue. He had sat through the entire trial, which is the important thing.").

For these reasons , Claim 13 is denied.

**F.    Ineffective Assistance of Appellate Counsel**

**Claim 22**

Cota alleges that his Sixth Amendment right to the effective assistance of counsel was violated by appellate counsel's failure to raise meritorious claims. (Doc. 25 at 171.) Of the three claims cited by Cota, only one was raised in state court, and only in part.

As discussed above in the Court's analysis of Claim 8, Cota alleged in his PCR proceedings that appellate counsel performed ineffectively by failing to raise a *Batson* claim based on the prosecutor's use of peremptory challenges to strike three jurors who had experience with mental health issues. The PCR court's rejection of the claim was, for the reasons this Court discussed, neither contrary to nor an unreasonable application of clearly established federal law.

The remaining ineffective assistance subclaims allege that appellate counsel "failed to challenge Arizona's unconstitutional death penalty scheme that requires a death sentence when one aggravator and no mitigators exist" and "failed to challenge the trial court's erroneous admission of unduly prejudicial evidence at Cota's trial." (Doc. 25 at 171.)

Cota raised neither of these claims in state court. He argues that their default is excused by the ineffective assistance of PCR counsel under *Martinez*. (Doc. 41 at 10–11, 84.) In *Davila*, the Supreme Court held the opposite, refusing to "extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim." 582 U.S. at 525.

Cota contends that *Martinez* applies to his claims notwithstanding *Davila*, "because these issues were not challenged at trial" and "no court has passed on its [sic] merits." (*Id.* at 84.)

The Supreme Court addressed this argument in *Davila*. As Cota notes, the Court recognized that the situation in *Martinez* required an exception to ensure that the underlying ineffective-assistance claim "will have been addressed by one court." *Davila*, 582 U.S. at 532 (quoting *Martinez*, 566 U.S. at 11). "Claims of ineffective assistance of appellate counsel, however, do not pose the same risk that a trial error—of any kind—will escape review altogether, at least in a way that could be remedied by" expanding *Martinez* to claims of ineffective assistance of appellate counsel. *Id.* Contrary to Cota's argument, however, "[t]his is true regardless of whether trial counsel preserved the alleged error at trial. If trial counsel preserved the error by properly objecting, then that claim of trial error 'will have been addressed by . . . the trial court.'" *Id.* (quoting *Martinez,* 566 U.S. at 11).

The Court then explained that if the claim of error was not preserved by trial counsel's objection, then the claim was either not strong enough to make out a case of appellate ineffectiveness or "was so obvious that appellate counsel was constitutionally required to raise it on appeal." *Id.* at 533. In the latter case, "trial counsel likely provided

ineffective assistance by failing to object to [the error] in the first instance," and "the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object." *Id.*

Cota's interpretation of *Davila* therefore fails. The decision itself recognized that not all trial errors would be preserved and noted that *Martinez* provides an avenue for such unpreserved claims to be addressed.

Claim 22 is denied.

## G.   Appellate Review of Death Sentence

### Claim 14

Cota alleges that the Arizona Supreme Court's decision affirming his death sentence violated his rights under the Sixth, Eighth, and Fourteenth Amendments.[24] (Doc. 25 at 139.) On direct appeal, Cota argued that the supreme court's abuse of discretion standard of review, as set forth in A.R.S. §13-756(A), providing that "the supreme court shall review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death," violates the Eighth and Fourteenth Amendments. The court denied the claim. *Cota*, 272 P.3d at 1044. This decision was neither contrary to nor an unreasonable application of clearly established federal law, including *Clemons v. Mississippi*, 494 U.S. 738 (1990).

In upholding the constitutionality of § 13-756(A), the Arizona Supreme Court explained that, "Meaningful appellate review requires only that an appellate court 'consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed,' not whether the appellate court itself would have imposed a death sentence." *Cota*, 272 P.3d at 1044 (quoting *Clemons*, 494 U.S. at 749). The Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated. *See, e.g.*, *Garza v. Shinn*, No. CV-14-01901-PHX-SRB, 2021

---

[24] The parties disagree about the procedural status of Cota's allegation that his Sixth Amendment rights were violated. The Court need not address that issue as the claim is plainly meritless. 28 USC § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005).

WL 5850883, at *109 (D. Ariz. Dec. 9, 2021); *State v. Martinez*, 189 P.3d 348, 361 (Ariz. 2008).

In *Clemons* the Court explained that "[i]t is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases . . . to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed." *Id.* at 748–49. The Arizona Supreme Court reasonably determined that its abuse of discretion standard constituted meaningful appellate review under *Clemons*. Cota cites no authority for the contrary proposition. Claim 14 is denied.

**H.    Systemic Challenges to the Death Penalty**

Cota raises a number of challenges to Arizona's death penalty scheme and to capital punishment in general. Most of these clams were raised on direct appeal and summarily rejected by the Arizona Supreme Court, which pointed to its previous decisions denying each of the claims. *See Cota*, 272 P.3d at 1045–46. Cota argues that the court did not address the claims on the merits "but only presented the issues in its appendix," and therefore AEDPA deference does not apply. (*See, e.g.*, Doc. 25 at 202.) He is incorrect. In *Harrington v. Richter*, the United States Supreme Court held that, "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." 562 U.S. 86, 98 (2011) ("There is no merit to the assertion that compliance with § 2254(d) should be excused when state courts issue summary rulings. . . .").

**1.    Claim 30**

Cota alleges that Arizona's capital sentencing scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because it does not require the jury to find the facts necessary to impose death beyond a reasonable doubt. (Doc. 25 at 202.) The Arizona Supreme Court denied the claim on direct review. This decision was neither contrary to nor an unreasonable application of clearly-established federal law.

The Constitution does not require a death penalty statute to set forth specific standards for a capital sentencer to follow in its consideration of aggravating and mitigating

circumstances. *See Zant v. Stephens*, 462 U.S. 862, 875 n.13 (1983) (explaining that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"); *see also Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."). In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court explained:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

*Id.* at 175 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988)).

Thus, the Constitution does not require the capital sentencer to find that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. *See Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting claim based on failure to apply beyond a reasonable doubt standard at sentencing); *Williams v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995) ("[T]he failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional."); *McGill v. Ryan*, No. CV-12-01149-PHX-JJT, 2019 WL 160732, at *28 (D. Ariz. Jan. 10, 2019) ("There is no Supreme Court authority requiring a jury to be instructed on a burden of proof in the sentencing phase of a capital case."), *aff'd sub nom. McGill v. Shinn*, 16 F.4th 666 (9th Cir. 2021).

Cota argues that in *Hurst v. Florida*, 577 U.S. 92 (2016), the Supreme Court held that capital jurors must make their weighing determination—aggravating versus mitigating factors—beyond a reasonable doubt. (Doc. 25 at 202–08.) This argument fails.

First, *Hurst* was not clearly-established federal law at the time the Arizona Supreme Court reviewed Speer's death sentence. *See Underwood v. Royal*, 894 F.3d 1154, 1186 (10th Cir. 2018) ("*Hurst* post-dates the [Oklahoma Court of Criminal Appeal's] decision and thus cannot serve as clearly established federal law for purposes of our review under

1    AEDPA.") (citing *Greene v. Fisher*, 565 U.S. 34, 38 (2011)). As the Court announced in

2    *McKinney v. Arizona*, 140 S. Ct. 702, 708 (2020), *Hurst* does "not apply retroactively on

3    collateral review." *See Ybarra v. Filson*, 869 F.3d 1016, 1032–33 (9th Cir. 2017); *Speer v.*

4    *Thornell*, No. CV-16-04193-PHX-GMS, 2023 WL 2503733, at *81 (D. Ariz. Mar. 14,

5    2023).

6          Even if *Hurst* were clearly-established law for purposes of this claim, Cota would

7    not be entitled to relief. In *Hurst* the Court held that Florida's capital sentencing scheme

8    violated *Ring*, 536 U.S. 584. *Ring* invalidated Arizona's capital sentencing statute under

9    which a judge made the factual findings necessary to expose a defendant to a death

10   sentence. Under the Florida scheme, a jury rendered an advisory verdict while the judge

11   made the ultimate factual determinations necessary to sentence a defendant to death. *Hurst*,

12   577 U.S. at 98. The Court held that this procedure was invalid because it "does not require

13   the jury to make the critical findings necessary to impose the death penalty." *Id.* The *Hurst*

14   Court simply applied *Ring* to Florida's capital sentencing statutes.

15         Contrary to Cota's argument, *Hurst* does not hold that a jury is required to find

16   beyond a reasonable doubt that the aggravating factors outweigh the mitigating

17   circumstances. *Hurst* held only that Florida's scheme, in which the jury rendered an

18   advisory sentence but the judge made the findings regarding aggravating and mitigating

19   factors, violated the Sixth Amendment. *Id.* at 97.

20         *Hurst* simply did not address the process of weighing aggravating and mitigating

21   circumstances and "made no holding regarding [the] determination . . . that the mitigators

22   do not outweigh the aggravators." *United States v. Tsarnaev*, 968 F.3d 24, 88–89 (1st Cir.

23   2020), *reversed on other grounds,* 142 S. Ct. 1024 (2022). Again, the Supreme Court has

24   held that the sentencer may be given "unbridled discretion in determining whether the death

25   penalty should be imposed after it has found that the defendant is a member of the class

26   made eligible for that penalty." *Zant*, 462 U.S. at 875; *see Tuilaepa*, 512 U.S. at 979–80

27   *Franklin*, 487 U.S. at 179.

28

In *McKinney*, 140 S. Ct. at 707, the Court reiterated that "a jury must find the aggravating circumstance that makes the defendant death eligible." The Court explained, however, that "in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." Thus, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances." *Id.* at 708. If jury weighing is not required, there cannot be a standard for that weighing.

Claim 30 is denied.

**2.      Claim 31**

Cota alleges that the death penalty is categorically cruel and unusual punishment in violation of the Eighth Amendment. (Doc. 25 at 208.) He does not indicate how the Arizona Supreme Court's denial of this claim conflicts with or unreasonably applies clearly-established federal law. Supreme Court precedent holds that the death penalty does not constitute cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *see also Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and again reaffirmed that capital punishment is not per se unconstitutional."); *Roper*, 543 U.S. at 568–69 (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders); *see United States v. Aquart*, 912 F.3d 1, 50–51 (2d Cir. 2019). Claim 31 is denied.

**3.      Claim 32**

Cota alleges that Arizona's death penalty scheme violates his rights to equal protection and due process because it fails to require the jury to make specific findings of fact and conclusions of law that can be reviewed on appeal. (Doc. 25 at 211–12.) Cota cites no authority to support his claim that the sentencer court violates the federal constitution if it fails to make specific findings as to each proffered mitigating circumstance. To the contrary, the Ninth Circuit has held that "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the

state court did indeed consider all mitigating evidence offered by the defendant.'" *Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994). Claim 32 is denied.

### 4.      Claim 33

Cota alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found. (Doc. 25 at 213–14.) The Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable application of clearly established federal law.

Arizona's death penalty scheme allows certain, statutorily-defined aggravating factors to be considered in determining eligibility for the death penalty. For death to be an appropriate sentence, at least one aggravating factor must be found and the sentencer must determine that the mitigating circumstances do not warrant a lesser sentence. This scheme has been found constitutionally sufficient. *See Lewis v. Jeffers*, 497 U.S. 764, 774–77 (1990); *Walton v. Arizona*, 497 U.S. 639, 649–56 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584; *Woratzeck v. Stewart*, 97 F.3d 329, 334–35 (9th Cir. 1996); *Smith*, 140 F.3d at 1272. Claim 33 is denied.

### 5.      Claim 34

Cota alleges that the introduction of hearsay rebuttal testimony—namely, the victim impact statements of Noni Martinez and Victor Martinez Jr.—during the penalty phase violated his right to confrontation and cross-examination under the Sixth Amendment. (Doc. 25 at 214–15.) The Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable application of clearly-established federal law.

Cota's argument relies on *Crawford v. Washington*, 541 U.S. 36, 54–55 (2004), which held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The argument fails

because Sixth Amendment confrontation rights do not apply in sentencing proceedings. *See United States v. Littlesun*, 444 F.3d 1196, 1199 (9th Cir. 2006) ("*Crawford* does not expressly speak to sentencing. . . . *Crawford* speaks to trial testimony, not sentencing."); *see also, e.g.*, *United States v. Monteiro*, 417 F.3d 208, 215 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005); *United States v. Kirby*, 418 F.3d 621, 627–28 (6th Cir. 2005); *United States v. Fleck*, 413 F.3d 883, 894 (8th Cir. 2005); *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir. 2005). Claim 34 is denied.

### 6.    Claim 35

Cota alleges that the trial court's refusal to permit voir dire of prospective jurors regarding their views on specific aggravating factors and mitigating circumstances violated his rights under the Sixth and Fourteenth Amendments. (Doc. 25 at 215–17.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law. *Witherspoon*, *Witt*, and *Morgan* "do[ ] not compel a trial court to allow questions about how a potential juror would vote if given specific examples of aggravating or mitigating evidence." *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013); *see Richmond v. Polk*, 375 F.3d 309, 329–30 (4th Cir. 2004); *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999); *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998); *see also Smith v. Ryan*, No. CV-12-00318-PHX-PGR, 2014 WL 1247828, at *27 (D. Ariz. Mar. 24, 2014), *aff'd*, 823 F.3d 1270 (9th Cir. 2016). Claim 35 is denied.

### 7.    Claim 36

Cota alleges that Arizona's death penalty scheme is unconstitutional because it permits jurors "unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide a principled means to distinguish between those who live and die." (Doc. 25 at 217–18.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law.

1     "Although the Constitution requires that the states devise procedures to guide a

2     sentencer's discretion, the absence of specific standards instructing the sentencer how to

3     weigh the aggravating and mitigating factors does not render a death penalty statute

4     unconstitutional." *Ortiz v. Stewart*, 149 F.3d 923, 944 (9th Cir. 1998) (citing *Zant*, 462 U.S.

5     at 880), *overruling on other grounds recognized by Apelt v. Ryan*, 878 F.3d 800, 827 (9th

6     Cir. 2017)). Again, the Supreme Court has "never held that a specific method for balancing

7     mitigating and aggravating factors in a capital sentencing proceeding is constitutionally

8     required." *Franklin*, 487 U.S. at 179; *see Marsh*, 548 U.S. at 175; *Tuilaepa*, 512 U.S. at

9     979–80. Claim 36 is denied.

10          **8.     Claim 37**

11          Cota alleges that Arizona's death penalty scheme is unconstitutional because it fails

12    to require cumulative consideration of multiple mitigating circumstance and fails to require

13    that the jury make specific findings as to each mitigating circumstance. (Doc. 25 at 218–

14    20.) The Arizona Supreme Court denied the claim on direct review. Because the United

15    States Supreme Court has not prescribed a specific method for weighing aggravating and

16    mitigating factors, this decision was neither contrary to nor an unreasonable application of

17    clearly-established federal law. *See Zant*, 462 U.S. at 875; *Marsh*, 548 U.S. at 175.

18    *Tuilaepa*, 512 U.S. at 979–80. Claim 37 is therefore denied

19          **9.     Claim 38**

20          Cota alleges that Arizona's capital sentencing scheme is unconstitutional because it

21    limits full consideration of mitigation evidence by providing that a defendant must prove

22    mitigating circumstances by a preponderance of the evidence. (Doc. 25 at 220.) The

23    Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable

24    application of clearly-established federal law.

25          The Supreme Court has specifically rejected the argument that the Arizona statute

26    is unconstitutional because it imposes on defendants the burden of establishing, by a

27    preponderance of the evidence, the existence of mitigating circumstances sufficiently

28    substantial to call for leniency. *Walton*, 497 U.S. at 649–51. The Court has subsequently

reaffirmed that the reasoning in *Walton* still controls with respect to burdens of persuasion. *See Marsh*, 548 U.S. at 173 (holding that "a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances"). Once the government has properly carried its burden of establishing death eligibility, "it [does] not offend the Constitution to put the burden on [defendant] to prove any mitigating factor by a preponderance of the evidence." *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007) (citations omitted).

Claim 38 is denied.

**10.   Claim 39**

Cota alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not set forth objective standards to guide the jury in weighing aggravating factors against mitigating circumstances. (Doc. 25 at 220–21.) For the reasons already discussed, the Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. *See Tuilaepa*, 512 U.S. at 979–80 (a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision"); *Franklin*, 487 U.S. at 179; *Zant*, 462 U.S. at 875. Claim 39 is denied.

**11.   Claim 40**

Cota alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor "unbridled discretion" to seek the death penalty. (Doc. 25 at 221–22.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law.

The Supreme Court has held that prosecutors have wide discretion in making the decision whether to seek the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987); *Gregg*, 428 U.S. at 199 (holding that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith* the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can

1   decide whether to seek the death penalty." 140 F.3d at 1272; *see, e.g.*, *Speer v. Thornell*,

2   No. CV-16-04193-PHX-GMS, 2023 WL 2503733, at *85 (D. Ariz. Mar. 14, 2023). Claim

3   40 is denied.

4        **12.   Claim 41**

5        Cota alleges that Arizona's capital sentencing scheme violates the Fifth, Eighth, and

6   Fourteenth Amendments because it denies capital defendants "the benefit of

7   proportionality review of their sentences." (Doc. 25 at 222–23.)

8        There is no federal constitutional right to proportionality review of a death sentence.

9   *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *see Allen v.*

10   *Woodford*, 395 F.3d 979 1018–19 (9th Cir. 2005). The Ninth Circuit has explained that the

11   "substantive right to be free from a disproportionate sentence" is protected by the

12   application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97

13   F.3d 1246, 1252 (9th Cir. 1996); *see, e.g.*, *Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016

14   WL 1045355, at *47 (D. Ariz. Mar. 16, 2016*), aff'd*, 932 F.3d 789 (9th Cir. 2019).

15        The Arizona Supreme Court's denial of this claim was neither contrary to nor an

16   unreasonable application of clearly-established federal law. Claim 41 is denied.

17        **13.   Claim 42**

18        Cota alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

19   Amendments were violated because the indictment did not include a finding of probable

20   cause with respect to the aggravating circumstances. (Doc. 25 at 223–24.)

21        The Arizona Supreme Court's denial of this claim was neither contrary to nor an

22   unreasonable application of clearly established federal law. The Supreme Court has held

23   that facts constituting the elements of an offense must be charged in a federal indictment.

24   *See Jones v. United States*, 526 U.S. 227, 251–52 (1999). However, the Fifth Amendment

25   Due Process Clause does not incorporate the same requirements into state criminal

26   prosecutions by virtue of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S.

27   516, 538 (1884); *see also Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Because

28   states are not required by the Constitution to empanel grand juries for purposes of

indictment, they are not required to specify aggravating factors in an indictment. *See, e.g., Moeller v. Weber*, 635 F. Supp. 2d 1036, 1063 (D.S.D. 2009), *order amended on denial of reconsideration*, No. CIV. 04-4200, 2010 WL 9519011 (D.S.D. Apr. 9, 2010), *aff'd*, 649 F.3d 839 (8th Cir. 2011); *Dixon*, 2016 WL 1045355, at *48. Claim 42 is therefore denied.

### 14.     Claim 43

Cota alleges that the reasonable doubt instruction used in the guilt and aggravation phases of his trial "diluted and shifted the burden of proof" and deprived him of his rights under the Sixth and Fourteenth Amendments. (Doc. 225–26.) The Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable application of clearly-established federal law.

The trial court provided the following instruction on reasonable doubt:

> The State has the burden of proving the defendant guilty beyond a reasonable doubt. This means the State must prove each element of the charges beyond a reasonable doubt.

> In civil cases, it is only necessary to prove that a fact is more likely true than no[t] or that its truth is highly probable. In criminal cases such as this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find the defendant guilty. If, on the other hand, you think there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and find him not guilty.

(RT 7/7/09 at 14–15; *see also* RT 7/21/09 at 55–56).

Cota argues that the instruction "lowers the state's burden of proof to a clear and convincing standard, shifts the burden of proof to the defendant, and misinforms the jury that the state need not overcome every doubt." (Doc. 25 at 226.)

"The beyond a reasonable doubt standard is a requirement of due process, but the

1   Constitution neither prohibits trial courts from defining reasonable doubt nor requires them

2   to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). As long as the

3   jury is instructed that the defendant must be found guilty beyond a reasonable doubt, "the

4   Constitution does not require that any particular form of words be used in advising the jury

5   of the government's burden of proof. Rather, taken as a whole, the instructions must

6   correctly convey the concept of reasonable doubt to the jury." *Id.*

7        The instruction provided by the trial court, which was consistent with Arizona law,

8   *see State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), is based on the pattern

9   instruction adopted by the Federal Judicial Center.

10        *See State v. Van Adams*, 194 Ariz. 408, 417–18, 984 P.2d 16, 25–26 (1999). Cota

11   cites no authority holding that it impermissibly lowers the burden of proof, and, in *Victor*,

12   Justice Ginsburg praised the instruction as "clear, straightforward, and accurate." 511 U.S.

13   at 26 (Ginsburg, J., concurring). The Ninth Circuit has upheld identical or substantially

14   similar instructions. *See, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257–59 (9th Cir.

15   1997); *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992); *see also Harris v.*

16   *Bowersox*, 184 F.3d 744, 751–52 (8th Cir. 1999). Claim 43 is denied.

17        **15.    Claim 44**

18        Cota alleges that Arizona's capital sentencing scheme violates the Eighth and

19   Fourteenth Amendments because it creates a presumption of a sentence of death and

20   requires a defendant to affirmatively prove that the sentencer should spare his life. (Doc.

21   25 at 227.) The Arizona Supreme Court's denial of the claim was neither contrary to nor

22   an unreasonable application of clearly-established federal law. The United States Supreme

23   Court has rejected the claim that Arizona's death penalty statute is impermissibly

24   mandatory and creates a presumption in favor of the death penalty. *Walton*, 497 U.S. at

25   651–52; *see Smith*, 140 F.3d at 1272. Claim 44 is denied.

26        **16.    Claim 45**

27        Cota alleges that the trial court's failure to require special verdict forms for the jury

28   to indicate its specific findings on the mitigating circumstances violated his rights under

1    the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 25 at 227–29.) The Arizona

2    Supreme Court denied the claim. Its ruling was neither contrary to nor an unreasonable

3    application of clearly-established federal law.

4         The Constitution does not require a capital sentencer to document its analysis of

5    mitigating circumstances, as long as the sentencer considers all of the evidence. *See Jeffries*

6    *v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the

7    sentencer exhaustively document its analysis of each mitigating factor as long as a

8    reviewing federal court can discern from the record that the state court did indeed consider

9    all mitigating evidence offered by the defendant") (citing *Parker*, 498 U.S. at 314–19; *see*

10   *also Jeffers*, 38 F.3d at 418 (explaining that a defendant is not "entitled to a specific listing

11   and discussion of each piece of mitigating evidence under federal constitutional law");

12   *Speer*, 2023 WL 2503733, at *76.

13        The trial court instructed the jury in Cota's case to consider all mitigating evidence.

14   (*See* RT 7/23/09 at 7–13.) There was no constitutional violation. Claim 45 is denied.

15        **17.    Claim 46**

16        Cota alleges that the instruction requiring the jury to unanimously determine that

17   the mitigating circumstances were "sufficiently substantial to call for leniency" violated

18   the Eighth Amendment. (Doc. 25 at 229–31.) The Arizona Supreme Court denied the

19   claim, relying on *State v. Ellison*, 140 P.3d 899 (Ariz. 2006).

20        In *Ellison* the court cited *McKoy v. North Carolina*, 494 U.S. 433 (1990), and *Mills*

21   *v. Maryland*, 486 U.S. 367 (1988). *Ellison*, 140 P.3d at 922. In *Mills* the Supreme Court

22   reversed a decision upholding a capital sentence because jurors viewing the instructions

23   and verdict form "well may have thought they were precluded from considering any

24   mitigating evidence unless all 12 jurors agreed on the existence of a particular such

25   circumstance." 486 U.S. at 284. In *McKoy* the Court reversed a death sentence where "the

26   instructions and verdict form expressly limited the jury's consideration to mitigating

27   circumstances unanimously found." 494 U.S. at 444 n.8.

28

Cota's argument that Arizona's unanimity requirement impermissibly limited the jury's consideration of mitigating evidence fails because unanimity was not required with respect to individual mitigating circumstances. *See Smith v. Spisak*, 558 U.S. 139, 148 (2010) (finding no violation of *Mills* and *McKoy* where "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously"). In Cota's case, the jury was properly instructed that unanimity was required only with respect to the verdict:

> While all 12 of you have to unanimously agree that the State proved beyond a reasonable doubt the existence of a statutory aggravating circumstance, you do not need to unanimously agree on a particular mitigating circumstance. Each one of you must decide individually whether any mitigating circumstance exists.

(RT 7/23/09 at 14.)

Cota also suggests that the Supreme Court in *Marsh* found Arizona's capital sentencing scheme to be constitutionally suspect. (Doc. 25 at 230.) To the contrary, the Court found that the reasoning in *Walton* controlled its analysis of Kansas's death penalty statute, and *Walton* upheld the allocation of burdens in Arizona's death penalty scheme. *Marsh*, 548 U.S. at 172–73, 177.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law. Claim 46 is denied.

**18.    Claim 47**

Cota alleges that the trial court's failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth, and Fourteenth Amendments. (Doc. 25 at 231–33.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law. The Supreme Court has never held that such an instruction is required to narrow the class of defendants eligible for the death penalty, which instead is accomplished through the use of statutory aggravating factors. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56; *Blystone*, 494 U.S. at 306–07; *see also State v. Bocharski*, 189 P.3d 403, 415

(Ariz. 2008) (explaining that the class of persons to whom the death penalty applies was narrowed by the jury's finding of two aggravating factors, "making an above the norm instruction unnecessary"); *Garcia*, 2022 WL 1166408, at *47. Claim 47 is denied.

### 19. Claim 48

Cota alleges that the refusal to permit him to argue or the jury to consider whether his death sentence would be proportional to other similarly situated defendants violated his rights under the Eighth and Fourteenth Amendments. (Doc. 25 at 233–35.) As already noted, there is no federal constitutional right to proportionality review of a death sentence. *McCleskey*, 481 U.S. at 306; *see Allen*, 395 F.3d at 1018–19; *Ceja*, 97 F.3d at 1252. The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law. Claim 48 is denied.

### 20. Claim 49

Cota alleges that the trial court's refusal to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated his rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 235–37.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly-established federal law.

"[T]he United States Supreme Court has expressly rejected the assertion that a capital defendant has a federal constitutional right to produce evidence of residual doubt at sentencing." *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1021 (D. Ariz. 2007) (citing *Oregon v. Guzek*, 546 U.S. 517, 523–25 (2006)); *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 250–51 (2007) ("[W]e have never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing."); *Franklin*, 487 U.S. at 174 (suggesting there is no constitutional right to present evidence of "residual doubt" because "[s]uch lingering doubts are not over any aspect of petitioner's character, record, or a circumstance of the offense") (quotation omitted); *see also Holland v. Anderson*, 583 F.3d 267, 283 (5th Cir. 2009) (explaining that the Supreme Court "has not recognized a constitutional right to argue 'residual doubt' at sentencing," so the state court's decision

1  precluding such evidence was neither contrary to nor an unreasonable application of clearly
2  established federal law). Claim 49 is denied.

3  **21.  Claim 50**

4  Cota alleges that the trial court's failure to instruct the jury that the State bore the
5  burden of proving its rebuttal to mitigation evidence beyond a reasonable doubt violated
6  his rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 25 at 237–40.) The
7  Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable
8  application of clearly-established federal law. Again, the Supreme Court has never set
9  specific standards or methods for balancing aggravating and mitigating factors once the
10 defendant has been found eligible for the death penalty. *See Marsh*, 548 U.S. at 173,
11 175; *Franklin*, 487 U.S. at 179; *Stephens*, 462 U.S. at 875 n.13. Claim 50 is denied.

12 **22.  Claim 51**

13 Cota alleges that the death penalty violates human rights and international law and
14 thereby violates his Eighth Amendment rights. (Doc. 25 at 240–42.) The Arizona Supreme
15 Court denied this claim on direct appeal. This decision was neither contrary to nor an
16 unreasonable application of clearly-established federal law.

17 Cota cites no Supreme Court precedent holding that capital punishment is illegal in
18 this country based on international law. In fact, "such challenges to imposition of the death
19 penalty have been repeatedly rejected." *Catlin v. Davis*, No. 107CV01466LJOSAB, 2019
20 WL 6885017, at *230 (E.D. Cal. Dec. 17, 2019); *see Carter v. Chappell*, 2013 WL 781910,
21 (C.D. Cal. Mar. 1, 2013) ("Clearly established federal law does not hold the death penalty
22 to violate international law or the federal Constitution."); *Rowland v. Chappell*, 902 F.
23 Supp. 2d 1296, 1339 (N.D. Cal. 2012) ("Petitioner cannot demonstrate that any claim of a
24 violation of international law is even cognizable on federal habeas review, given that such
25 review is designed to address claims that a Petitioner is in custody in violation of the
26 Constitution or laws or treaties of the United States."). In *Coleman v. Mitchell*, 268 F.3d
27 417 (6th Cir. 2001), the Sixth Circuit explained that "the claim that international law
28 completely bars this nation's use of the death penalty is unsupportable since the United

States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *Id.* at 443 n.12; *see Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (holding that the Vienna Convention did not create individual judicially enforceable rights); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004) (holding that the UN Charter, Universal Declaration of Human Rights, and International Convention on Civil and Political Rights do not create obligations enforceable in federal court).

Claim 51 is denied.

### 23.   Claim 52

Cota alleges that execution by lethal injection is cruel and unusual punishment. (Doc. 25 at 242.) The Arizona Supreme Court denied Cota's claim that lethal injection per se constituted cruel and unusual punishment. *Cota*, 272 P.3d at 1045. The ruling was not contrary to or an unreasonable applications of clearly-established federal law. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008) ("This Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."). Neither the United State Supreme Court nor the Ninth Circuit has concluded that Arizona's lethal injection protocols violate the Eighth Amendment. *See Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

In his habeas petition, Cota's allegations focus on Arizona's lethal injection protocols and history. (Doc. 25 at 242–50.) Those protocols are no longer in place. *Cf. Guardian News & Media LLC v. Ryan*, No. CV-14-02363-PHX-GMS, 2017 WL 4180324, at *2 (D. Ariz. Sept. 21, 2017) (noting current execution protocol, set forth in Department Order 710, provides that ADC will use either pentobarbital or sodium pentothal as the execution drug). Cota may challenge that protocol in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573, 579–80, (2006) (recognizing that a challenge to the State's execution method may be brought in a § 1983 action); *Nance v. Ward*, 142 S. Ct. 2214, 2223 (2022). Claim 52 is denied.

**J.     Clemency**

**Claim 53**

Cota alleges that he will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. (Doc. 25 at 250–51.) This claim is not cognizable on federal habeas review. Habeas relief may only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Cota's challenge to state clemency procedures and proceedings does not represent an attack on his detention and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997). Claim 53 is denied.

**K.     Cumulative Prejudice**

**Claim 54**

Finally, Cota argues that his conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in his case. (Doc. 25 at 251–53.) This claim is meritless.

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.,* 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law").

The Ninth Circuit has held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may nonetheless prejudice a defendant to such a degree that his conviction must be overturned. *See Mancuso*, 292 F.3d at 957. But here, the Court has not identified any constitutional errors arising during Cota's trial. Therefore, "[b]ecause there is no single constitutional

1   error in this case, there is nothing to accumulate to [the] level of a constitutional violation."

2   *Id.*; *see Boyde*, 404 F.3d at 1176; *Morris*, 677 F.3d at 1132 & n.3. "If there are no errors,

3   there is no need to consider their cumulative effect." *McGill*, 16 F.4th at 685.

4         Because Supreme Court precedent does not recognize the doctrine of cumulative

5   error, and since this Court has determined that no prejudice resulted from the errors alleged

6   by Cota, the claim of cumulative prejudice is meritless. Claim 54 is denied.

7   ### IV.    EVIDENTIARY DEVELOPMENT

8         Cota requests evidentiary development with respect to Claims 1, 5, 6, 9, 11, 23, 24,

9   25, and 29. (Doc. 47.) He seeks discovery, an evidentiary hearing, and expansion of the

10  record under Rules 6, 7, and 8 of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

11  (*Id.*)

12  **A.**    **Exhausted Claims**

13        Claims 1 and 9, alleging ineffective assistance of trial counsel, were, in part, raised

14  and denied on the merits in state court, as were Claims 6, alleging a *Miranda* violation, and

15  11, alleging that Cota's rights were violated when the trial court did not investigate whether

16  a juror was sleeping. As set forth above, this Court found that the PCR court's denial of

17  the claims was not unreasonable under 28 U.S.C. § 2254(d).

18        Because they did not satisfy § 2254(d)(1) or (2) based on the state court record, the

19  Court is precluded from considering new evidence in support of the claims. *Pinholster*, 563

20  U.S. at 181; *Gulbrandson*, 738 F.3d at 993–94 & n.6.

21  **B.**    **Unexhausted Claims**

22        The remaining claims for which Cota seeks evidentiary development were not

23  presented in state court.[25] Therefore, the Court's "'discretion . . . to consider new evidence'

24  . . . is . . . cabined by the requirement in § 2254(e)(2) that the petitioner must have attempted

25  'to develop the factual basis of [the] claim in State court.'" *Stokley v. Ryan*, 659 F.3d 802,

26  808 (9th Cir. 2011) (quoting *Pinholster*, 563 U.S. at 186).

27

28  ---

[25] The Court also found Claims 23, alleging ineffective assistance of PCR counsel, and 29, arguing that the Court must re-evaluate Cota's death sentence, non-cognizable.

1    Under § 2254(e)(2), a federal court may not hold an evidentiary hearing unless it
2  first determines that the petitioner exercised diligence in trying to develop the factual basis
3  of the claim in state court. *See Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). If
4  the failure to develop a claim's factual basis is attributable to the petitioner, the court may
5  hold a hearing only if the claim relies on (1) "a new rule of constitutional law, made
6  retroactive to cases on collateral review by the Supreme Court, that was previously
7  unavailable" or (2) "a factual predicate that could not have been previously discovered
8  through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). In addition, "the facts
9  underlying the claim [must] be sufficient to establish by clear and convincing evidence that
10 but for constitutional error, no reasonable fact finder would have found the [petitioner]
11 guilty of the underlying offense." *Id.*

12   Section 2254(e)(2) limits a petitioner's ability to present new evidence through a
13 Rule 7 motion to the same extent that it limits the availability of an evidentiary hearing.
14 *See Cooper–Smith*, 397 F.3d 1236, 1241 (9th Cir. 2005), *overruled on other grounds by*
15 *Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016); *Holland v. Jackson*, 542 U.S. 649, 652–
16 53 (2004) (per curiam). Accordingly, a petitioner who seeks to introduce new affidavits
17 and other documents never presented in state court must demonstrate diligence in
18 developing the factual basis in state court or satisfy the requirements of § 2254(e)(2).

19   Cota contends that the failure to develop the factual basis of these claims resulted
20 from the ineffective assistance of PCR counsel. (*See, e.g.*, Doc. 47 at 15.) This argument
21 is foreclosed by the Supreme Court's recent decision in *Ramirez*, which held that "under §
22 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise
23 consider evidence beyond the state-court record based on ineffective assistance of state
24 postconviction counsel." *Ramirez*, 142 S. Ct. at 1734. According to *Ramirez*, a petitioner
25 is at fault when PCR counsel is negligent in developing the record, and therefore "a federal
26 court may order an evidentiary or otherwise expand the state-court record only if the
27 prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 1735.

28

1    Cota does not attempt to meet those requirements. The claims for which he seeks
2    evidentiary development do not rely on a new, retroactive rule of constitutional law. Nor
3    do they rely on a factual predicate that could not have been discovered previously through
4    due diligence. The evidence Cota seeks to develop, consisting largely of additional
5    information from mental health experts and family members, existed at the time of the state
6    court proceedings, so there is no new factual predicate under § 2254(e)(2).
7        Cota is not entitled to evidentiary development.

## V.    CERTIFICATE OF APPEALABILITY

9        Under Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot
10   take an appeal unless a certificate of appealability ("COA") has been issued by an
11   appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases
12   provides that the district judge must either issue or deny a certificate of appealability when
13   it enters a final order adverse to the applicant. If a certificate is issued, the court must state
14   the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

15       Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner
16   "has made a substantial showing of the denial of a constitutional right." This showing can
17   be established by demonstrating that "reasonable jurists could debate whether (or, for that
18   matter, agree that) the petition should have been resolved in a different manner" or that the
19   issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at
20   484 (quoting *Barefoot*, 463 U.S. at 893 & n.4). For procedural rulings, a certificate of
21   appealability will issue only if reasonable jurists could debate whether the petition states a
22   valid claim of the denial of a constitutional right and whether the court's procedural ruling
23   was correct. *Id.*

24       The Court finds that reasonable jurists could debate its resolution of Claim 1(A),
25   alleging trial counsel performed ineffectively by failing to present "readily available and
26   compelling" mitigating evidence, and Claim 2, alleging that Cota's due process rights were
27   violated when the jury was incorrectly instructed that he could be eligible for parole and

28

1   when the trial court refused to permit Cota to present evidence of his ineligibility for future
2   release.

3                                   **VI.    CONCLUSION**

4          The Court has considered Cota's claims and determined that none establish that he
5   is entitled to habeas relief.

6          Based on the foregoing,

7          **IT IS HEREBY ORDERED denying** Cota's Petition for Writ of Habeas Corpus
8   (Doc. 25). The Clerk of Court shall enter judgment accordingly.

9          **IT IS FURTHER ORDERED** denying Cota's request for evidentiary
10  development. (Doc. 47.)

11         **IT IS FURTHER ORDERED granting** a certificate of appealability with respect
12  to Claims 1 and Claim 2.

13         **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of
14  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ
15  85007-3329.

16         Dated this 18th day of July, 2023.

17
18
19                                        _____
20                                        Honorable Diane J. Humetewa
                                          United States District Judge
21
22
23
24
25
26
27
28